JOEY D. GONZALEZ RAMOS  V. ADR VANTAGE, INC.  EXHIBIT INDEX

1.   EXHIBIT 1- PROPOSAL

2.   EXHIBIT 2-PROPOSAL BY ADR 11/18/2016

3.   EXHIBIT 3- ADR REPORT

4.   AFFIDAVIT OF DIANE LIPSEY

5.   ADR ORDER GRANTING MOTION TO DISMISS 05/04/2018

JOEY D. GONZALEZ RAMOS  V. ADR VANTAGE, INC.

EXHIBIT 1

PROPOSAL

| | | | PAGE | OF | PAGES |
|---|---|---|---|---|---|
| | | | 1 | | 4 |

**IMPORTANT:** Mark all packages and papers with contract or order numbers.

| 1. DATE OF ORDER | 2. CONTRACT NO. *(If any)* | 6. SHIP TO: |
|---|---|---|
| 11/22/2016 | GS-22F-8074H | |

| 3. ORDER NO. | 4. REQUISITION/REFERENCE NO. | a. NAME OF CONSIGNEE |
|---|---|---|
| AG-32SB-D-17-0014 | 833421 | USDA ARS AFM DEPUTY ADMINISTRATOR F |

**5. ISSUING OFFICE** *(Address correspondence to)*
National Capital Region Business Se
National Capital Region Business Se
5601 Sunnyside Avenue
Mail Stop 5108
BELTSVILLE MD 20705

**b. STREET ADDRESS**
5601 SUNNYSIDE AVENUE
ROOM 3-2163

| c. CITY | d. STATE | e. ZIP CODE |
|---|---|---|
| BELTSVILLE | MD | 20705-5109 |

**7. TO:**

**a. NAME OF CONTRACTOR**
ADR VANTAGE INC

**f. SHIP VIA**

**b. COMPANY NAME**

**c. STREET ADDRESS**
1660 L ST NW STE 302

1100605158#

**8. TYPE OF ORDER**

☐ a. PURCHASE

REFERENCE YOUR:
PROPOSAL

Please furnish the following on the terms and conditions specified on both sides of this order and on the attached sheet, if any, including delivery as indicated.

☒ b. DELIVERY

Except for billing instructions on the reverse, this delivery order is subject to instructions contained on this side only of this form and is issued subject to the terms and conditions of the above-numbered contract.

| d. CITY | e. STATE | f. ZIP CODE |
|---|---|---|
| WASHINGTON | DC | 20036-5641 |

**9. ACCOUNTING AND APPROPRIATION DATA**
AR00.17.......7010301910.2540...

**10. REQUISITIONING OFFICE**
IAS

**11. BUSINESS CLASSIFICATION** *(Check appropriate box(es))*

☐ a. SMALL  ☒ b. OTHER THAN SMALL  ☐ c. DISADVANTAGED  ☒ d. WOMEN-OWNED  ☐ e. HUBZone

☐ f. SERVICE-DISABLED VETERAN-OWNED  ☒ g. WOMEN-OWNED SMALL BUSINESS (WOSB) ELIGIBLE UNDER THE WOSB PROGRAM  ☒ h. EDWOSB

**12. F.O.B. POINT**
Destination

| 13. PLACE OF | | 14. GOVERNMENT B/L NO. | 15. DELIVER TO F.O.B. POINT ON OR BEFORE *(Date)* | 16. DISCOUNT TERMS |
|---|---|---|---|---|
| a. INSPECTION Destination | b. ACCEPTANCE | | 01/13/2017 | |

**17. SCHEDULE** *(See reverse for Rejections)*

| ITEM NO. (a) | SUPPLIES OR SERVICES (b) | QUANTITY ORDERED (c) | UNIT (d) | UNIT PRICE (e) | AMOUNT (f) | QUANTITY ACCEPTED (g) |
|---|---|---|---|---|---|---|
| | Tax ID Number: 52-1837305 DUNS Number: 848843488 Organizational Climate Assessment of the USDA, ARS, Subtropical Horticulture Research Station (SHRS) in accordance with the Statement of Work. Continued ... | | | | | |

| 18. SHIPPING POINT | 19. GROSS SHIPPING WEIGHT | 20. INVOICE NO. | | 17(h) TOTAL *(Cont. pages)* ◄ |
|---|---|---|---|---|

**21. MAIL INVOICE TO:**

**SEE BILLING INSTRUCTIONS ON REVERSE**

| a. NAME | Invoice Processing Platform (IPP) | $28,794.91 |
|---|---|---|
| b. STREET ADDRESS (or P.O. Box) | All invoices must be submitted electronically through the Invoice Processing Platform (IPP) via www ipp gov | |
| c. CITY | d. STATE | e. ZIP CODE |

**17(i) GRAND TOTAL** $28,794.91 ◄

| 22. UNITED STATES OF AMERICA BY *(Signature)* | 11/22/2016 ► *Molly Jackson* | 23. NAME *(Typed)* MOLLY JACKSON TITLE: CONTRACTING/ORDERING OFFICER |
|---|---|---|

AUTHORIZED FOR LOCAL REPRODUCTION
PREVIOUS EDITION NOT USABLE

OPTIONAL FORM 347 *(Rev. 2/2012)*
Prescribed by GSA/FAR 48 CFR 53.213(f)

**IMPORTANT:** Mark all packages and papers with contract and/or order numbers.

| DATE OF ORDER | CONTRACT NO. | | ORDER NO. |
|---|---|---|---|
| 11/22/2016 | GS-22F-8074H | | AG-32SB-D-17-0014 |

| ITEM NO.<br>(a) | SUPPLIES/SERVICES<br>(b) | QUANTITY<br>ORDERED<br>(c) | UNIT<br>(d) | UNIT<br>PRICE<br>(e) | AMOUNT<br>(f) | QUANTITY<br>ACCEPTED<br>(g) |
|---|---|---|---|---|---|---|
| | Admin Office:<br>    National Capital Region Business Se<br>    National Capital Region Business Se<br>    5601 Sunnyside Avenue<br>    Mail Stop 5108<br>    BELTSVILLE MD 20705<br>Agency Code: AR00 Budget Yr Start: 17 SHC:<br>7010301910 BOC: 2540<br>Period of Performance: 11/25/2016 to<br>01/13/2017 | | | | | |
| 001 | Organizational Climate Assessment of the<br>USDA, ARS, Subtropical Horticulture<br>Research Station (SHRS) in accordance with<br>the Statement of Work.<br><br><br>The total amount of award: $28,794.91. The<br>obligation for this award is shown in box<br>17(i). | | | | 28,794.91 | |
| | TOTAL CARRIED FORWARD TO 1ST PAGE (ITEM 17(H)) | ▷ | | | $28,794.91 | |

OPTIONAL FORM 348 (Rev. 4/2006)
Prescribed by GSA FAR (48 CFR) 53 213(f)

JOEY D. GONZALEZ RAMOS  V. ADR VANTAGE, INC.

EXHIBIT 2

PROPOSAL BY ADR 11/18/2016

## PART I – CONTRACT ADMINISTRATION DATA

1. **Title**: Organizational Climate Assessment

2. **Contract Points of Contact (POC):**

   a. **The Contractor point of contact is: <u>Shayne Julius</u>**
   
   | | |
   |---|---|
   | Address: | ADR Vantage, Inc. |
   | | 1660 L Street NW, Ste. 302 |
   | | Washington, DC 20036 |
   | Email: | sjulius@adrvantage.com |
   | Phone: | (202) 296-2328, ext. 102 |

   b. **The Government points of contact are as follows:**

   i. **Contracting Officer (CO) and Contract Specialist (CS): <u>Molly Jackson</u>**
   
   | | |
   |---|---|
   | Address: | USDA, ARS, NCRBSC, ACQUISITION |
   | | 2150 Centre Ave, Bldg. D, Ste. 310 |
   | | Fort Collins, CO 80526 |
   | Email: | Molly.Jackson@ars.usda.gov |
   | Phone: | (970) 492-7006 |

   ii. **Technical Points of Contact: <u>Chevon Gibson</u>**
   
   | | |
   |---|---|
   | Address: | USDA, ARS, AFM, DAAFM |
   | | 5601 Sunnyside Ave. |
   | | Beltsville, MD 20705 |
   | Email: | Chevon.Gibson@ars.usda.gov |
   | Phone: | (202) 720-0868 |

3. **NAICS for this procurement is**: 541612 – Human Resources Consulting Services – Size Standard is $15.0M

4. **Period of Performance**: Nov. 25, 2016 – Jan. 13, 2017

5. **Assessment Location:**
   USDA, ARS, Subtropical Horticulture Research Station
   13601 Old Cutler Road
   Miami, FL 33158

6. **Invoices**: To invoice, a vendor must first enroll in the Invoice Processing Platform (IPP) by visiting https://www.ipp.gov/vendors/index.htm. Once enrolled, all invoices must be submitted electronically through IPP. The IPP is a government-wide secure web-based payment information service offered free of charge to government agencies and their suppliers by the U.S. Department of Treasury's Financial Management Service (FMS).

   One-time enrollment in IPP means that you will receive a series of e-mails from Treasury services. The first email will have the IPP Logon ID and link to the IPP application. A second e-mail, containing the password will be sent within 24 hours. Once you receive these emails, please login to the IPP application and complete the registration process.

   Benefits of registering with IPP include the ability for your company to create invoices directly from a contract award and submit them electronically, as well as:
   * E-mail notification when invoice(s) are paid
   * Online payment history
   * Remittance download

   E-mail notifications of payments are sent when a payment is distributed to your bank account and will include all pertinent payment information. The IPP Customer Support Desk is available to assist users Monday through Friday (excluding bank holidays) from 8:00AM - 6:00PM ET, including answering any questions related to accessing IPP or completing the registration process. Their toll-free number is (866) 973-3131 or they can be reached at: IPPCustomerSupport@fms.treas.gov.

7. **Non-Excepted Activity**: Work under this contract has been determined **NOT TO BE** an **Excepted Activity** in the absence of an appropriation or CR. Activities under this contract do not support the preservation and protection of life and property and do not support law enforcement, health and safety functions. In the event of shutdown, you will be notified by the cognizant contracting

officer (CO) of the Government status and directed to suspend performance/stop work under this contract. For details on the procedures, see Federal Acquisition Regulation (FAR) Clause 52.242-14, Suspension of Work or FAR Clause 52.242-15, Stop Work Order, as included in this contract.

## PART II - CONTRACT TERMS AND CONDITIONS

### 52.252-2 -- Clauses Incorporated by Reference (Feb 1998)

This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available. Also, the full text of a clause may be accessed electronically at this/these address(es):

FAR:    http://farsite.hill.af.mil/vffara.htm
AGAR:   http://farsite.hill.af.mil/VFagara.HTM

| Clause | Title | Date |
|--------|-------|------|
| 52.212-4 | Contract Terms and Conditions – Commercial Items | May. 2015 |
| 52.223-2 | Affirmative Procurement of Biobased Products Under Service and Construction Contracts | Sept. 2013 |
| 52.232-39 | Unenforceability of Unauthorized Obligations | Jun. 2013 |
| 52.232-40 | Providing Accelerated Payments to Small Business Subcontractors | Dec. 2013 |
| 52.242-15 | Stop-Work Order | Aug. 1989 |

(End of Clause)

### 452.211-72 – Statement of Work/Specifications (Feb 1988)

The Contractor shall furnish the necessary personnel, material, equipment, services and facilities (except as otherwise specified), to perform the Statement of Work/Specifications referenced in Section J.

(End of Clause)

### 452.246-70 – Inspection and Acceptance (Feb 1988)

(a) The Contracting Officer or the Contracting Officer's duly authorized representative will inspect and accept the supplies and/or services to be provided under this contract.

