# Exhibit

# E

Coral Gables, Florida

I, Joey D. Gonzalez-Ramos, being first duly sworn on oath, make the following statement, freely and voluntarily to K. Jake Dang (Dang), who has identified himself to me as a Special Agent (SA) with the Office of Inspector General (OIG), Office of Investigations, United States Department of Agriculture (USDA), knowing it may be used in evidence. I understand that this statement is not confidential and may be shown to any party who has an official interest.

My full name is Joey D. Gonzalez Ramos (Gonzalez). I am employed by USDA Agricultural Research Service (ARS) as a GS-11 IT Specialist for approximately 14 years. I have held this position since January 2003. My official duty station is USDA ARS, Subtropical Horticulture Research Station (SHRS), 13601 Old Cutler Rd., Coral Gables, Florida (ARS Miami Facility). I am the only IT specialist located here. I am the network administrator responsible for the computer server and telephone system at the ARS Miami Facility and the ARS facility in Ft. Lauderdale, Florida. My supervisor's name is David Alexander (Alexander), who is the Administrative Officer at ARS Miami Facility. I do not supervise any ARS employees. I also represent the ARS employees through the Union.

On Wednesday, October 19, 2016, and on other dates, I was interviewed by SA Dang in regards to Mars Chocolate North America, LLC (Mars) computer circuit that was installed within the ARS Miami Facility's LAN server/telephone room. During the interview, I told SA Dang the following:

Mars' role/function at the ARS Miami Facility is to conduct collaborative research on cocoa with our ARS scientists. Mars has shared office spaces and approximately 25 employees at this location. Since the previous Research Leader/Director (RL), Robert Heath, passed away, the

ARS Miami Facility never had a permanent RL.  Instead, ARS employees from other locations would rotate personnel into the ARS Miami Facility to serve as "Acting Research Leader/Director".  The RL is responsible for the ARS Miami Facility and supervises the Administrative Officer, IT Specialist, ARS scientists, and other ARS employees at the location.

Dr. Ricardo Goenaga (Goenaga) is the RL for ARS in Puerto Rico.  Approximately from March 2015 to December 2015, Goenaga was the Acting RL at the ARS Miami Facility.  Dr. Hamed Abbas (Abbas) is currently the Acting RL.  Abbas is from the ARS, Southeast Area office, Stoneville, Mississippi.

On April 22, 2015, Goenaga has sent me an email with a request from Mars concerning the lack of bandwidth delivered by the current DSL data link and wanted to remedy this by having a "higher capacity cable link" installed.  Mars wanted to determine what clearances were needed from ARS Miami Facility to authorize this installation.  Mars also wanted to "segregate USDA and Mars network infrastructure" and "would like the Mars network infrastructure components to be moved to a different room, perhaps one of the labs, where the access is restricted to primarily to Mars' associates".

On April 24, 2015, I replied to Goenaga's email that I do not know who would be the person (s) that would give clearances for the installation.   In the email, I referred Goenaga to Tom Houston (Houston), IT Specialist (Networking), OCIO Communications Services Staff, Beltsville, MD, with telephone number 301-504-1062, and Michael Lee (Lee), Supervisory IT Specialist (Administrative and Financial Management, Eastern Business Service Center, Information Technology Branch, College Station, Texas), with telephone number 979-260-9476, who would be the persons that could answer questions to these particular IT issues.  On the same date,

Goenaga replied and acknowledged to my email and said, "Great, thanks!"   After that, I do not

know whether Goenaga had contacted IT Specialists Houston and/or Lee about Mars' request.

As part of my job duties, I do not have the authority to approve and/or install Mars' computer IT

equipment.   I do not know who would make the decision or approve the installation of Mars

computer circuit inside the ARS LAN server room.   Normally when a USDA owned-computer

hardware or connector is being installed within the computer server room, only a representative

from the ARS Office of Chief Information Officer (OCIO) would contact me.

In June/July 2015, unbeknown to me, a representative from a private company arrived to install a

computer circuit inside the ARS LAN server room.   I asked Goenaga about the installation.

Goenaga told me that he thought I knew about the circuit installation.   Prior to the installation of

the Mars' circuit, I did not receive any communication from Goenaga or from anyone at the ARS

OCIO.