(b) Inspection and acceptance will be performed at:
    USDA, ARS, Subtropical Horticulture Research Station
    13601 Old Cutler Road
    Miami, FL 33158

(End of Clause)

## SECTION J: LIST OF ATTACHMENTS

| Attachment No. | Description |
|----------------|-------------|
| 1 | Statement of Work |
| 2 | Proposal |

# Subtropical Horticulture Research Station Organizational Climate Assessment Statement of Work

Administrative & Financial Management
Agricultural Research Service
United States Department of Agriculture

## I. Background:

The United States Department of Agriculture (USDA), Agricultural Research Service (ARS), conducts research to develop and transfer solutions to agricultural problems of high national priority and provide information access and dissemination to:

- ensure high-quality, safe food, and other agricultural products;
- assess the nutritional needs of Americans;
- sustain a competitive agricultural economy;
- enhance the natural resource base and the environment and provide economic opportunities for rural citizens, communities, and society as a whole.

ARS is comprised of Headquarters Staff Offices, Field Operations divided into geographic areas and locations, and Administrative and Financial Management (AFM).

The work outlined in this statement of work is being requested to support the agency in conducting a comprehensive employee climate assessment of the Subtropical Horticulture Research Station (SHRS), which is located in Miami, Florida. The SHRS is responsible for supporting the agricultural industries in the southern areas of the United States by providing environmentally sound research on: (1) the genetics of tropical and subtropical fruit and ornamental crops; (2) the interdiction and control/eradication of exotic plant insect pests. Additionally, it's worthy to note that some employees at the location are represented by the National Federation of Federal Employees, Local Chapter 1752.

## II. Purpose and Scope:

The purpose of this contract is for the ARS to obtain consultative support in conducting a thorough employee climate assessment of the SHRS. This assessment will require the vendor to conduct roughly 40 interviews of persons located in Miami, Florida and/or the Washington metropolitan area.

## III. Requirements:

The Contractors shall conduct the following type of support in this assessment:

1. **Organizational Climate Assessment**
   a. Conduct candid interviews of all employees in Miami and employees outside of the Miami, as determined
   b. Offer alternative mechanisms for sharing feedback, such as, methods that protect anonymity, as well as, accommodation for employees unable to interview in person

    c.  Ensure interviews capture information on Employee Relation and Labor Relation issues at the location to assist with understanding the history and background of climate issues

    d.  Identify the role of the Union at the Miami location

    e.  Provide an objective analysis on the challenges at the Miami location, specifically address concerns of hostile work environment

    f.  Develop and provide recommendations on ways to improve/resolve the challenges

    g.  Provide a report that is specific as to the challenges that can be relied upon for further action by the Agency.

## IV. Period of Performance

November 25, 2016 – January 13, 2017

## V. Location

USDA, ARS, Subtropical Horticulture Research Station
13601 Old Cutler Road
Miami, FL 33158

## VI. Mandatory Staff Requirements:

The contractor's staff must possess the following qualifications in order to be acceptable to perform the work of this project:

    i.  Knowledge and understanding of Federal employee & labor relations, employee misconduct and EEO;

    j.  Experience in conducting organizational and/or employee climate surveys;

    k.  Must be a citizen of the United States; and

    l.  Standard security clearances may be required for contractor staff. The specifics of the clearance may differ.

## VII. Deliverables:

The contractor shall provide a comprehensive report outlining the issues identified and categorized from the assessment interviews; recommendations for mitigation; and a proposal for an attainable way forward. All interviews must be completed by December 30, 2016. The final report shall be submitted no later than January 13, 2017.

## VIII. Additional Requirements / Notices

All records, files, documents, and work papers associated with this work shall be the property of the Federal government. In addition, all materials developed or customized to meet USDA requirements shall be the property of the Federal government. USDA will be authorized to make copies of any non-commercial, non-copyrighted material for use, without notification to the vendor. At the time of record disposition or contract transition, the vendor shall box, label and deliver all records, files, documents, materials and work papers to the COR or a location identified by the COR.

Contractor is responsible for protecting Personally Identifiable Information (PII) in accordance with the all applicable Federal, Departmental and Agency statuses, regulations, and policies. PII is – any information about an individual maintained by an agency, including (1) any information that can be used to distinguish or trace an individual's identity, such as name, social security number, date and place of birth, mother's maiden name, or biometric records, and (2) any other information that is linked or linkable to an individual, such as medical, educational, financial, and employment information. Contractor staff may be required to complete and return a non-disclosure and/or confidentiality agreement.

## IX. Government Furnished Property / Equipment

The USDA may provide space, access to computers, computer setup / maintenance, USDA standard applications and software for computers, LAN, internet access, parking, and electronic mail service necessary to perform the requirements of this SOW as approved by the COR.

## X. Travel

Travel may be required. All travel shall be conducted in accordance with the Federal Travel Regulations. Travel shall not be calculated based on the location of the contractor's staff home, but by the business address of the company.



# ADR Vantage

## U.S. Department of Agriculture
## Agriculture Research Services
## Subtropical Horticulture Research Services

## Climate Assessment Services

## Request for Quote 1155005

### Proposal Submitted
November 18, 2016

**ADRV Contact:**          **Shayne Julius**    sjulius@adrvantage.com    202.296.2328

**ADR VANTAGE, INC.**    **1660 L STREET NW, SUITE 302, WASHINGTON, DC 20036**
**PHONE: 202.296.2328**                                          **FAX: 202.355.6689**
**INFO@ADRVANTAGE.COM**                              WWW.ADRVANTAGE.COM

### NOTICE OF RESTRICTIONS

*This proposal or quotation includes data that shall not be disclosed outside the Government and shall not be duplicated, used, or disclosed – in whole or in part – for any purpose other than to evaluate this proposal or quotation. If, however, a contract is awarded to ADR Vantage, Inc. as a result of – or in connection with – the submission of this data, the Government shall have the right to duplicate, use, or disclose the data to the extent provided in the resultant contract. This restriction does not limit the Government's right to use information contained in this data if it is obtained from another legitimate source without restriction. The data subject to this restriction are contained in all sheets marked with the following legend: "Use or disclosure of data contained on this sheet is subject to the restriction on the title page of this proposal or quotation." This proposal or quotation contains trade secrets and commercial or financial information that are either specifically exempted from disclosure by statute or are privileged or confidential within the meaning of exemption that is set forth in §5 USC 552 (b) (3) and (4), respectively, of the Freedom of Information Act, §5 USC 552, and the disclosure of which could invoke the criminal sanctions of §18 USC 1905.*

ADR Vantage

## ORGANIZATIONAL CLIMATE ASSESSMENT FOR THE SUBTROPICAL HORTICULURE RESEARCH STATION

ADR Vantage is pleased to submit a quote for an organization climate assessment in response to RFQ#1155005 in support of the Subtropical Horticulture Research Station. We understand that the U.S. Department of Agriculture's Agriculture Research Division seeks to perform an organization climate assessment for the Subtropical Horticulture Research Station located in Miami, Florida. The climate assessment will involve one-on-one interviews with approximately 40 employees located in Miami and the Washington, DC area. We understand that this project is to be conducted in a union environment and that some of the SHRS employees who are to be interviewed are members of the National Federation of Federal Employees.

### I.    Background and Capability of ADR Vantage

For over twenty-two years ADR Vantage has been providing organization development, employee engagement, and conflict resolution services in the federal workplace. Our key personnel have extensive experience working with federal employment and labor relations, employee misconduct, and EEO matters within the federal government, and specifically the challenges facing government employees.

Climate assessments are an essential tool in developing a comprehensive understanding of an organizational landscape, and in enabling employees to have a voice that influences their organizational environment. Throughout our history, climate assessments have been a part of our core service offerings, and over the past two years, ADR Vantage has conducted multiple climate assessments that included concerns relating to hostile work environments. A climate assessment conducted for the Department of Energy completed in October 2016 involved concerns about systemic discrimination based on race, gender, and a long history of distrust among employees.



In May 2016, our team concluded a climate assessment for the Federal Reserve Board involving one-on-one interviews with forty-five employees. The impetus for that project was serious and our team responded quickly. We initiated, scheduled, and concluded interviews within two weeks of the request, and reported on our findings in time for leadership to intervene effectively. Other recent climate assessments include those conducted for four regional offices of the Equal Employment Opportunity Commission, and an assessment conducted for the National Archives. These successful projects have resulted in ADR Vantage being invited back to conduct assessments with other departments within the same agencies, and to support the implementation of recommendations produced as an outcome of the assessment.

In every climate assessment effort, ADR Vantage seeks to produce meaningful data that the organization can use to address presenting and underlying problems, and to leverage organizational strengths for greater success.

## II.   Approach

The RFQ seeks a strategy to conduct an organizational climate assessment for the Subtropical Horticulture Research Station (SHRS). The first step in an effective climate assessment is planning. The ADR Vantage team will first meet by phone with members of the project steering committee. Typically, the steering committee consists of leaders who are sponsoring the effort, and key stakeholders who are invested in the outcome and results of the effort.

During this meeting, our team will learn more about what is prompting the climate assessment, and the desired outcomes. From the first meeting, we will start to customize interview questions based on the specific needs of the SHRS, and will work with project sponsors to craft communications to employees to announce the effort. Additionally, we use the first meeting to discuss methods for protecting the anonymity of all participants to ensure that it is protected throughout the life of the project. We will also use this meeting to address logistical considerations including identifying individuals to be interviewed,



identifying private locations for interviews, scheduling interviews, and alternatives to in-person interviews.

A. **Conduct candid interviews of all employees in Miami and employees outside of Miami, as determined:**

Our approach is to conduct one-on-one interviews in a private and comfortable space where employees can feel comfortable speaking freely. For some employees, a telephonic interview may be more comfortable than meeting in-person. Interview questions will be designed to elicit information about the dominant issues, strengths and challenges of the team, and potential ideas that staff and leadership can implement. The interviews will ensure that they gather answers to those questions custom designed for this effort, and will allow for free-form conversations for employees who want to share feedback not directly connected to the interview questions. Key to the success of the assessment will be that the leadership and staff feel safe and encouraged to be respectfully forthcoming, that their participation can make a difference, and that their points of view will be shared anonymously. They should also be assured that they may opt-out of participation. Our experience is that with careful and thoughtful initial communication, we will have sufficient participation to provide the insights needed for the initial assessment. Interviews typically last for 40-45 minutes, yet we schedule each interview for an hour to allow for interviews that need or want additional time.

Ideally, in-person interviews will be conducted in two separate spaces, so that multiple interviews can be conducted simultaneously.

B. **Offer alternative mechanisms for sharing feedback, such as, methods that protect anonymity, as well as, accommodation for employees unable to interview in person.**

Interviews are the most effective method for gathering information in a climate assessment because they provide privacy and a conducive environment for gathering



candid feedback. For cases where an in-person interview is not possible, ADR Vantage can conduct private interviews via our confidential telephone conference line or via our confidential web-based conference service.

The interview questions can be made accessible online via a web-based survey for employees to complete individually and within a specific timeframe. Online surveys can also be effective for gathering statistical data, via Likert scales. We use surveys to collect additional data and to provide a quantitative analysis to supplement the information gathered during the in-person interviews.

Because ADR Vantage uses an online platform for web-conferencing and meetings, we can also conduct private focus groups with small groups of no more than six employees per focus group.