On October 14, 2015, Goenaga emailed the ARS Miami Facility's employees informing us that

personnel from Stratus Dynamics (Stratus), Colorado Springs, Colorado will be conducting an

on-site assessment of the ARS Miami Facility Information Technology (IT) and phone system

infrastructures.   Stratus was contracted by ARS to conduct an IT assessment of the ARS Miami

facility.   ARS paid $34,993 for this IT assessment.

On February 3, 2016, I received an email from Alexander about the IT assessment report and

findings. The Mars' computer circuit was mentioned in the assessment.   According to the IT

assessment report, dated November 27, 2015, the assessment was conducted between October 13

and November 6, 2015.   On page 22 of the report, under "MARS" heading, Stratus stated, "The

presence of Mars Inc. is unique within my experience.   I have not seen a commercial

organization present in a government location without specific, documented interaction that delineates the security boundary between the organizations.  As a privately held company, it is unlikely that Mars would follow the Federal Information Security Management Act (FISMA). There are comparable security standards available for commercial enterprises (Sarbanes-Oxley (SOX), Purchase Card Industry (PCI), International Standards Organization (ISO) 27000, etc.), as a privately held company, Mars could adopt any of them or choose to develop their own.  It is unlikely that their security focus would be in-line with US Federal/USDA/ARS requirements."

Some of the issues identified in the report were that ARS and Mars were sharing infrastructure such as the physical wiring that was owned by ARS.  It stated that "while Mars maintains its own network infrastructure for its workstations, it utilizes the physical ARS' wiring.  Mars employees have access to common space (conference rooms, library, etc.) and have connected to the ARS network to gain internet access.  Mars router, switch, and server resources are co-mingled with ARS router, switch and server resources.  Mars servers currently are connected to ARS power systems (UPS, Generator).  Inadvertent damage to Mars' systems could occur in the event of a power failure or something as simple as a power cord being dislodged.  The commingling of systems makes data ownership difficult to enforce."

After the IT assessment findings, I received addition information from forwarded chain email, dated February 1, 2016, where IT Specialist Houston sent an email to Silverstein outlining the actions and activities, with concurrence from ARS OCIO Chief Information Officer, Paul Gibson, and Chief Information Security Officer, Scott Finke, that the ARS Miami Facility and local IT specialist would need to do to resolve the identified and service issues and maintain the network on a regular basis.  In that email, among other items, it referenced Mars, in which

Houston stated, "No devices not managed by ARS are allowed on the ARS network.  Work with Mars to establish a data management plan for any shared/collaborative data."

On Feb. 3, 2016, after reviewing the IT assessment report, I replied to Dr. Jeffery Silverstein (Silverstein), Associate Area Director of ARS, Southeast Area, Stoneville, Mississippi, Dr. Abbas, and Alexander about issues that were mentioned in the IT assessment findings and among other things, the Mars' computer circuit where I had nothing to do with the authorization and installation of the Mars' circuit installation.  If Goenaga did not consult with OCIO, then he would have been solely responsible for the installation and commingling of Mars equipment at the ARS Miami Facility.

On February 3, 2016, after I explained in an email to Silverstein and other ARS employees about the Mars' computer circuit, I requested a conflict of interest investigation between Goenaga and Mars.  I do not know if Goenaga had received anything in return from Mars such as a bribe, gifts, or etc.   I believe that he is looking into the prospect of a getting a job with Mars, just like Dr. Raymond Schnell did in 2011 and that is the reason he facilitated the installation.  This is not the only thing he did for Mars while in Miami.  He also attempted to delay a security project with Lincpass and facilitated the modification of an electrical panel at the Miami location without authorization, all for the benefit of Mars.

On February 8, 2016, Silverstein replied via email informing me that he authorized an investigation based on what I have raised in the above email and that the investigation will be conducted by ARS Personnel and Labor Solutions (PALS).

Subsequently, PALS interviewed me twice (April 6 and May 11, 2016). I felt they were investigating me instead of my compliant. I felt that way because of the questions they were asking.

On September 5, 2016, GONZALEZ requested the results of the investigation conducted by PALS regarding the Mars circuit, from Jeffrey Silverstein (SILVERSTEIN). SILVERSTEIN at the time was the assistant Southeast Area Director to Deborah Brenna (BRENNAN). After few emails back and forth, I formalized the request with the Union and sent it to BRENNAN. On November 9, 2016, I received from HALL a response denying my request. In this response she also proceeded to berated me. For this reason I believe an investigation was never conducted.

To date, Mars circuit is still in the ARS LAN server room. Mars had inquired about quotes to relocate IT equipment and etc. and this information was provided to them. But they don't have the budget for it. Also, I created a shared folder on the network for Mars and ARS employees to share information, but there are no shared data in there.