C. **Ensure interviews capture information on Employee Relation and Labor Relation issues at the location to assist with understanding the history and background of climate issues.**

ADR Vantage has worked in union environments within the federal sector on many occasions and has had opportunities to engage employee relations, union and labor stakeholders to create collaborative conversations about issues and trends in the workplace. Through our experiences conducting climate assessment and organizational development work, we have ensured that all necessary stakeholders are involved at the onset of an engagement when formulating the initial approach and/or if necessary crafting questions that are tailored to the unique office dynamics as identified by management, employee/labor relations and union stakeholders through their interactions and observations of their employees. ADR Vantage understands how critical it is to include background and perspectives from many vantage points to ensure our facilitators have the best opportunity to understand the history and concerns employees may have shared.

ADR Vantage, Inc.
*Use or disclosure of data contained on this sheet is subject to the restriction on the title page of this proposal.*

page 4 of 12



D. **Identify the role of the Union at the Miami location.**

Part of any climate assessment is to identify early in the process the requisite parties that may have an impact on the success of implementing recommendations and outcomes that are generated.  We have seen from our work with organizations that have unions, that there are often nuisances involving Collective Bargaining Agreements (CBA's) and other policies, practices and procedures that have been agreed upon that could be impacted by the outcomes of an assessment.  As part of this project, if those types of concerns are raised, our practice has been to involve the local or regional union representative in the process as needed to explore how the solutions and/or direction of the climate assessment may have interplay with an CBA's that may be in place.

E. **Provide an objective analysis on the challenges at the Miami location, specifically address concerns of hostile work environment.**

A critical element of any climate assessment is the objectivity in the analysis of the collected interview data. ADR Vantage will provide our objective analysis by first organizing the responses by the question asked, then by identifying common themes. We categorize similar topics, experiences, or attitudes shared by the employees by the frequency in which they appear in the data. These are then separated into primary, secondary, and tertiary themes. We then look for responses that contradict those themes to present a comprehensive understanding of how employees are being impacted by each theme. Finally, we identify high-impact outlier responses, those topics, experiences, or attitudes that might not be shared by most employees, but if ignored represent either a lost opportunity or potential threat the organization's performance or wellbeing.



F. **Develop and provide recommendations on ways to improve/resolve the challenges.**

Equally as important as ADR Vantage's objective analysis is the subjective analysis of the steering committee. Because the steering committee members are part of the organization being assessed, their intimate knowledge of the operations and dynamics of the organization provides additional context and insight to be used in the analysis of the data. We work with the steering committee to help them make meaning of the data, and decide what the best course of action is given the context of their organization.

As part of a comprehensive climate assessment, our team will provide two sets of recommendations on how to move forward in improving and resolving challenges. The first set of recommendations will be those offered by the employees interviewed. Specific interview questions will solicit ideas from employees about what they believe should be done. Those ideas will be assembled and presented as-is without modification by our team. The second set of recommendations will highlight the following:

1. Immediate next steps for sharing the results of the climate assessment with the employees who were interviewed.

2. Immediate to 30-day actions: These will be recommendations that should be implemented in the very near future. Often these recommendations are interventions designed to address a persisting or serious conflict. In some cases, they are intended to help mitigate harm and prevent further damage, and should be implemented immediately. Otherwise, these will be easy-to-implement actions, policies, or procedures that leaders can immediately start putting into practice that will help make the change effort apparent to all employees.

3. 60 to 90-day actions: These will be recommendations that require additional planning and resources, and are designed to give employees an outlet for

ADR Vantage

US Department of Agriculture (USDA)
Agricultural Research Services
Subtropical Horticulture Research Services
RFQ# 1155005

sharing feedback with the organization on an ongoing basis. In cases where the organization may not have the internal capacity or neutrality to support ongoing conversations, these recommendations might be for follow-on services, such as facilitated dialogues or coaching.

4. Long-term actions: These recommendations will highlight ways that leaders can create a lasting cultural shift in the organizational environment, and may require sustained planning and resources.

## G. Provide a report that is specific as to the challenges that can be relied upon for further action by the Agency.

Our team will provide a written summary of the climate assessment results, and of our recommendations for addressing the challenges identified by the data. In addition, we propose a follow-up meeting with the steering committee. In this meeting, we will discuss the findings and recommendations, and will solicit their subjective opinions to build a holistic story of the data. We will work with the steering committee in developing a plan for them to implement immediate next steps for sharing the climate assessment results with those employees who were interviewed.

## H. Sample Project Plan

The final project plan will be based on early conversations with appropriate officials at SHRC. The following is a sample of what a project plan would often include in an organizational climate assessment as described in the Statement of Work. It also forms the basis of our Cost Proposal.

**Task 1:**   Project Preparation -  Week of November 28

- Initial Discussion and review of project plan with the project sponsor(s).
- Telephone interview with the steering committee to include appropriate agency leadership regarding organizational perspective, priorities, and objectives.

ADR Vantage

- Consultation regarding communication with employees and other stakeholders about the Climate Survey.
- Drafting questions and creating an information-capture template.

**Task 2:**   Information Sharing

**Task 2.1:**  Surveying Employees - Weeks of December 5 or 12

- Communicating with Employees and other stakeholders
- Distributing surveys
- Scheduling interviews

**Task 2.2:** Interviews with leadership and stakeholders - Week of December 12 or 19

- These interviews will be conducted with two members of our team and would include appropriate agency leaders, individually, as well as officials for HR, ER/LR, and the Union.

**Task 2.3:** Employee Interviews - Week of December 12 or 19

- Two members of the ADR Vantage team will travel to Miami for 3 to 3 ½ days onsite to conduct to 40 interviews.

**Task 3:**   Data analysis and Draft of Report - Weeks of Dec. 26 - Jan 2

**Task 4:**   Final Draft of Report and Recommendations          January 13th 2017

## III.   Staffing

ADR Vantage's climate assessment team consists of ADR Vantage President, **Dianne Lipsey**, Vice President, **Marcia Thompson**, and Director of Program, **Rick Buccheri**. Each member of this team is knowledgeable of Federal employee and labor relations, employee misconduct and EEO matters through their years of federal experience and working with federal leaders, employees and the unions that represent them. They each have experience conducting organizational / employee climate assessments, including experience conducting climate assessments with multiple federal agencies within the past

ADR Vantage

two years. Additionally, through their work with the Transportation Security Administration, Ms. Lipsey, Ms. Thompson, and Mr. Buccheri have all be been pre-screened using Standard Form 85, and ADR Vantage maintains a secret-level facilities clearance.

## Dianne Lipsey

Ms. Lipsey is a founding principal and president of ADR Vantage, Inc. a consulting firm specializing in conflict management and workplace effectiveness in the federal government sector.   Ms. Lipsey has nearly 25 years of experience as a practitioner providing: training, facilitation, mediation, project management, and evaluation services.

Ms. Lipsey consults with federal agencies on a variety of workplace engagement initiatives and has served as an internal ADR program coordinator, an ombudsman, and an executive coach.   She is experienced in change and transition management, organizational assessment, and employee engagement.   Through her firm, Ms. Lipsey maintains a national roster of more than a 100 individuals and organizational practitioners who support conflict management and related services as needed throughout the U.S.

Ms. Lipsey has also designed and conducted a variety of training workshops such as effective communications, everyday negotiations, conflict management, mediation skills and practice, and other emerging human resources management issues. Ms. Lipsey has supported effective workplaces for such agencies as the Transportation Security Administration, the Federal Deposit Insurance Corporation, Department of Homeland Security, the National Institutes for Health, the National Archives and Records Administration, and many others.

Ms. Lipsey holds a Master degree in counseling and an undergraduate degree in psychology. She has continued her education in Conflict Prevention and Management. She received her mediation certification from the Supreme Court of Virginia in 1995.  She

ADR Vantage

US Department of Agriculture (USDA)
Agricultural Research Services
Subtropical Horticulture Research Services
RFQ# 1155005

is certified to administer the Myer's Briggs Type Indicator and the Strength Deployment Inventory and in the Spring of 2016 will begin working towards a Certificate in Leadership Coaching.

## Marcia Thompson

Ms. Thompson is the Vice President of ADR Vantage, and over the course of her career, has worked with employee and workplace concerns in various capacities. She is very familiar with workplace protections and equal employment laws; in addition to being an attorney, she is a former DOJ EEO counselor and is an US EEOC trained workplace investigator. She has taught employment law and workplace investigations for over 10 years for government and corporate clients, and providing annual organizational compliance updates.

Ms. Thompson is also a national trainer, public speaker, collaborative problem solver, change management facilitator and civil rights professional. She is a Supreme Court of Virginia-certified mediator and holds a coaching certificate awarded by the American Society for Training and Development. She has worked extensively with state and federal government agencies, as well as corporations to help teach, coach and create better workplace environments and stronger working relationships built on trust and mutual respect.

As a former Ombudsman Ms. Thompson, has served as an avenue of assistance for an entire agency looking at policies, practices and procedures and workplace dynamics. In this capacity, she provided training and coaching on topics related to promoting and better handling change, conflict resolution, communication barriers, employee engagement, and diversification across the workforce and changing workplace dynamics. She has conducted focus groups, assessments, surveys, and climate assessments for several federal agencies over many years to include the US EEOC, the Architect of the Capital, Federal Reserve Bank, and U.S. Census Bureau.

ADR Vantage

**Rick Buccheri**

Mr. Buccheri is the Director of Programs at ADR Vantage. In addition to overseeing and coordinating its roster of nearly 140 professional practitioners, Rick also serves as a consultant, facilitator, mediator and trainer. He brings over ten years of experience in the field of conflict resolution and conflict engagement, and is knowledgeable of EEO laws and regulations, as well as other policies and regulations that shape the federal workplace.

Mr. Buccheri has performed climate assessments both nationally and internationally. He was integral to ADR Vantage's climate assessment with the Federal Reserve Board and led a regional climate assessment with the EEOC in 2015. In 2013, he and a small team of consultants conducted a climate assessment for the Ipelegang Community Center in Soweto, South Africa, which restored communication and camaraderie between a staff experiencing race and class-based conflict. Also in 2013, he conducted a climate assessment for the Conflict Resolution Center of Montgomery County where it resulted in increased engagement from board members and a was instrumental in initiating a three-year strategic planning effort.

## IV.   Cost Proposal:  133 hours + Travel = $28,794.91

ADR Vantage's climate assessment team has thoroughly studied the Statement of Work. Based on our interpretations and understanding of what is being requested, our quote is prepared with the following assumptions:

1. We understand that USDA prefers and anticipates that most of the 40 interviews will be conducted in person in Miami, Florida. To accommodate the timeline of the project, our quote includes the cost of two members of our team conducting interviews on site in Miami, Florida.

ADR Vantage

US Department of Agriculture (USDA)
Agricultural Research Services
Subtropical Horticulture Research Services
RFQ# 1155005

2. It is not clear whether the USDA expects that the contractor or the agency will be responsible for scheduling the interviews with each person. Per our experience with other agencies, our quote assumes that ADR Vantage will take responsibility for scheduling the interviews, and the associated costs are included.

3. Due to the holiday season, we expect the cost of travel will likely increase between today's date, and the date the travel arrangements are confirmed. We have attempted to anticipate the rise of such costs, and our cost proposal includes our projections.