I have provided a copy of the emails and IT assessment report that were referenced in my statement to SA Dang.

I have read this statement, consisting of 7 pages, and it is true and correct. I have initialed each page. I have been given an opportunity to make any corrections or additions.

Date  11/30/16

_____
Joey D. Gonzalez Ramos

WITNESS:



City and State

Subscribed and sworn
before me this 30 day of
November 2016

K. Jake Dang
Special Agent
U. S. Department of Agriculture
Office of Inspector General
Office of Investigations
Ft. Lauderdale, Florida

Coral Gables, Florida

I, Joey D. Gonzalez-Ramos, being first duly sworn on oath, make the following statement, freely

and voluntarily to K. Jake Dang (DANG), who has identified himself to me as a Special Agent

(SA) with the Office of Inspector General (OIG), Office of Investigations, United States

Department of Agriculture (USDA), knowing it may be used in evidence. I understand that this

statement is not confidential and may be shown to any party who has an official interest.

My full name is Joey D. Gonzalez Ramos (GONZALEZ). I am employed by USDA

Agricultural Research Service (ARS) as a GS-11 IT Specialist for approximately 14 years. I

have held this position since January 2003. My official duty station is USDA ARS, Subtropical

Horticulture Research Station (SHRS), 13601 Old Cutler Rd., Coral Gables, Florida (ARS

Miami Facility). I am the only IT specialist located here. I am the network administrator

responsible for the computer server and telephone system at the ARS Miami Facility and the

ARS facility in Ft. Lauderdale, Florida. My supervisor's name is David Alexander

(ALEXANDER), who is the Administrative Officer at ARS Miami Facility. I do not supervise

any ARS employees. I am also a Union president and represent the ARS bargaining unit

employees in Florida and Puerto Rico.

On Wednesday, October 19, 2016, and on other dates, I was interviewed by SA DANG in

regards to my OIG hotline complaint that involves a situation where a part-time ARS Miami

Facility employee, Clifford Ramsey (RAMSEY), Office of Automation Assistant, may have

been bribed with the offering of a full time position in return for him to file a grievance against

ALEXANDER.

For some time now, some supervisors at the ARS Miami Facility are trying to discipline
ALEXANDER.  The reason behind this is that these supervisors are afraid that ALEXANDER
would cite them for potential mismanagement of funds or safety concerns.  Also, because these
supervisors believe that the issues brought by the Union are the result of disclosures made by
ALEXANDER.  To advance this cause, Labor Relations Officer Kathleen Hall (HALL) from
ARS Personnel and Labor Solutions (PALS), Acting Research Leader (RL) Hamed Abbas
(ABBAS) for ARS Miami Facility, and Program Support Assistant Laverne Holden (HOLDEN)
from ARS Miami Facility enticed RAMSEY to file a grievance against ALEXANDER using the
Union that I preside.

RAMSEY reported for duty at the Miami ARS Facility on July 11, 2016.  The above situation
began approximately on August 3, 2016.  On that date, I received a phone call from HOLDEN
and ABBAS requesting information in regards to filing a grievance.  HOLDEN was in ABBAS'
office when they called me.  HOLDEN later explained that RAMSEY wanted to file a grievance
against ALEXANDER.  RAMSEY arrived minutes later seeking advice from the Union and
explained that he was misled by the Agency (ARS) into thinking that he would earn the salary of
a full-time employee when he was hired only as a part-time employee.  In other words,
RAMSEY'S contract/offer listed the salary of a full time employee rather than as a part-time
employee and that led him to believe that the full time salary listed was his salary.  For that,
RAMSEY blamed ALEXANDER.  I explained to RAMSEY that I did not see how
ALEXANDER was responsible for misleading him when he had nothing to do with his contract.
During the conversation, RAMSEY explained that before coming to my office, ABBAS and
HOLDEN agreed that he was misled by the Agency.  According to RAMSEY, ABBAS

proceeded to call the ARS Human Resources Department (HRD) to determine how RAMSEY could obtain a full time position.  RAMSEY mentioned that they spoke to Kristen Brunclik (BRUNCLIK) from the Agency's HRD to determine how they can make this happen.  Later, they called Karla Agurto (AGURTO), Financial Technician, into the office.  According to RAMSEY, they called AGURTO to determine whether the location had the budget for a full time position.  RAMSEY stated that when AGURTO went into ABBAS' office, he was asked to step out.  At that point, I suggested to RAMSEY to wait for the new offer to materialize instead of filing any grievance.  RAMSEY agreed.