If our assumptions are not correct, ADR Vantage remains prepared to submit a revised proposal which will incorporate any additional information that USDA provides, and the subsequent impact to the overall firm fixed price.

| Activity | Hours |
|---|---|
| Project Preparation. | 15 |
| Information Sharing & Interviews | 68 |
| Data analysis and Draft of Report | 40 |
| Final Draft of Report and Recommendations | 10 |
| Total Hours | 133 |

Travel = NTE $2,609
     i.    Airfare:  NTE $800
    ii.    Lodging and taxes: 2 travels for 3 night =$1,329
   iii.    Per Diem: 2 travelers for 23 nights = $480

# Marcia K. Thompson                                  *Senior Consultant*

Marcia Thompson has over 20 years of diverse experience as a neutral facilitator, mediator, trainer, and coach. She has been certified by the Supreme Court of the Commonwealth of Virginia since 2000. Additionally, in 2013, she was appointed by the U.S. Department of Justice to serve as a Hearing Officer for administrative DOJ/PSOB appeals. Her experience with organizational systems and assessments, conflict systems design, mediation and facilitation processes has enhanced organizational performance through improved communication and by building lasting competencies across organizations. She has experience serving as General Counsel for an international organization and developed organizational policies, procedures and practices that were inclusive and compliant with the law. Additionally, she has developed curriculum and training on ADR and related topics that have been approved for mediator training and certification by the Supreme Court of Virginia.

| Work Experience | **2016 – Present: Vice President: ADR Vantage, Inc.** |
|---|---|
| | *Provide neutral intervention services, including organizational climate assessments, individual employee assessments, training, facilitation, coaching, and consulting to enhance organizational performance and engagement through improved communication and conflict competency among colleagues, management, executives, including facilitation, mediation, coaching, conflict management systems design, and training.* |
| | **2010 – 2013: Ombudsperson: Architect of the Capital (AOC)** |
| | *Served as an avenue of assistance for an entire federal agency of approximately 2,300 employees to address all forms of workplace conflict and serve as a neutral resource for training, executive and conflict coaching, mediation, and facilitative dialogs. Conducted assessments, surveys, and focus groups to facilitate resolution.* |
| | **2005 – 2013: Social Justice/Criminal Justice Professor: Bowie State University** |
| | *Taught courses in conflict resolution, advocacy, rule of law, and other courses in the social/criminal justice track. Conflict resolutions course taught as an introductory course to understand all forms of ADR and facilitative problem solving with an emphasis on mediation.* |
| | **2000 – 2013: ADR Consultant: Resolving Conflict Institute, LLC** |
| | *Provided mediation, training, conflict coaching, facilitation services, curriculum design, organizational assessments, and strategic planning to corporate and public organizations. Worked as a trainer, mediator, facilitator, and problem-solver with several agencies to include the U.S. EEOC, HUD, DHS, U.S. Department of State, Department of Agriculture and others.* |
| Formal Education | • **Juris Doctor**, George Mason University Law School, 1998 |
| | • **B.A.**, Criminal Justice, Michigan State University, 1992 |

**Facilitation and Coaching**

Marcia has provided expert facilitation of strategic planning and conflict management, improved communication and leadership visioning sessions with the goal of assisting executives, management and employees to clearer outcomes and a guiding path forward, leading to a comprehensive roadmap to next steps and problem solving. Her facilitative style ensures the development of an agenda and development of inclusive and collaborative goals prior to meetings; integration of stakeholder interests and creating an environment where parties are heard and understood; mindful management of time and pacing; mediate exchange and discussion of proposals and counter-proposals; and offer expert insight and advice, when appropriate, to assist the participants in their decision-making. Marcia has also served as a conflict and executive coach as an Ombudsperson and as an ADR consultant.

**Mediation and Conflict Management**

Marcia received her initial mediation training through the U.S. Department of Justice while being trained and certified as an EEO counselor in 1995. Additionally, she was certified by the Supreme Court of the Commonwealth of Virginia to practice mediation in 2000 and also serves as a mentor mediator. Since that time, she has mediated or facilitated hundreds of sessions, both informal and formal, in a neutral setting without judgment of the participants or their perspectives. In mediation assignments involving workplace, EEO, legal grievances or complaints, she mediates with a facilitative, non-evaluative approach to problem-solving. Subject matter of sessions includes: workplace relationships; equal employment opportunity and civil rights; collective bargaining; organization plans; and neighborhood and community disputes. Also, in association with her role as an Ombudsperson, she served as an agency wide neutral and often as a mediator, facilitator, trainer, executive coach. Marcia also successfully ran her own conflict management consulting company Resolving Conflict Institute, LLC for almost 14 years and provided mediation and ADR services to both public and private clients nationally.

**Training and Curriculum Development**

Marcia offers over 20 years of experience developing curriculum and training personnel on organizational and workplace matters to include: conflict management, alternative/conflict resolution, inclusion, ethics and various prevention techniques. She has designed and provided training to corporate and federal sector employees and managers on communication skills, labor and employment law and alternative dispute resolution processes and many other workplace topics. As a full time professor for many years she instructed pre-law and social justice students on the art of negotiation in both informal and formal sessions, interest-based bargaining, and mediation as a problem-solving process. Marcia has also developed all forms of teaching aids, facilitators' guides, student handbooks, activities and has conducted train-the-trainers for both corporate and government clients. Marcia has created curriculum and training for the Department of Homeland Security and U.S. Department of State as well as American Management Association. Marcia has served as a keynote speaker on leadership and other topics at several national conferences and venues.

## Dianne Chasen Lipsey                          *Senior Consultant*

Dianne Lipsey has worked in the field of conflict management, training, and organization development since 1993. For the past 20 years, she has been improving workplace culture and interpersonal relationships. She holds credentials as a mediator, trainer, facilitator, and conflict coach and is certified in the use of self- and team-development tools, including MBTI and TKI.

| Work Experience | **1993 – Present: Founder and President, ADR Vantage, Inc.** <br> *Established small, woman-owned conflict resolution, organizational development, employee engagement, and training firm as a leader in serving supporting conflict management and organizational needs of federal agencies.* <br><br> **2005: Organizational Ombudsperson, National Institutes of Health (NIH)** <br> *Provided job and executive coaching, conflict assessment, mediation, facilitated dialogue and team building.* <br><br> **1990 – 1993: President, DCL & Associates** <br><br> **1982-1990: Director of Affiliate and Employment Services, Epilepsy Foundation of America** |
|---|---|
| Formal Education | • **M.A.**, Rehabilitation Counseling, University of Alabama, 1975 <br> • **B.A.**, Psychology, Auburn University, 1974 |

**Organization Development**

Dianne works with organizations in transition, under stress, or in conflict. She designs organizational assessment plans based on the needs and circumstances of the organization, most involving an anonymous survey, follow-up interviews, focus groups, and/or use of other feedback tools. A typical example used with a 30 person office within the Federal Reserve involved using the Denison Organizational Culture Survey, coupled with individual interviews with all staff, and a series of staff and management meetings to validate results and to build communication linkages among the staff and management. She planned and designed the Employee Engagement program resulting from one such assessment for the Department of Treasury, including an action plan to address capacity building at multiple levels of the organization simultaneously.

**Facilitation**

Dianne has conducted many facilitation workshops and events for groups ranging in size from 5 to 50, assisting participants through various processes including: public conversations projects, brainstorming and idea generating, process redesign, team building, strategic planning, cooperative problem solving. She guides participants through successful processes by careful planning and design, awareness of group dynamics and techniques for encouraging participation, maintaining focus and energy, and having fun and uses a variety of adult learning strategies to maintain interest and engender new thinking. Dianne demonstrated the use of collaborative problem solving related techniques in processes for the FBI and U.S. Department of Justice to support their newly formed CIO offices; and used techniques like gallery walks, multi-voting, and idea generating to help a working group on the future of airport security for TSA.

**Mediation and Conflict Management**

Dianne mediates and develops conflict management programs for workplace ADR programs with multiple federal agencies, including TSA, FRB, FDIC, and NARA. She has worked with federal agencies in establishing their iternal mediation programs, providing training and mentoring for the initial cohort and ongoing mentoring, training and process consultation. She has conducted several mediations and conflict management assessments and interventions since 2005.

**Training and Curriculum Development**

Dianne has over 30 years of experience helping adults learn how to understand each other and work better together. She has created curriculum for more than 20 federal agencies to assist their workplaces to become more collaborative and effective in their communication and in managing conflict, including work on early updates to CME for TSA. She encourages clear focus on learning objectives for diverse participants through lecture, exercises, activities and discussions. She develops realistic scenarios and case examples.

Dianne is skilled in training adult learners, integrating new media and technology to stimulate discussion and reinforce learning. She provides thoughtful feedback to reinforce progress and develop new skills. Recently she conducted a 3-day advanced mediation training for NRC's internal mediation program and a communication skills workshop for the National Endowment for the Arts.

**Coaching**

Dianne enhances her 10 years of coaching practice through her background in counseling and mediation. She establishes rapport with individuals in coaching toward more effective behavior and success on the job, and is skilled at helping people distill their issues and create definable actions to address them. She is a certified coach through Georgetown Universities executive coaching program.

## Richard (Rick) Buccheri, II                                     *Consultant*

Rick Buccheri merges his extensive career managing conflict as a mediator, facilitator, trainer, and conflict coach, with an organizational systems perspective as a consultant. He is able to recognize and influence the organizational patterns that impact interpersonal relationships, as well as the interpersonal dynamics that impact the organizational goals. He focuses on creating safe spaces in which people are empowered to collaborative effectively. Rick has both national and international experience performing organizational climate assessments.

| Work Experience | **2015 – Present: Director of Programs, ADR Vantage, Inc.**<br>*Develops the capacity of all programs. Oversees 125-member roster. Serves as mediator, facilitator, trainer, coach, and consultant.*<br><br>**2014 – 2015: Program Manager, ADR Vantage, Inc.**<br>*Coordinated programs. Co-designed and co-delivered an advanced mediation skills course.*<br><br>**2012 – 2014: Mediation Specialist, Office of the State's Attorney (MD)**<br>*Increased the use of mediation to resolve criminal disputes, and mediated the most sensitive or complex cases.*<br><br>**2012 – 2013: Performance-Based Evaluator, Community Mediation Maryland**<br>*Observed and evaluated mediators based on a 120-point matrix of mediator behaviors.*<br><br>**2011 – 2012: Mediation Manager, Conflict Resolution Center of Montgomery County (MD)**<br>*Mentored mediators at all skill levels and conducted intake on new mediation referrals.*<br><br>**2008 – 2010: Volunteer Coordinator, and Mediator, Community Mediation, Inc.**<br>*Managed a roster of volunteer mediators and provided continuing education courses in mediation and conflict de-escalation skills. Mediated community and criminal cases.* |
| --- | --- |
| Formal Education | • M.S., Organization Development, American University, 2013<br>• B.A., Community Studies and Civic Engagement, University of Baltimore, 2011 |

**Mediation and Conflict Management**

Rick has over 9 years of experience as a mediator. He has mediated criminal disputes through the State's Attorney's office in Rockville, MD, and through Community Mediation in Baltimore City, as well as hundreds of workplace conflicts as a community mediator and through ADR Vantage. He has managed and developed four consecutive mediation programs in not-for-profit, public, and private sectors. Management of those program involved providing mentorship and training to entire rosters of mediators, as well as performing intake and handling the referral and screening of

all cases. In 2014, he co-designed and delivered an internal mediation program training and mentorship program for the TSA's National Resolution Center.

## Training and Curriculum Development

Rick has 6 years of experience in training delivery and curriculum design on conflict management, conflict resolution, and conflict engagement. He has delivered short and long-form interactive sessions for the general public, and designed and delivered advanced-skill training sessions for specialized groups of mediators. He delivers trainings through a variety of methods and techniques, including experiential learning, lecture, demonstration, case study, and facilitated dialogue, role-play, mentoring, and supervised practice to cover a range of adult learning methods. He has created experiential exercises, brochures, manuals, role-play scripts, handouts, and evaluations. He has also designed and implemented trainer-led and self-administered curricula for entry-level employees intended to introduce and teach basic-level skills and linear processes. Materials included manuals, checklists and self-tests.