To understand the role of HOLDEN in this situation, I want to explain that HOLDEN is the purported supervisor of RAMSEY.  Prior to this, ALEXANDER was RAMSEY'S supervisor. On July 22, 2016 (See Att. 1), and after RAMSEY started work at ARS Miami Facility, ABBAS and HALL sent the Union an email informing that the paperwork had been started to make HOLDEN a supervisor and that from that point on, HOLDEN would supervise RAMSEY. HOLDEN does not supervise anyone else.  I received HOLDEN'S purported official supervisory position documentation on November 7, 2016 (See Att. 1) from HALL. The person signing the authorization was BRUNCLIK.  Prior to November 7, I have requested HOLDEN's supervisory documentation in previous occasions with no avail.  On one of these occasions, I was berated in an email from ABBAS (See Att. 2).  HOLDEN'S documentation was effective and signed by BRUNCLIK on July 24, 2016. I believe this documentation was backdated. (See Att. 1)

Approximately two weeks later, on August 17, 2016, I received an email from RAMSEY with the attachment "TREATMENT." (See Att. 3). This time he made different accusations against

ALEXANDER in which RAMSEY did not discuss during our first conversation.  It's worth noting that the syntax and the grammar in the body of the email contrasted with the one in the attachment, which made me think that the email and the attachment were written by two different persons.  I invited RAMSEY to my office to discuss his concerns.  Once again, RAMSEY attempted to have the Union file a grievance against ALEXANDER. This time, he mentioned that ALEXANDER made him wear a "big shirt", made him work outside, and that he treats him different than HOLDEN.  He concluded that ALEXANDER was racially motivated.  His explanations this time were even less convincing than before.  During our conversation, I explained to RAMSEY why the union could not file a grievance against ALEXANDER.   We also talked about his accusation of racism.  At one point during the conversation, visibly upset at ALEXANDER, he referred to him as "that hazel eye."  At the end of the conversation, I told RAMSEY, and he agreed to wait until the offer for a full time position materializes.   He also agreed that he will email ABBAS to inquire about the full time position.

On September 12, 2016, I asked RAMSEY about the full time position and he expressed that he did not care anymore and that he just wanted to leave.  The same day HALL emailed Dave Stamey (STAMEY) about a situation between RAMSEY and GONZALEZ. (See Att. 4). STAMEY is the business representative from the National Federation of Federal Employees (NFFE).  According to HALL, GONZALEZ used the term "nigger" at the workplace while conversing with RAMSEY, and that word had no bearing in the discussion that took place between RAMSEY and GONZALEZ, while he first sought union representation.  She also said that RAMSEY complained that GONZALEZ did not want to file a grievance against ALEXANDER because they are "friends."

JD6

On September 13, 2016, ALEXANDER relayed to me that RAMSEY had complained about me to HALL because I refused to file a grievance and that RAMSEY stated that I made a racial comment during our conversation.  This alleged racial comment was no more than an explanation that I gave to RAMSEY during the second visit to my office while he was seeking union representation.  At first, RAMSEY stated that ALEXANDER had discriminated against him because ALEXANDER addresses HOLDEN (who like RAMSEY is African American) in a "different way".  I explained to him that if he wanted to succeed in a discrimination complaint, he needed more than that and that he needed events that arose to an inference of discrimination or alternatively a blatant act.  I then proceeded to give him an example using a situation that occurred at ARS Miami Facility many years ago where one employee called the other "nigger" and that employee succeeded in a discrimination complaint.  RAMSEY laughed about this story and related a personal experience while he was in the military where he witnessed someone called another person by the same epithet.