## Facilitation

Rick has 6 years of experience in facilitating community-wide conflicts, meetings, group dialogues, and inter-group dialogues. Facilitation process includes identification and engagement of multiple stakeholder groups, exploration of issues, consensus building, meeting design, dialogue, brainstorming and action planning. Stakeholder groups include executives, boards, department groups, neighborhood associations, committees, religious groups, discussion groups, and student bodies. Skills include active and reflective listening, reframing of topics and issues, bringing awareness to group dynamics, ensuring diversity of perspectives and inclusion, observing body language, and non-verbal cues.

## Organization Development

Rick has 4 years' experience as an organization development practitioner and consultant. Highlights including leading a climate-study and initiating a strategic planning process at the Conflict Resolution Center of Montgomery County. He also conducted a climate study at an office of the Equal Employment Opportunity Commission that led to the improvement of relationships between the employees, management, and union representatives. He conducted a climate study and facilitated whole-team discussions among TSA's vetting analysis division, and was integral to a climate assessment conducted for the Federal Reserve Board.

## Coaching

Rick has 6 years of experience coaching and mentoring mediators. Coaching focuses on supporting mediators to self-identify behaviors and behavioral patterns that impacted their performance as mediators, and on supporting mediators to consider, experiment with, and apply alternate behaviors and perspectives. As a conflict coach, he helps people in conflict explore, understand, and resolve their own conflicts through the lenses of power, identity, and emotion.

JOEY D. GONZALEZ RAMOS  V. ADR VANTAGE, INC.

EXHIBIT 3

ADR REPORT



# Report for the U.S. Department of Agriculture Agricultural Research Service

# Climate Assessment of the Subtropical Horticultural Research Station

## Prepared by ADR Vantage, Inc.

## February 2017

ADR VANTAGE, INC. 1660 L STREET NW, SUITE 302, WASHINGTON, DC 20036

PHONE: 202-296-2328    FAX: 202-355-6689



USDA Agricultural Research Service
SHRS Climate Assessment
February 2017

# Table of Contents

REPORT FOR USDA's Agricultural Research Service: Climate Assessment of the Subtropical Horticultural Research Station

I.      Introduction ................................................................................................................... 2

II.     Methodology .................................................................................................................. 2

III.    Data Analysis .................................................................................................................. 4

IV.     Summary of Findings .................................................................................................... 13

V.      Recommendations........................................................................................................ 17

ADR Vantage

## REPORT FOR USDA AGRICULTURAL RESEARCH SERVICE

### Climate Assessment of the Subtropical Horticultural Research Station

### Prepared by ADR Vantage, Inc.

### February 2017

## I.    Introduction

The Subtropical Horticultural Research Station (SHRS) in Miami, Florida, a unit of the USDA's Agricultural Research Service (ARS) conducts research to develop and transfer solutions to agricultural problems of high national priority relating to food and nutrition, agricultural economy, and natural resources and the environment. ADR Vantage was engaged by ARS to perform an employee climate assessment of the SHRS. The primary purpose of the assessment was to identify factors that contribute to employee complaints of harassment and a hostile work environment, to help the ARS leadership understand the state of concerns within the SRHS and to provide recommendations to address them.

Dianne Lipsey and Rick Buccheri from ADR Vantage spent three days on site at SHRS in mid-December, 2016. We interviewed the current temporary Research Leader (RL), Dr. Hamed Abbas and 26 other staff from all levels of the organization. We had subsequent conversations with Area Director, Dr. Deborah Brennan; Associate Area Director, Archie Tucker; and others with firsthand knowledge of the recent developments at SHRS including former temporary RL for SHRS, Dr. Ricardo Goenaga; former Research Scientist, Dr. Ray Schnell; and USDA Human Resources Specialist Supervisor for Labor Relations, Kathleen Hall. Most everyone we spoke with was very forthcoming. Their perspective varied but there was strong consensus about the overall themes.

This report provides an analysis of the resulting themes from the interviews and our findings and recommendations. Our recommendations reflect our understanding of ARS's actions that are already in progress to address the issues concerning the operations and staff morale.

## II.    Methodology

ADR Vantage began the climate assessment with preliminary conversations with ARS Associate Area Director, Archie Tucker and USDA Senior Counsel, Stephanie Masker. From those meetings, we learned that there have been an abundance of grievances and formal complaints originating from the SHRS, and that there were specific challenges between management and the employee union, the National Federation of Federal Employees (NFFE).

ADR Vantage

USDA Agricultural Research Service
SHRS Climate Assessment
February 2017

**Process**. Based on our understanding of ARS's objectives for the climate assessment, we determined data collection would need to be through one-on-one, in-person interviews. To encourage participation, their involvement needed to be voluntary, questions needed to be constructed to allow unforced, genuine concerns to arise unprompted and we needed to assure participants anonymity in their responses.

Once dates for the visit to SHRS could be confirmed, the Area Director, Dr. Brennan, announced the climate assessment to the SHRS employees, introduced the ADR Vantage team and encouraged voluntary participation. She also reminded Bargaining Unit Employees (BUE) they are entitled to have their union representative present for interviews if they so choose. ADR Vantage reached out to establish contact with Dr. Hamed Abbas, the temporary Research Leader, and employees at the site and to schedule interviews. In our communication with staff, we emphasized that participation was voluntary and we explained how their contributions would be used to identify patterns and trends that could be shared with ARS without exposing individuals. We had a short turnaround for the visits because of the upcoming holiday season and so, to ensure as much participation as possible, we made multiple invitations to employees and offered to schedule interviews by telephone and at times convenient to employees. We also continued to schedule appointments throughout our visit. We were able to speak with 26 of the roughly 32 employees at SHRS and the temporary RL.

**Questionnaire Design**. The interview data collection tool was a thirty-three question interview, composed of open-ended questions and rating scales. The open-ended questions were meant to elicit broad perspectives from employees to allow for their open and honest sharing of their true work experiences, without directing or limiting the nature of their responses. Likert rating scales and Yes/No questions supplemented the open-ended questions to provide measurable scores for specific questions regarding experiences. Overall, the questions focused on the following themes:

- Employee Engagement: How well employees understood their role in relation to the overall work and mission of the SHRS and their satisfaction levels.

- Communication & Relationships: How employees get and share information, the degree and effectiveness of collaboration and coordination among work groups and which relationships are most supportive or challenging.

- Respect and Fair Treatment: These questions address the core questions for the assessment – the existence, prevalence and impact of treatment that could be considered harassment, hostile or otherwise discriminatory.

- Leadership & Support: How individual managers and the management structure within SHRS, ARS and USDA support employees and their work and what leadership factors most impact the effectiveness of the SHRS.

ADR Vantage

**Interviews**. ADR Vantage representatives Dianne Lipsey and Rick Buccheri were onsite at the SHRS in Miami, FL between Tuesday, December 13 and Thursday, December 15, 2016. During that time, we met Dr. Hamed Abbas and 26 of roughly 32 employees.  This represented approximately 81% of the staff positions as designated on the Organizational Chart.  The level of participation also provided a cross section of perspectives from every employment category and research area.  Phone interviews were also offered to employees who were not able to meet for an in-person interview. One employee made use of this option. All employees interviewed were aware of at least some of the issues impacting the atmosphere and work at SHRS. For the most part they were careful to comment within the confines of their own experiences or observations and expressed hope that   their contributions will result in improvements at the site.

Through the interviews, four additional people where identified who could offer unique perspectives on the atmosphere and onsite experience at SHRS. They each accepted the invitation to speak with us and provided valuable perspective and historical context relating to the issues facing the SHRS.  Those individuals included:

- ARS Area Director, Deborah Brennan, PhD
- Former Temporary Research Leader, Ricardo Goenaga, PhD
- USDA Labor Relations Officer, Kathleen Hall
- Former Research Geneticist, SHRS, Ray Schnell, PhD[1]

Questions for the supplemental interviews were tailored to help us understand a broader context such as: key turning points and the events that preceded them; the roles and relationships between SHRS, ARS, PALS, and the Union; and previous efforts to address personnel and organizational issues that are still impacting SHRS and its employees.

**Report Findings**. As this is a climate assessment, we collected and are reporting experiences and points of view from employees, management, ARS Area Office officials and others as listed above. The report reflects the dominant themes and critically important observations from those subjects that are affecting the employees' workplace experiences. At times, we specify a subgroup of employees such as Scientists, Technicians, Administrative staff, laborers or maintenance employees. At times, we refer to the "Researchers" to cover the Scientists and Technicians.  Researchers are the majority of employees and those most directly affected by many the issues  identified in this report.

## III.   Data Analysis

The Subtropical Horticultural Research Station is located in Miami, Florida and conducts research under the auspices of the USDA ARS Southeast Area Office in Stoneville, Mississippi. Its top leadership on site is a Research Leader (RL), who in addition to his own research projects is

---

[1] Dr. Schnell continues to work onsite for an aligned organization.  He made clear his comments where based on his experience with SHRS rather than representing the opinions or experiences of his current employer.  ·

ADR Vantage

responsible for the overall executive leadership at the Station. The SHRS Organizational Chart shows a full-time staff compliment of 40 employees[2]. There are seven Scientists (with one vacancy) each with his or her own team, and an Administrative Officer (AO) with a four-person administrative team.  Most of the maintenance support for the site including custodial workers and tractor operators  work under the supervision of the Horticulturalist.

At the time of the climate assessment, SHRS had a temporary Research Leader, and there were 11 vacancies[3], including the permanent Research Leader, the Horticulturalist, both custodial workers and two of the three tractor operators. Of the remaining five vacancies, three were from a single six-person team supporting the Plant Geneticist. Two employees who would usually have reported to AO were assigned to work directly for the temporary Research Leader. There were also multiple pending EEO complaints and union grievances against various members of the management team, most of which came from a single employee.

Employees at all levels of the SHRS eagerly participated in the interviews. Twenty-six (26) of the approximately 32 SHRS employees on staff at the time, and the temporary Research Leader met with ADR Vantage. Most were very forthcoming and hopeful the climate assessment would yield improvements in long-standing issues and frustrations. Almost all observations, ratings and responses to open-ended questions can be captured in one of the following themes.

- Employee engagement
- Permanent Research Leader
- Administrative functioning and the Administrative Officer
- IT Specialist and the NEFE union local President
- Communication factors and collaboration
- Employee perceptions of hostility, harassment, or unfair treatment

1. **Employee Engagement**. Most research employees interviewed spoke positively, and even passionately, about their work and its contribution. They willingly described their work and how it relates to SHRS's mission. Many of those working in maintenance and administrative roles could also describe how their work contributed to SHRS. Employee satisfaction and description of the overall atmosphere is reflected in some of the representative quotes below.

- Overall satisfaction level for employees was a 6.29 out of a possible 10.

- Employees rated the overall atmosphere of the SHRS workplace at a 5.29 out of 10.

---

[2] There are 40 permanent positions shown on the SHRS Organizational Chart with 11 vacancies.  There are also at least 2 temporary employees and the ARS employee temporarily assigned to SHRS as the RL.
[3] According to the Organizational Chart.

ADR Vantage

- Enthusiasm for their work was affected by feelings of losses from earlier years – of staff, resources, focus and collegiality and a feeling that others outside of SHRS may not care about their work.

  o  *"I love my job and I feel like I really make a difference." ~ "I consider my work very important. The industry relies on what I do." ~ "My job is to make it possible for them [the Scientists] to do the work they do." ~ "This is my dream job."*

  o  *"The atmosphere before was that we were all willing to help each other. Now we are trying to stay away." ~ "We feel like we get the short end of the stick. Everyone is overworked and understaffed." ~ "Not getting a [permanent] RL makes people who feel unappreciated."*

- Within the research units, most employees appreciate the relationships. Most of the Technicians enjoy trusted and even collegial relationships with their Scientists and the Scientists appreciate and in some cases, entrust their Technicians with greater responsibilities than Technicians might usually expect.