On September 13, 2016, I emailed ALEXANDER acknowledging the conversation we had and also asked RAMSEY to release from talking about the conversations we had while he sought union representation to file a grievance against ALEXANDER. (See Att. 5).  The next day, I saw RAMSEY in the Administration office.  He was sorting the mail next to the office of the purchasing agent, Selby Artis (ARTIS).  Ashley Johnson (JOHNSON), a lab technician that works at the location, was also in ARTIS' office.  I asked RAMSEY about the release and he responded that he doesn't have to release me from "anything."  He also said that I would need to speak with HOLDEN or ABASS.  I walked back to my office and wrote an email to RAMSEY memorializing our conversation. (See Att. 5)

On September 14, HALL stated that RAMSEY does not need to send me a release. I requested HALL to send me any complaint she had from RAMSEY against me, but she refused. She became very argumentative about the entire situation. (See Att. 5). HALL had requested or implied that the Union needed to file a grievance against ALEXANDER. However, HALL does not need the assistance from the Union in filing grievance. The Union and PALS are in opposite end. Rather than encouraging a grievance to be filed against ALEXANDER, PALS is supposed to prevent such actions. Also, HALL has been very combative in other grievances I have filed against other supervisors at the Miami location. This entire situation leads me to believe that HOLDEN, HALL, and ABBAS recruited RAMSEY to file a grievance against ALEXANDER in return for a full time position. When I refused to file the grievance through the Union, these individuals turned RAMSEY against me.

On September 21, 2016, ALEXANDER emailed me requesting a written statement, regarding a racial comment I made during my conversation with RAMSEY. I explained the situation to ALEXANDER to the extent I believed I was permitted. I maintained that my conversation with RAMSEY while he sought union representation was confidential. Once again, I requested a release or documentation regarding his allegations. When I refused to give a written statement, I received a second email from ALEXANDER. This time the claim was that I called an employee, presumably RAMSEY, a "nigger". I did not call RAMSEY the "N" word nor did I direct it at him. When I put in doubt the legitimacy of this inquiry, HALL intervened stating in an email dated September 22, 2016 that I was accused of misconduct, that I was the "target" of an

JD6

investigation, and that my request for this information was "clearly a conflict of interest."  (See
Att. 6). She also questioned that my conversation with RAMSEY was privileged.

Subsequent to this situation, I learned from ALEXANDER that RAMSEY made allegations that
he feels intimidated by my presence.  These complaints began after September 26, 2016, that day
I deposed HALL as part of a pending case I have before the Merit System Protection Board
(MSPB) in which it relates to my FY 2015 Performance Rating where Acting RL Ricardo
GOENAGA (GOENAGA) lowered my performance rating from Superior to Fully Successful in
retaliation for some protected disclosures I made regarding practices during GOENAGA'S
tenure at the ARS Miami Facility.  During the deposition, it became evident that HALL is a
material witness in the appeal.

For the above reasons, ALEXANDER asked me to access the Administration office space
through the "back door."  ALEXANDER and RAMSEY'S offices are at opposite sides of the
Administration office space.  ALEXANDER'S office is closer if accessed from the back door.
This also avoids passing next to RAMSEY'S office if I was to enter through the front door.
ALEXANDER also asked me not to go near RAMSEY'S office.  I complied with this request.  I
also limited my presence in Administration office area.  For example, I would wait until
Tuesdays or Thursdays, the days RAMSEY does not work, if I needed to speak with
ALEXANDER or for any other matter pertaining Administration matters.  This includes
attending to IT requests.

Despite complying with this request, it appears that RAMSEY kept complaining about my presence. I conducted two additional depositions for the pending MSPB'S appeal on October 26 and 27, 2016. One was for Alan Meerow (MEEROW), a researcher at the location, and the other for GOENAGA. Right after those depositions, ALEXANDER indicated that RAMSEY complained to HOLDEN, that I logged to the computer assigned to RAMSEY and that he felt intimidated and harassed. I explained that one of the days when RAMSEY does not work, I was testing the copier which is also used as a printer for personnel in Administration office. The computer was the only one available and closer to the copier. These two items are part of my IT responsibilities. RAMSEY also complained that he felt intimidated because I stood one day in the hallway outside of the Administration office.

On November 1, 2016, ALEXANDER delivered to me a document titled, "No Contact Order." (See Att. 7). According to this document, I am to "refrain from any and all workplace contact with Clifford Ramsey." Including "physical contact, prolonged staring, written communication, email, text messages, social media messages, verbal communication and any and all other types of contact." The "No Contact Order" did not state that I could not have access to the Administration office area or that I was to access the Administration office area only from the back door.

On November 13, 2016, after I received RAMSEY'S allegations regarding our meetings, I delivered to ALEXANDER my statements of what transpired during these two conversations with RAMSEY. (See Att. 8).

On November 14, 2016, while I was in ALEXANDER'S office, ABBAS arrived. At the time, RAMSEY had not arrived. After I finished talking with ALEXANDER, I went to my office. Minutes later ALEXANDER came to my office and told me that ABBAS has indicated that the "No Contact Order" meant that I could not be in the Administration office area at all the days RAMSEY have to be present at the location.