2. **Permanent Research Leader**. *"We need steady and good leadership."* The prevailing view is that issues that are most impacting the site are a result of not being able to secure skilled and committed leadership. The following are composite viewpoints from employee responses to questions about satisfaction on the job, overall atmosphere, and specific questions about management.

   - **Collaboration, Collegiality, and Cooperation**. Most of the Scientists indicated a degree of in- fighting and competition among their colleagues. Technicians seemed less affected, but aware of tensions and its effect on their relationships with other Technicians. The following was shared with ADR Vantage as an example of the kind of impact an RL would have on relationships among the Researchers.

     *There was disagreement among the Scientists about the use and maintenance of a piece of equipment. The manufacturer recommended use of a chemical solution claiming that it is better for the equipment but historically SHRS had used a water solution, believing it to be safer and able to produce comparable results. When this disagreement arose and a choice was made to follow the manufacturer's recommendation the decision produced resentment among those who disagreed.*

   - **Administrative Personnel Issues**. The most cited complaint among employees interviewed is the significant dysfunction in the Administrative Office. This includes what they describe as an AO who does not know SHRS culture or his job; who is generally unhelpful and unable to work effectively with his own staff; and who shields his Information Technology (IT) Specialist from accountability. They provided multiple examples of facilities and equipment not being maintained, delays in personnel actions, costly inattention to priority travel,

ADR Vantage

allowing IT upgrades to go uninstalled or improperly installed, inability to find the IT Specialist for long periods of time, lack of follow-through on priority requests, and passiveness and even hostility to efforts by Researchers to resolve even simple issues.

The word "fear" was often used to describe why employees avoid seeking help from the IT Specialist or going through an involved process for other administrative needs. Many described efforts to take care of problems themselves and frustration that even when they did, the AO would find ways to delay them or the IT Specialist, who is also the NFFE local president, would block employees from doing tasks not specified in their position descriptions.

Most believe these problems can be addressed but requires vigilance and persistence that is only likely to come from a strong, committed and permanent RL.

- **Employee Morale**. Scientists do not feel there is sustained interest in their work. Others see ongoing unresolved issues, a lack of a sense of unity, shared purpose and that someone is advocating for them. "*After a while, you stop caring.*"

  Many employees appreciate the efforts of the current temporary RL, Dr. Hamed Abbas, but recognize that his attention is consumed by the unresolved personnel issues and that he will ultimately get frustrated and leave. Even if he can make some of the needed changes, they believe he will not stay long enough to resolve long-standing issues and restore the cohesive and coordinated research environment.

  > *"The leadership void is the big thing. If someone could fix this void to a full-time permanent, respected, well-qualified candidate for research leader, the apparent problems would go away."*

3. **Administrative Functions and Administrative Officer.** Virtually every person we spoke with had significant complaints about the administration at SHRS. Major issues with IT support was the lead concern. Other issues ranged from the inability to handle basic maintenance, to major problems with travel, to deceitful behavior on the part of the AO. With some exceptions, the administrative staff are viewed as not responsive and as having lost what used to be a commitment to supporting the science by supporting the people. People believe the AO lacks command of the job and that his actions are often counterproductive and appear to intentionally block reasonable solutions.

- **Travel Requests**. Travel processing is a dominant complaint from the Scientists. They report inability to get travel requests processed in time, not being able to track the approval status, and receiving no communication from the administrative staff about



progress. Scientists, whose jobs and professions require travel, sometimes overseas, also complain about their US Government Passport processing and that their inability to count on the administrative staff to support them can complicate travel plans. They provided multiple examples of having to cancel trips even when they were to chair sessions and expenses were covered. They feel the administrative staff do not know how to process travel or care about the complications this causes. They are also frustrated that they are barred from trying to track the progress and troubleshoot problems themselves. They feel constrained in their ability to engage in the professional exchanges expected of them as ARS Scientists and as leaders in their fields of research.

- **Basic Communication**. Employees cited examples of not being notified about upcoming events because of inconsistent and what they view as possible selective email distribution. The most concerning experiences described by the researchers was the lack of coordination or even sufficient notice about interruptions to water or electricity supply. At SHRS, water and electricity disruptions can impact research and damage equipment.

- **Filling or Working Around Vacancies**. Employees complain of three issues related to vacancies: Inaction on hiring requests; lack of communication about progress and/or hiring instructions from ARS; and efforts from the AO or the union local president to block workarounds to compensate for vacancies. Examples:

  o The hiring decision for summer temporary employees went so long, the researcher had to use the more costly contract vehicle to make the hires.

  o A technician volunteered to fix a broken gate, because of insufficient maintenance employees. The Union challenged the employee's action because the technician's position description did not cover this maintenance function.

  o The position of mechanic had been vacant long enough that employees explained they were unable to find a working golf cart and that for a property as large as SHRS, this situation significantly interferes with the work.

- **Basic Maintenance**. Employees provided many examples of facilities, equipment and property not being adequately maintained, including things as small as the water filters not being changed in the main building to the grass being allowed to grow so tall that researchers were unable to get to their locations to collect samples. SHRS's location is particularly susceptible to hurricanes. After one such event, researchers arrived the next day to find the generators were not functioning and loss of electrical power and water needed to sustain ongoing experiments. Researchers do not have confidence that the AO grasps what is needed to set and oversee priority maintenance schedules. Nor is he able or willing to work with them to find solutions to immediate needs as they arise.

ADR Vantage

- **Administrative Staff Accountability.** We heard many examples of requests not being fulfilled in a timely way, correct way or at all; being challenged by the AO when following-up on requests; and researchers not trusting the response from the AO. Employees described situations when the AO denied having received the request or tried to shift blame to someone else, and/or find some rule or reason he could not proceed, and sometimes using all three of these approaches.

Almost every researcher complained that the IT Specialist's work is not satisfactory, that he is not responsive, and that he can be very difficult to deal with. We understand that, at the time of the interviews, the IT Specialist worked one day per pay period at the Fort Lauderdale location and for the remainder of the pay period in Miami. Employees were aware that the IT Specialist was assigned to work from the Fort Lauderdale location periodically. Regardless of where he is assigned to work, they complain that he is not accessible or responsive in person, by phone or through the online support request system and that when they have consulted the AO on the matter, he has been unhelpful.

- **Barriers to the Research.** The Scientists do not believe that the AO is interested in helping them. They provided many examples of his erecting barriers to their efforts and requiring them to spend much more money on contractors than using internal staff. They also describe unpleasant and difficult encounters with him, experiences in which he denies what he had previously said or done.

> *"The AO stands in the way of any kind of reasonable solution to the employment problems. He actively looks for ways to make things impossible. There are huge numbers of stops along the way. Everything's adversarial."*

4. <u>**IT Specialist/NFFE Local President**</u>. The IT Specialist was identified by most employees interviewed as being involved in, if not the source of, harassment and hostility. He serves USDA as the IT Specialist for SHRS as a direct report to the AO. He is also president of the National Federation of Federal Employee's (NFFE) local. As IT Specialist, he is regarded by the Researchers as deficient, unresponsive, and difficult to deal with. The Scientists are uncomfortable with the access he has, as IT Specialist, to their research, emails and phones. In his union role, he is regarded as combative, intentionally disruptive, and uninterested in working out issues he believes need to be challenged. It is widely believed that he is able to influence and manipulate his boss, the AO, and it is that relationship that gives him the autonomy to act as he pleases and protects him from accountability.

- **Basic IT Support.** Employees provided multiple examples of deficiencies that included slow or no response to even urgent requests and an inability and sometimes unwillingness to support their particular IT needs. One research team waited a year for installation of software upgrades and then it was not installed properly.

Another complained that he refused to "deal with" operating systems other than Windows, even though many programs are not Windows-based. The result is that the Researchers, his customers, have had to take care of their own IT needs. There were numerous complaints that employees could not reach him by phone or through the on-line request systems, having to track him down physically and even after that, not being able to count on him to respond to requests.

> *"When you do tell him about things, sometimes he takes care of it and sometimes he won't. "*

- **Misuse of Union Role.** Of the Bargaining Unit Employees (BUE) we interviewed, none were dues-paying members. Several employees said that the IT Specialist would represent them without their invitation or agreement, filing grievances on their behalf. Some employees noted that he spends a lot of his time behind closed doors with the union steward. Whether or not his actions on behalf of the union or employees have a legitimate basis, employees overwhelming believe he is abusing his role and not helping resolve real concerns at SHRS. Researchers feel that he is always on the lookout for things he can use against them in grievances, often twisting what they have said or done. Mostly they complain that the volume of grievances is a huge burden to their work, feels like harassment and that far from improving the working environment, they are making it worse.

- **Frustration and Intimidation.** Beyond union grievances, employees describe the IT Specialist and his close association with the AO as interfering with their work. If they challenge him, even without intending to, he will try to use EEO complaints and union grievances, and leverage his relationship with the AO to impose arbitrary rulings that will slow or stop their work. Scientists are aware that he can and believe he has accessed their data and email, interfering with their research and professional communication. Some Scientists say they no longer use their USDA email or phone for certain communication because of this concern.

Employees described the IT Specialist's use of personal attacks and strong language. A newly hired employee complained that the IT Specialist was particularly aggressive toward him, used racially charged language and, as a result, the IT Specialist has been instructed to have  no contact with this employee. We heard from another employee that the IT Specialist's aggressiveness toward her when she approached him with an unresolved IT matter made her very uncomfortable.

> *"The IT Specialist is unreceptive to any kind of suggestions and he's impolite when he's annoyed or frustrated. In a recent incident, he took something he shouldn't have. We talked about it and he "flipped out," and raised his voice. It was very uncomfortable. I don't go to him if I don't have to."*

ADR Vantage

- **Lack of Accountability**. Most employees believe that the IT Specialist receives special treatment from the AO. We heard examples of employees seeking help from the AO when they were not able find or get help from IT Specialist only to have the AO do nothing and then later to experience what they believed was retaliation from the IT Specialist. They believe the IT Specialist is allowed to do and behave however he wants and that the AO protects him. They also believe the AO shares information with the IT Specialist that he should not have access to which later shows up in a complaint or grievance.

    *"I can ignore most things, but this was very clear that he [the IT Specialist] feels he can speak how he wants without repercussion. It's rare to be in a workplace where that is tolerated."*

5. **Communication Factors and Collaboration**. We were interested to know about how information is shared at SHRS and how effectively it is communicated in order to identify communication factors that might be affecting the work and morale. Such factors might include the routine exchange of information about SHRS business, research priorities, the search for a permanent Research Leader, and responses to issues employees may have raised such as with travel, hiring, IT support and maintenance.

Scientists were the most informed about SHRS developments but also ranged in their responses regarding what they know, how they hear information and how often they attend management meetings. Technicians learned about SHRS developments sometimes officially through emails, more often through their Scientists but also unofficially and informally from other employees. Maintenance employees primarily relied on informal communication. Informal communication was described as information passed from employee to employee, like rumors. The temporary RL has tried to reinstitute regular meetings but we were unable to determine if they are happening regularly or effectively and how much support he gets from Scientists in that effort.

Researchers do not seem to value the exchange of information as they may have in the past. They express that they must be more self-sufficient and at times more self-interested than in past years due to reduced staff, inability to get sufficient administrative support and not having a permanent Research Leader. They recognize that this development has led to reduced coordination and collegial exchange and increased tensions among some Scientists. With the resources and support provided by MARS, some feel that the cacao research receives a disproportionate amount of attention and resources. Scientists also recognize that a strong, engaged and permanent RL can help balance the research priorities and support a more unified and balanced focus for the work of the SHRS as a whole.