These actions I believe are in retaliation for the pending MSPB's appeal and the depositions that I conducted prior to these events. I felt that the No Contact Order had hindered the performance of my official duty when I arrive at work. It is my understanding that HALL and HOLDEN are behind these allegations from RAMSEY. HALL'S motivation is the fact that she is a material witness in the appeal and her participation, if proven can lead to disciplinary actions. HALL in turn advises ABBAS. HOLDEN seems to be seeking ALEXANDER's dismissal in order to obtain the position of Administrative Officer.

HOLDEN also advises ABBAS, in return receives preferential treatment from. For example, in May 2016, HOLDEN attended to an IT training in San Francisco, CA. This is another matter that I would like to inform OIG and that is related to the possible mismanagement of funds in regards ABBAS, HOLDEN and HALL. At the time and continuing up to the present, HOLDEN is the Program Support Assistant. There is no component of IT in her job descriptions. She is not knowledgeable of IT or computers. I did not find out about her training until she returned. At the time, she stopped by my office and told me about it. She said that a computer committee was formed and that is the reason she attended this training. This however was the first time that

I heard of this computer committee.  Since then, there has been no mention of a computer

committee, much less a meeting by such committee has been held.

ABBAS approved HOLDEN's IT training in San Franciso, California where it cost $7,600.00 for

HOLDEN to travel to San Francisco to attend an IT training.  This training was conducted by a

company called Unitek. According to HOLDEN she attended a "CompTIA" boot camp leading

to certification. The training in question includes components of computer repair, networking

and security.  HOLDEN did not possess the pre-requisites to attend this type of training. The

prerequisites for this training according to the Unitek site; "This certification boot camp is ideal

for those who have had some previous experience with hardware, networking and security

elements within the workforce."[1]  HOLDEN has been employed with the Agency since 2014, at

no time she has performed any work related to computers, nor mentioned that she has worked or

have knowledge of IT principles.  In July 2016, while I was on leave, a message was sent to the

employees at the ARS Miami location that HOLDEN was my backup.  This again was never

discussed with me before.  One of the reasons she cannot be my backup is that she could not do

my job just by attending a 7 day training.  But even if she does, she does not have any access to

the network and no administrative passwords to be able to fix any IT related problems.

The papers I provided to SA DANG showed that she traveled from Miami to San Francisco from

May 1 – 8, 2016.  The entire trip cost $7,630.00 ($3,500.00 for the training and the rest for

lodging and incidentals).  This by far is more expensive than any IT training I have ever attended

in 13 years with ARS.  She could have attended the same training in Miami or any other location

---

[1] http://www.unitek.com/training/comptia/aplus_netplus_securityplus_bootcamp.php#Pre-Requisites

in Florida, hence saving the $4,100 in lodging, rental car, and per diem.  I believe this trip was a gift from ABBAS for assisting him with ALEXANDER.  I also believe that she chose San Francisco, California because she wanted to visit someone there since pictures in her Facebook page show this. (See Folder 9).  As I previously stated, this training does not serve any purpose to the ARS Miami Facility.  Even if it was, it was not offered to anyone else but HOLDEN, which is probably the one of the least knowledgeable person at the Miami location to attend this type of training.

As previously discussed, HOLDEN is at the present time a supervisor at the request of ABBAS. Prior to this designation, in 2015, I represented and advised HOLDEN regarding several complaints from researchers at the location.  The complaints began almost immediately after HOLDEN was employed by the Agency in 2014.  They are consistent with the fact that HOLDEN was not performing adequately.  For this reason, during her tenure, GOENAGA suspended her teleworking privileges.  On one occasion, I had to meet with GOENAGA and David Kuhn (KUHN), one of the researchers at the location, regarding the treatment she received with KUHN on one occasion.  According to KUHN, he was frustrated after telling HOLDEN numerous times that she was not performing up to standard.   In an email dated September 21, 2015, from GOENAGA to HALL and that I obtained through discovery from the pending MSPB appeal, GOENAGA describes HOLDEN'S reviews as "terrible." (See Att. 10). According to GOENAGA, he had a meeting with the scientific staff and "not a single scientist said anything positive about her (HOLDEN'S) performance on issues pertaining to travel."  Somehow she retook her teleworking privileges after GOENAGA left in December 2015. This prompted MEEROW, at the time the location's temporary Research Leader, to inquiry in January 2016 as



to why she was teleworking. (See Att. 11). Since her arrival in 2014, MEEROW has been one of

the most fervent critics.