    *"We have minimum collaboration and conversations among colleagues. I tried to not rock the boat for the first few years, but now I'm getting tired."*

ADR Vantage

USDA Agricultural Research Service
SHRS Climate Assessment
February 2017

6. <u>**Employee Perception of Hostility, Harassment, or Unfair Treatment**</u>. Over recent years there have been unusually high numbers of EEO complaints and union grievances from SHRS. For the climate assessment, ADR Vantage was interested to learn whether and how widely employees share the kind of real or perceived experiences that often lead to EEO complaints. We asked questions about fairness and equality of treatment to help understand what might be behind the specific complaints. We also asked open-ended questions about the atmosphere and satisfaction to shed light on the more generalized concerns about hostility and harassment in the work place.

- Fair Treatment.
  - o When asked, "How fairly do you think you are treated by your manager?", employees responded with an average rating of 8.10 out of a possible high score of 10.
  - o 23 of 24 of those responding answered, "No" to the question: "In the past 2 years, have you personally been denied requests, where you believe the denial was unfair?"
  - o When asked, "Have you or do you know of someone at SHRS who has been treated unfairly based on age, race, ethnicity, sexual orientation etc.?" 19 of 23 responded, "No."
  - o A large majority of employees interviewed speak positively about their own managers[4].
    - 92% said they were likely or very likely (were comfortable) to raise a concern with their manager.
    - 75% were judged to offer a positive response to the question, "If you had one word to describe what you value most in your manager, what would it be?" The following are representative examples of the words. "Integrity, Sincerity, Lenient, Not Micromanaging, Respect, Honesty, Fair, Patient.



Fairness

(Legend: Yes No)

---

[4] The term "manager" refers to the immediate supervisor of employees being interviewed, whether Scientist, AO, or RL.

ADR Vantage

- Use the term "Hostile" or "Harassment".

  o   When asked to identify their most challenging relationships, 9 employees specifically identified the AO, and 11 specifically identified the IT Specialist in that capacity or in his role as union local president. Four other individuals were identified but none received more than 1 designation.

  o   To open-ended questions about satisfaction level, overall atmosphere, and what impacts performance, the lack of administrative support, lack of IT support, and difficulties with the AO and IT Specialist/Union local president by far exceeded any other negative comment.

- Gender, Ethnicity and Racial concerns.

  o   Approximately 25% of those interviewed described situations that made them uncomfortable relating to gender, ethnicity, and race.

  o   This report has already documented allegations that the IT Specialist used racially charged remarks.

- Factors Contributing Negatively to the Work Environment.  The following factors frequently appeared in statements from employees.

  o   Interpersonal conflict among some of the Scientists,

  o   Interpersonal conflict between the Scientists and the administrative staff, and

  o   Lack of sufficient staffing, sufficient maintenance, communication, and a permanent Research Leader to provide focus and oversight on these matters.

## IV.  Summary of Findings

The factors most affecting the working environment at SHRS are the long delay in hiring a strong and permanent Research Leader, a host of issues attributable to the performance and conduct of the AO and the IT Specialist, and a disheartened and disjointed Research team. The three are interrelated and together consume large amounts of time, resources, and overall sense of well-being at SHRS. To address these issues will require continued vigilance and determination to continue to work toward ensuring performance and conduct issues are being consistently addressed, especially while transitioning to a new RL.

1. <u>Employee Engagement.</u> Most Scientists and Technicians like their work and have high regard for and like their research teams, but have little knowledge about what else is happening at SHRS or ARS plans for the site. Even so, they view the work environment as very negative largely because of lack of administrative support and the hostility or operational harassment they experienced from the Administrative Officer and the IT Specialist. The fear of getting dragged into to problems by the AO or the IT Specialist and frustration of not being able to get things taken care of is contributing to erosion of goodwill, sense of well-being, and



overall morale. Many employees are further discouraged that ARS will not address the issues anytime soon.

2.  <u>Research Leaders and ARS Support</u>.  Multiple changes in the RL position over the past six years, even with the considerable time and energy devoted to SHRS by ARS Area Office and USDA, has contributed to many of the issues identified by the employees in the climate assessment. It is common that such a situation, especially coupled with the deficiencies in the administrative office, will erode the cohesion in an organization and employee morale as it has at SHRS.

    Some Scientists are frustrated and even feel bitterness about the amount of time it has taken for ARS to hire a permanent RL who is skilled and committed to their research and administrative needs. They appear uncertain and possibly uninterested in working with a temporary RL to address long-standing issues because he is temporary. From their past experiences, they expect he will soon leave and they are not convinced they should invest energy until there is a permanent RL.

3.  <u>The Role of the Scientists</u>.  The Scientists are key players in the success of strategies going forward. They are highly regarded by their teams and are committed to the research, which is the reason for SHRS to exist. They recognize that some of them have become increasingly self-interested as they have struggled with resource limitations, staffing and administrative issues and lack of clarity and constancy in leadership. These factors have contributed to the increase in tensions among them. Strategies that demonstrate an appreciation of their contributions and a clear commitment to their issues can have an important impact on the entire staff. They also recognize how important the RL is for them; that they need for someone to define a vision for the future, to help set priorities, advocate for their needs and to draw the SHRS research community together.

4.  <u>Administrative and Personnel Issues</u>.   The temporary RL has been confronting the very difficult personnel issues identified in this report, enduring a barrage of personal attacks, EEO complaints and union grievances in the process. He has also been implementing policies to require accountability administratively and among researchers, and is attempting to address the personnel issues to restore the resourceful and collegial climate that existed in the past. The following summarize the most impacting of these issues.

    - **Travel**. Researchers need clarity from the Administrative Office about the process for coordinating travel requests. They need much more timely action to process requests, timely feedback about the status of their requests and proactive problem solving. They recognize that some of the problems are with the travel processing system but they feel the administrative staff should fully understand that system and be able to manage the process more effectively, keep them updated and engage with them to solve issues.

ADR Vantage

- **IT Support.** Staff do not get adequate or timely IT support. They are confronted with intimidating behavior when advocating for their needs and are fearful that the IT Specialist will disrupt their research or inappropriately access telephone or emails, and that he will, for unanticipated reasons, launch multiple complaints or grievances against them. They view the IT Specialist as a primary contributor to a hostile environment.

- **Administrative Staff Disconnected from the Mission.** Some of the administrative staff come under significant criticism. Researchers are frustrated that the administrative staff are ineffective in supporting their needs relating to new and ongoing research. In fact, they describe research-stopping problems with equipment installation, maintenance and repair; electrical and water systems being cut without consideration or even notice; a lack of caring and at worst an apparent effort to make things more difficult and more costly. Because the administrative staff have not had the benefit of consistent and coherent leadership in recent years, there may be an opportunity to see clear improvements in their functioning under more effective leadership. The Finance Officer is regarded as very reliable.

- **Vacancies.** The research teams experience the same kinds of frustrations with management of the vacancies as they do with travel.

- **AO's Behavior toward Researchers.** Scientists complain that the AO actively blocks things from getting done, adheres rigidly to his interpretation of rules that are barriers, even when proven wrong, does not act in a timely way, and is unwilling or unable to manage the IT Specialist.

5. **Administrative Officer and IT Specialist.** The AO appears to allow the IT Specialist freedom to act and to spend his duty time as he chooses, both for responding to IT support requests and for conducting union activities. Further, the AO appears to foster hostility in his interactions and especially when he or the IT Specialist are challenged. Some employees believe the AO shares information with the IT Specialist that the IT Specialist should not have access to and that the IT Specialist then uses the information to retaliate against whomever he feels he is in conflict with. Their behavior and apparent efforts to shield one another from accountability is disheartening for the employees, erodes the focus and goodwill of the staff, adds an enormous burden onto the research teams, and they believe it adds significantly to the Agency's cost in time and other resources.

Almost every person interviewed regards the actions and inactions of these two individuals as the most important immediate issue. No action by ARS will be effective in improving the atmosphere at SHRS without addressing the issues involving these two positions.

6. **Perceptions of Hostile, Harassment, and Unfair Treatment.** The source of what employees describe as harassment and hostility stems almost exclusively from the actions of the IT Specialist whether he is acting in that capacity or as NFFE local president, or he is coordinating with the Administrative Officer. Almost all EEO and union actions over recent

ADR Vantage

years have come from the IT Specialist, acting either on his own behalf or representing other bargaining unit employees.[5]

There is some likelihood these actions will continue if the USDA and ARS investigate recent allegations against him and/or move to track and improve his performance.

Other than the behavior of the IT Specialist, some employees have or are experiencing uncomfortable comments, jokes and suggestions based on their gender, ethnicity, or race. No one described these experiences as harassment but their experiences suggest insensitivity or a lack of recognition that these actions or statements are not appropriate could reflect deeper attitudes.

7.   **Questions of Waste, Fraud, and Abuse**.  ADR Vantage frequently works with agencies as a confidential neutral and in that capacity, we are obligated to report to the agency what we believe to be evidence of waste, fraud or abuse. We do not know what definition USDA would use for these concepts but the conduct we have heard about from SHRS employees concerning the IT Specialist would raise such a question for us. Specifically, we would be concerned with the following allegations:

- That the IT Specialist he has used his position as IT Specialist to access material he should not have access to,

- Examples we heard of aggressive and intimidating behavior, and

- Overuse of union grievances without an opportunity for management to address issues, which has cost the government in time and other resources.

---

[5] We heard from employees that, as NFFE local president, the IT Specialist would sometimes encourage employees to allow him to file grievances for them but often he would file grievances without the employee's consent.

ADR Vantage

## V.  Recommendations

1.  <u>Hire and onboard permanent Research Leader as soon as possible</u>. For this hire, it will be particularly important that the person selected is fully apprised of the challenges. The interview panel should be convinced that he or she will be skilled and committed to helping address immediate issues and rebuilding cohesion among the research teams. The following are recommendations to support the new RL and the transition.

    1.1. For the new RL to be successful it will be especially important that he or she:

    - Quickly establishes credibility with the Scientists and demonstrates an interest in their work;
    - Demonstrates skill and confidence as a manager with energy to address tough challenges; and
    - Can gain consensus on a plan-of-action to restore employee morale and team coordination and collaboration.

    1.2. In final interviews, share findings from the climate assessment and ask questions about his or her approach to addressing issues.

    1.3. Be prepared to offer the incoming RL resources to engage a neutral facilitator to help build Scientists' support and address team building, conflict management and process improvements issues.

    1.4. Brief the incoming RL on the steps taken by Dr. Abbas for continuity and as a framework to build upon.

2.  <u>Address internal issues while preparing for the new Research Leader</u>.  It will be important to sustain and build on the progress Dr. Abbas has been able to make in resolving the administrative and personnel issues, instituting new procedures, and working with Scientists and staff. The following efforts will reinforce support for Dr. Abbas or another temporary RL and the  Scientists while onboarding a new RL.

    2.1 If possible, retain Dr. Abbas for the transition period.  If not possible, confirm with him how long he will be able to continue and instruct him to communicate this to the SHRS staff.

    2.2 Whether nor not Dr. Abbas is able to remain as temporary RL through the transition, actively coordinate with him on the resolution of the ongoing personnel issues to prevent  backtracking and better ensure a smooth transition to the new RL.

    2.3 If possible, move the reporting line of authority for the IT Specialist to the RL for more immediate accountability and effective oversight.  This will be especially critical because of the difficulties concerning the  current AO documented through this assessment.

ADR Vantage

2.4  Provide the temporary RL with resources during the transition that will allow him to engage:

- A neutral conflict coach or other process consultant to support his handling of ongoing and very difficult internal conflicts, sometimes directed at him, and

- A neutral facilitator to help improve communication and dialogue with Scientists during the transition.