When confronted with the 2015 email about HOLDEN'S performance during the deposition,

HALL became evasive.  I asked her how is it possible that less than a year from the date and

under these circumstances, HOLDEN was about to be designated a supervisor, she denied any

knowledge of this and refused to give any opinion.  (See Att. 12). HOLDEN has taken advantage

of her position as a supervisor.  She arrives late in the afternoon for no apparent reason.  For a

long period of time, she has not work an entire week.  On some weeks, she is only at the location

for two days.  Despite of this, I believe she is entitled or may be charging overtime.  This is

because in the documents I obtained regarding her supervision, I did not see that she was

classified as "exempt." (See Att. 1).

Her continued absences and chaotic schedule has caused problems and complaints from some of

the employees at the location.  I have knowledge of at least three scientists:  MEEROW, Osman

Gutierrez (GUTIERREZ), and Nancy Epsky (EPSKY), who could not travel at the end of the

year after they have scheduled hotel reservations and air fare because problems with HOLDEN'S

performance.  I personally have spoken with Elena Schnell (SCHNELL), a lab technician

working at the location,  and GUTIERREZ, and both persons told me that because of

HOLDEN'S delays in processing their travel documentations, they were threatened by the credit

bureau regarding their credit.  Despite of this, she is able to maintain the same schedule and

allow to supervise a part-time employee, RAMSEY.  I believe the reason for this is that

RAMSEY has been assigned to take over her responsibilities.  In a subsequent conversation with



ABBAS and in the presence of ALEXANDER and HALL, ABBAS explained to me that
RAMSEY will be performing HOLDEN's tasks, such as travel and timekeeping.  RAMSEY, as
his title implies (Office Automation Assistant), was not hired by the Agency to perform
HOLDEN'S job.  In addition, RAMSEY is a GS-4 while HOLDEN is a GS-7.  This is another
example of the preferential treatment she receives.

In August 2016, ABBAS represented to the employees at the location that HOLDEN was a
supervisor.  As previously indicated, I was not provided HOLDEN'S official documentation
until mid-November and was backdated to July 24.  I believe the reason for this was to justify
HOLDEN'S attendance to a scheduled training only for supervisors at Fort Pierce, Florida on
September 15.  Despite the fact that the ARS location in Fort Pierce is around 2.5 hours from
Miami, HOLDEN was authorized two days of travel along with lodging and per diem by
ABBAS or Archie Tucker (TUCKER), who is the Assistant Southeast Area Director.  HOLDEN
travelled to West Palm Beach (WPB) on August 13 in a Government vehicle from the Miami
location.  From August 14 to the 15, she was authorized to travel to Fort Pierce.  I have alerted
ALEXANDER of HOLDEN'S presence at WPB, after noticing pictures of the hotel in her
Facebook page on September 13, 2016.  One of the posting showed that she arrived at the
Courtyard WPB Airport at 6:30 PM. (See Folder 13).

One of the postings show that HOLDEN was attending a "VIP Open House" for a company
called "Legalshield" (https://www.legalshield.com).  This company appears to sell legal
insurance or legal advice when needed for a monthly premium.   Legalshield also recruits
associates to sell its products.  According to Facebook, the activity was scheduled on September

13, 2016 from 7:15 PM to 10:15 PM.  When confronted by ALEXANDER on November 7, 2016, ABBAS and HOLDEN lied about the reasons for being in WPB.  According to HOLDEN, she was authorized prior to travel to Ft. Pierce because ABBAS' flight was redirected to WPB. ABBAS went along with HOLDEN'S initial response.  He stated that he was scheduled to meet with his collaborator Brian Scully (SCULLY) and HALL at Fort Pierce.  That because his plane landed in WPB around midnight, HOLDEN came to pick him up, and that rather than "driving back after midnight" (presumably to Miami), he and HOLDEN decided to stay overnight. (See Att. 14).