2.5  Commit to regular communication with staff including regularly scheduled staff meetings and supplemented meetings with email updates from the temporary RL to keep employees apprised of SHRS, ARS and USDA developments.  This will be especially important for reassuring staff during this time of SHRS transitions and the introduction of a new USDA administration.

3.  **<u>Communicate the outcomes of the climate assessment</u>**. It is always important to employees who participate in an assessment to learn what will result from their involvement. It is especially true when employees feel vulnerable or discouraged.  Communicating as much as legally possible about the results and proposed actions builds confidence and trust that SHRS employees will need to continue to support their managers and leaders as they work to address their issues.  This communication could be done in an all-hands meeting or in a meeting limited to the managers but with the expectation that the managers brief their teams.  Ideally, Dr. Brennan and/or Mr. Tucker would meet with staff, share as much as possible from the findings and actions the Area Office proposes, without betraying the confidentiality of participants, and encourage dialogue with the staff. It may be useful for the ARS office to engage a neutral facilitator to help encourage a productive dialogue and capture and help process points of view from the staff.

4.  **<u>Address morale issues among Scientists</u>**. Acting quickly on issues raised by the Scientists will communicate that their concerns have been heard and validated and will give them confidence and build goodwill toward their new leadership. The following would usually be conducted  by the AO. Since he has not been successful in addressing these concerns, we recommend these actions be conducted under the authority of the temporary RL or Area Office.

4.1.  Improve travel request processing.

- Designate someone from the Area Office or Headquarters  travel office to work closely with the SHRS Program Assistant to review the travel guidelines and approval procedures, identify where request most often gets delayed and develop internal procedures to streamline, track and report on approvals;

- Assign the Program Assistant to develop and commit to communication protocols that will:

    - keep travelers apprised of the status of their requests and involve them in problem solving,

    - provide routine updates to travelers on developments in travel policy, and

    - regularly seek suggestions from travelers for improving SHRS internal controls.

ADR Vantage

USDA Agricultural Research Service
SHRS Climate Assessment
February 2017

4.2. Engage a neutral facilitator to work with the temporary RL and Scientists to define and gain consensus on priority administrative issues, create a framework for coordination during the transition, and begin restoring collegiality.

4.3. Provide regular updates to the Scientists and the Administrative staff on the hiring progress for the RL. We would recommend that these communications come directly from Area Office Director, Dr. Brennan in coordination with the temporary RL.

5. **Govern actions of the IT Specialist.** Move the reporting line of authority for the IT Specialist to the RL to ensure his availability and improve responsiveness and to track satisfaction from Researchers and others. Investigate allegations that he has abused his access to data, emails and telephones as well as his conduct toward other employees and consider appropriate disciplinary measures as appropriate.

6. **Offer EEO and Implicit Bias training.** Within the coming 6-12 months, conduct training for the SHRS that includes both basics of a manager's EEO responsibility and a section on implicit bias, to address the issues raised in the climate assessment about statements, jokes and uncomfortable situations based on gender or ethnicity.

7. **Create a plan-of-action to incorporate recommendations and other actions adopted resulting from the climate assessment.** The incoming RL will want his or her own action plan or at least to review, revise and adopt an interim one. Acknowledging that hiring and onboarding could take months, we strongly recommend that the temporary RL be empowered to create an interim action plan. This is needed to assure a systematic response to immediate and critical issues and to reinforce the Area Office's message that ARS takes employee concerns seriously.

7.1. Create a plan that:
   - Systematically incorporates, prioritizes and implements ARS priorities for addressing concerns raised in this assessment; and
   - Includes benchmarks and methods for collecting periodic feedback from the RL, researchers and others on progress.

7.2. Build in employee support. Ideally there would be some level of employee involvement in developing the plan, at least keeping them apprised about the planning process, creating ways for them to provide suggestions, and encouraging their help in implementation.

8. **Conduct a follow-up climate assessment in 12-months** to gauge progress and refocus recommendations as needed. Follow-up assessments are not always needed or possible, given funding realities. When possible however, a follow-up assessment will support ARS objectives of improving SHRS and communicate to the SHRS employees ARS's intensions and commitment.

JOEY D. GONZALEZ RAMOS  V. ADR VANTAGE, INC.

EXHIBIT 4

AFFIDAVIT OF DIANE LIPSEY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOEY D. GONZALEZ RAMOS     *

    Plaintiff      *

v.            *

ADR VANTAGE, INC.,     *   Case: 1:18-cv-01690 JURY
              Assigned to: Mehta, Amit P.

           *

    Defendant     *

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### AFFIDAVIT OF DIANNE LIPSEY

1. My name is Dianne Lipsey. I am over the age of 21.

2.   I am making this Affidavit based on my personal knowledge of the facts set forth herein, or the facts as they appear in memoranda, records or data compilations of ADR Vantage, Inc.

3.   I am the President of ADR Vantage, Inc.

4.   ADR Vantage, Inc. is a Washington, DC Company. Our principal place of business is located at 1660 L Street, NW, Suite 302, Washington, DC 20036.

5.   ADR Vantage, Inc. is incorporated and headquartered in Washington, DC since 1993. It is a consulting firm specializing in conflict management and work place effectiveness almost exclusively as contractors for the federal government.

6.   The contract was entered into between ADR Vantage, Inc. and the Agricultural Research Service which is an agency of the United States Department of Agriculture headquartered in Washington, DC for the purpose of conducting an organizational climate assessment of the ARS Subtropical Horticultural Research Station (SHRS) in Miami Florida. Additionally, interviews were conducted at the ARS SHRS in Miami, Florida over a 3-day period or by telephone at a later date by two members of ADR Vantage staff in December 2016. Upon completion of the interviews, ADR Vantage compiled and analyzed the interview results and prepared preliminary recommendations and a draft report which was

submitted for review and comment via email only to Chevon Gibson (the USDA Contracting Officers Representative, located at the time in Washington, DC), Stephanie E. Masker (Senior Counsel, USDA Office of General Counsel, located at the time in Washington, DC), and Archie Tucker (ARS Associated Area Director located at the time in Southeast Regional Office in Arkansas) in January 2017.  Following their review we submitted a final copy on February 2, 2017.  ADR Vantage never sent the report to anyone – other than the three persons named in this paragraph, nor was the report published online.

7. The report by ADR Vantage was a summary of responses conclusions and recommendation based on interview questions posed to then current and a few former employees at SHRS, including members of ARS regional and SHRS leadership and ARS management.

8. In conducting interviews and preparing a report, ADR Vantage was merely acting pursuant to the requirements of the contract.  There was no agreement with anyone to perform an illegal act, nor was there any ill will nor intent to harm plaintiff nor anyone else.


Aug-27, 2018
DATE

_____
Dianne C. Lipsey, President ADR Vantage, Inc.


Verification under perjury: I declare that I have read the foregoing Affidavit and the facts stated in it are true, executed this _27_ day of August, 2018


_____
Dianne C. Lipsey, President ADR Vantage, Inc.


Subscribed to and Sworn before me at this _27th_ for the _August_ day of August, 2018.

_____
Notary Public

BRIAN DAVID ALGER
NOTARY PUBLIC
REG #
251114
COMMISSION
EXPIRES
1/31/2019
COMMONWEALTH OF VIRGINIA

State of _VIRGINIA_

My Commission Expires: _01.31.2019_

JOEY D. GONZALEZ RAMOS  V. ADR VANTAGE, INC.

EXHIBIT 5

ADR ORDER GRANTING MOTION TO DISMISS 05/04/2018

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

CASE NO. 18-20938-CV-KING

JOEY D. GONZALEZ,

      Plaintiff,

vs.

ADR VANTAGE, INC.,

      Defendant.

_____/

## ORDER GRANTING MOTION TO DISMISS

THIS CAUSE comes before the Court upon the Defendant, ADR Vantage, Inc.'s Motion to Dismiss (DE 4) filed on March 20, 2018. The Plaintiff filed its Response (DE #5) on March 30, 2018, to which the Defendant Replied (DE #8) on April 6, 2018.

### I. Background

The three-count Complaint (DE 1) alleges claims for defamation, civil conspiracy, and injunctive relief against Defendant ADR Vantage Inc., ("ADR"). All three claims relate to a Climate Assessment conducted by ADR in order to allow the United States Department of Agriculture ("USDA"), the Plaintiff's employer, to gain perspective and consider recommendations to create positive change. The survey was conducted on December 13-15, 2016 at the USDA Miami location and it was allegedly released in February 2017. According to the Plaintiff, certain unknown individuals attributed to Plaintiff matters of fraud, violations of rules and regulations, waste, abuse, and mismanagement of Federal government funds, harassment, and hostile working environment. The Defendant moves for dismissal based on a

lack of personal jurisdiction.

## II. Discussion

The determination of whether a federal court has personal jurisdiction over a defendant involves a two-part inquiry. First, it must be determined whether the complaint alleges sufficient jurisdictional facts to bring the action within the ambit of Florida's long arm statute, which is codified at § 48.193, Fla. Stat. *Venetian Salami Co. v. Parthenais*, 554 So. 2d 499, 502 (Fla. 1989). Second, the Court must determine whether sufficient minimum contacts exist, in order to satisfy the due process requirements of the United States Constitution. *Id.* "[T]he constitutional touchstone" of the determination whether an exercise of personal jurisdiction comports with due process "remains whether the defendant purposefully established 'minimum contacts' in the forum State." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985). "Jurisdiction is proper . . . where the contacts proximately result from actions by the defendant himself that create a 'substantial connection' with the forum State." *Id.* (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957) (emphasis supplied).

Turning to the first part of the inquiry, the Court finds that the facts alleged in the Complaint are not sufficient to bring the Defendant within the purview of Florida's long-arm statute. The Complaint alleges that this Court has personal jurisdiction pursuant to § 48.193(1)(b), but fails to explain how that section of Florida's long arm statue governs. The Plaintiff appears to rely on § 48.193(1)(a)2, based on his statement that "false and defamatory statements made by Defendant were published or accessed in Miami-Dade County, and because Defendant engaged in tortious acts inside Miami-Dade County." Plaintiff's allegations of actions by third persons that are unaffiliated with ADR are not relevant to the Court's personal jurisdiction inquiry.

2

Given the Court's conclusion, the Court need not consider whether Defendant has minimum contacts with Florida sufficient to satisfy due process. Based on the facts as currently alleged, however, the Court finds that the allegations of the Complaint fall short of establishing this Court's personal jurisdiction over Defendant. The due process clause's minimum contacts requirement is not satisfied by a mere showing that a non-Florida entity participated in a series of interviews that spanned no more than three days. The Defendant has no employees, officers, or registered agent within the State of Florida, does not maintain an address, office, or telephone listing in Florida, holds no bank accounts or solicits client in the State of Florida.

## III. Conclusion

Based on the foregoing, the Complaint must be dismissed with leave to amend and allege facts supporting this Court's personal jurisdiction over Defendant.

Accordingly, it is hereby **ORDERED, ADJUDGED, AND DECREED** that:

1. Defendant, ADR's Motion to Dismiss Plaintiff's Complaint for Lack of Personal Jurisdiction (DE 4) is hereby GRANTED.

2. The Complaint (DE 1) is DISMISSED WITHOUT PREJUDICE. Should he elect to do so, Plaintiff may file an amended complaint within twenty (20) days of the date of this Order.

**DONE** and **ORDERED** in Chambers at the James Lawrence King Federal Justice Building and United States Courthouse, Miami, Florida, this __ day of May, 2018.

JAMES LAWRENCE KING
UNITED STATES DISTRICT JUDGE

Cc: All Counsel of Record

3