On November 9, 2016, after ALEXANDER requested confirmation from TUCKER, ABBAS changed his story.  Now, according to ABBAS, HOLDEN came to pick him up the next day (September 14) from the hotel because he took a shuttle from the airport to the hotel when he landed in WPB.  ABBAS also made a point to specify that he and HOLDEN stayed in different hotels.  ABBAS then proceeded to berate ALEXANDER stating that he should not have requested confirmation from TUCKER because the travel "approval stops with [him]."  He called ALEXANDER questioning the "unprofessionalism and behavior he did not expect from an AO."  He also stated that ALEXANDER'S conduct was not beneficial to building a bridge and repairing the damage he continued to practice relentlessly.  He ended this rant reminding ALEXANDER that he was on a Performance Improvement Plan (PIP).  To wit, he stated that he "remain (sic) hopeful the PIP would be a way for [him] to focus and redirect [his] efforts but by this very communication [he] was no longer certain."  (See Att. 14). I am familiar with this type of response from ABBAS. When HOLDEN is mentioned, he becomes aggressive and defensive.

Previously, I had sent an email to ABBAS regarding HOLDEN'S supervisory position.  He also berated me implying that I am a coward hiding behind the union and that I was trying to "pick up a fight."  I have requested this information from ABBAS because I observed HOLDEN assigning duties to RAMSEY and wanted to assure she was a bona fide supervisor. Also because once HOLDEN became officially designated a supervisor, she could no longer be a member of the union. (See Att. 2).

The truth is that ABBAS was previously scheduled to arrive on Delta flight 1229 at WPB at 12:22 AM on September 13.  He also had a reservation confirmed (86369289), at the Hampton Inn in WPB from September 13-14 arriving at 12:24 AM. (See Att. 15). ABBAS' plane was not redirected as HOLDEN previously stated.  As for HOLDEN, she also had a reservation to stay in WPB on September 13.  She arrived at the hotel around 6:00 PM that day or 6 hours before ABBAS landed.  (See Att. 16). There was no such emergency to pick ABBAS at midnight as she tried to make it appear.

On a separate matter, last year approximately in May 2015, ALEXANDER refused to approve an illegal purchase of construction material ordered by GOENAGA, the location's former Acting Research Leader.  For this reason, GOENAGA and the location's purchasing agent ARTIS were subjected to a ratification of unauthorized commitment. (See Att. 17) I learned about this situation because I ultimately represented the purchasing agent after he was given a letter of caution.  At the time, ALEXANDER said that he was being retaliated for this.



The illegal purchase was for a slab of concrete for a greenhouse that the location had some union members build. One employee in particular installed an electrical system in this greenhouse. The employee in question is Ricardo Gonzalez (R. GONZALEZ), a subordinate of MEEROW. R. GONZALEZ is an Agricultural Science Technician. This employee is not certified to do electrical installation, nor was hired for the Agency to do this type of work. The Union was involved in this situation because these constituted a change of working conditions and a safety concern.

In one of my conversations with ALEXANDER regarding the greenhouse, he told me that he had brought an electrician to the location for unrelated reasons and that the electrician discovered the electrical system in the greenhouse was unsafe. For these reasons, the ARS Miami Facility had to hire a certified electrician to re-install the electric system. (See Att.18). This resulted in disruption in the use of the greenhouse. Later ALEXANDER told me that some of the supervisors at the location, who were involved in building the greenhouse, started to send emails with disparaging comments about him. He also told me that for reporting the unsafe conditions at the greenhouse, one of these supervisors yelled at him.

On another occasion, ALEXANDER mentioned that some money destined to pay for the maintenance of some of the location's buildings were being used to pay for the utilities of the location's main building this is the building where the administration office building is located as well as most of the laboratories and personnel at the location. These buildings are literally falling apart. He said that after he reported this situation, he was blamed for it, even though this situation started years before he began working for the Agency at the end of 2014. This resulted

in ALEXANDER placement in a PIP.  For this reason, I also believe that ABBAS, HOLDEN,

and HALL wanted RAMSEY to file a grievance against ALEXANDER.  This obviously would

justify the PIP and makes the case stronger to fire ALEXANDER.  I also believe that now they

are coercing ALEXANDER to send emails or personally question me pretending he is inquiring

into the alleged act of misconduct on my part.   As of today, Mr. Ramsey remains a part- time

employee.

I have read this statement, consisting of <u>17</u> pages, and it is true and correct. I have initialed each

page. I have been given an opportunity to make any corrections or additions.

Date _____11 / 30 / 16_____



Joey D. Gonzalez Ramos

WITNESS:

/s/

_____

City and State

Subscribed and sworn
before me this _30_ day of
November 2016

K  Jake Dang
Special Agent
U. S. Department of Agriculture
Office of Inspector General
Office of Investigations
Ft. Lauderdale, Florida