## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOEY D. GONZALEZ RAMOS,            :
                                  :
    **Plaintiff**            :
                                  :
v.                                :            **Case No.: 18-cv-01690 (APM)**
                                  :
ADR VANTAGE, INC.,                :            **Assigned To: Amit P. Mehta**
                                  :
    **Defendant.**           :

## DEFENDANT, ADR VANTAGE, INC.'S
## RENEWED MOTION FOR SUMMARY JUDGMENT

COMES NOW the Defendant, ADR VANTAGE, INC. (hereinafter "ADR"), by and through its counsel, John J. Murphy, Esq., and Walker, Murphy & Nelson, LLP, and, pursuant to Rule 56 of the Federal Rules of Civil Procedure, hereby files this Renewed Motion for Summary Judgment, and in support thereto states as follows.

1.      The above captioned action involves Plaintiff's allegations of personal damages stemming from Defendant's alleged defamatory statements written in a Climate Assessment Report prepared for the USDA. *See, generally, Complaint.*

2.      On December 7, 2020, this Court denied without prejudice Defendant's then-pending summary judgment motion and allowed Plaintiff leave to depose Archie Tucker, Southeast Area Director for the USDA. *See, ECF 78.* On January 14, 2021, Mr. Tucker was deposed and after a status conference on February 8, 2021, this Court issued a briefing schedule for the instant Motion. *See, ECF 86.* This Renewed Motion for Summary Judgment follows.

1

3.    Based on the undisputed evidence and applicable law, Defendant ADR is entitled to derivative sovereign immunity.

4.    Based on the undisputed evidence and applicable law, Plaintiff's claims are barred by the statute of limitations.

5.    Based on the undisputed evidence and applicable law, Defendant's Climate Assessment Report is subject to multiple qualified immunities.

6.    Based on the undisputed evidence and appliable law, Plaintiff has failed to generate a *prima facia* case for defamation.

7.    Based on appliable law, the District of Columbia does not recognize an independent cause of action for civil conspiracy.

8.    Based on the undisputed evidence and appliable law, Plaintiff has failed to generate a *prima facia* case for intentional infliction of emotional distress.

9.    Based on the undisputed evidence and appliable law, Plaintiff has failed to generate a *prima facia* case for invasion of privacy.

10.    That as set forth more fully in the accompanying Memorandum of Points and Authorities, Defendant ADR is entitled to Summary Judgment as a matter of law.

WHEREFORE, the above-premises considered, it is respectfully requested that this Honorable Court:

1.    Grant this Renewed Motion for Summary Judgment; and

2.    For such other and further relief as this Court deems just and appropriate.

2

Respectfully submitted,

WALKER, MURPHY & NELSON, LLP

/S/ John J. Murphy

John Murphy, Esq. (Bar #14407)
9210 Corporate Boulevard, Suite 320
Rockville, Maryland 20850
(301)-519-9150 (Office)
(301) 519-9152 (Fax)
jmurphy@walkermurphy.com

## REQUEST FOR HEARING

Defendant hereby requests a hearing on all issues raised herein.

Respectfully submitted,

WALKER, MURPHY & NELSON, LLP

/S/ John J. Murphy

John Murphy, Esq. (Bar #14407)
9210 Corporate Boulevard, Suite 320
Rockville, Maryland 20850
(301)-519-9150 (Office)
(301) 519-9152 (Fax)
jmurphy@walkermurphy.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Motion for Summary Judgment was electronically mailed and/or mailed on the __22nd__ day of February 2021 to:

Joey D. Gonzalez Ramos, Esq.
P.O. Box 145073
Coral Gables, FL 33114-5073
E-service: joey.gonzalez@jdg-lawoffice.com
***Pro Se Plaintiff***

/S/ John J. Murphy

John J. Murphy, Esq.

3

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **JOEY D. GONZALEZ RAMOS,** | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **Case No.: 18-cv-01690 (APM)** |
| | : | |
| **ADR VANTAGE, INC.,** | : | **Assigned To: Amit P. Mehta** |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT, ADR VANTAGE, INC.'S <u>RENEWED MOTION FOR SUMMARY JUDGMENT</u>

The Defendant, ADR VANTAGE, INC. (hereinafter "ADR"), by and through its counsel, John J. Murphy, Esq., and Walker, Murphy & Nelson, LLP, and, pursuant to Rule 56 of the Federal Rules of Civil Procedure, hereby files this Memorandum of Points and Authorities in support of its Renewed Motion for Summary Judgment.

## <u>INTRODUCTION</u>

Plaintiff, a licensed attorney in the State of Florida, has brought this multi-count litigation against ADR alleging Defendant defamed him. *See, generally, Complaint (ECF 1)*. This lawsuit is one of many lawsuits, union grievances, equal employment opportunity complaints, and other cases brought by Plaintiff against the United States Department of Agriculture ("USDA"), its agents, and its employees. The common theme throughout Plaintiff's crusade is his belief that there has been some grand conspiracy to besmirch his good reputation and terminate him as a USDA information technology specialist, with no accountability for his own actions whatsoever.

4

Last year Plaintiff narrowly escaped summary judgment by claiming a need to depose Archie Tucker, the Southeast Area Director of the USDA. *See, ECF 66.* This Court granted Plaintiff leave to do so and afforded him an opportunity to see if Mr. Tucker would recant his sworn declarations submitted to this Court. *See, ECF 78.* Predictably, instead of helping the Plaintiff's case, Mr. Tucker's deposition testimony only made it worse. *See, infra.* Among other information helpful to the defense, during Mr. Tucker's deposition it was finally revealed that the Plaintiff received an unredacted copy of Defendant ADR's subject Climate Assessment Report on April 25, 2017, well over a year before he initiated this defamation case, despite Plaintiff's representations to this Court to the contrary.

Plaintiff has maintained the instant litigation for the past 2.5 years through obfuscation and a concerted effort at creating a raft of discovery "disputes" which have been soundly rejected.[1] Succinctly stated, ADR never defamed Plaintiff, enjoys derivative sovereign immunity and other qualified immunities, this case is barred by the statute of limitations, and any alleged damages are a mere charade. While Plaintiff maintains this and separate litigation against others, he has been on paid administrative leave collecting a salary at the expense of U.S. taxpayers, all while wasting valuable governmental resources with his ongoing and unrelenting litigation tactics. Because the instant litigation is devoid of any legal merit, summary judgment and sanctions are warranted.[2]

---

[1]    Plaintiff has filed at least thirteen (13) motions alleging some form of discovery dispute, all of which have been denied in whole or in part by this Court. *See, ECF 11, 15, 25, 27, 31, 35, 37, 38, 49, 51, 53, 74 and 82.* As to the last motion, this Court concluded, in part, that Plaintiff's discovery was "designed to harass opposing counsel … and intrude into his investigative efforts and mental impressions, which are covered by the attorney work product privilege." *See, February 7, 2021 Minute Order.*

[2]    Contemporaneously with the filing of the instant Motion, ADR is renewing its Rule 11 Motion for Sanctions.

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

1.      In November 2016, the USDA issued a Request for Work (#115505) seeking proposals meeting a specific "Statement of Work" from contractors like ADR to perform a formal Climate Assessment at its Miami field office.  *See, Statement of Work, attached hereto as* **Exhibit 1.**

2.      The USDA sought a formal climate assessment after it received complaints from employees alleging a hostile work environment along with concerning Federal Employee Viewpoint Survey results.  *See, Affidavit of Archie Tucker, ECF 30-2 at ¶¶ 7-10.*  In general, a climate assessment report is undertaken by a third-party neutral like ADR to assess and identify themes and patterns in a certain work environment with the goal of improving workplace conditions.[3]

3.      ADR was awarded the contract for the USDA Climate Assessment and completed the project in February 2017, culminating in a formal Climate Assessment Report which is the subject of the instant litigation.  *See, Climate Assessment Report, attached hereto as* **Exhibit 2**.

4.      Prior to ADR's Climate Assessment, Plaintiff served as the USDA's local Union President by default as he was never elected to that position and there were only two other union officials in a leadership role at the USDA Miami office.  *See, Plaintiff's Deposition at pp. 23, 157, excerpts attached hereto as* **Exhibit 3**.  During his time as the de facto Union President, Plaintiff filed as many as 14 to 15 unfair labor practices complaints against the USDA in a single year.  *Id.*

---

[3]      At the depositions of ADR employees Dianne Lipsney and Richard Bucchari, they explained in general terms how climate assessment reports were performed and utilized based upon their industry knowledge.  Copies of their transcripts are not currently available.

*at pp. 23-26.* Once Plaintiff was removed as Union President for not paying dues, the union "disappeared" and is no longer active. *Id. at pp. 157, 27.*

5.     Also prior to ADR's Climate Assessment, USDA employees Dr. Meerow and Mr. Ramsey filed Complaints alleging improper conduct on Plaintiff's part. *Exhibit 3 at pp. 59.* For example, Mr. Ramsey asserted that Plaintiff created a racially hostile work environment by using the "N word" which corroborates a statement in ADR's report about "documented allegations that the IT Specialist used racially charged remarks." *Id. at pp. 61-63. See, also, Exhibit 2 at p. 13.*

6.     When ADR employees went to the USDA's Miami office to conduct the climate assessment, Plaintiff emailed all union employees not to participate in the assessment and verbally instructed his two closest colleagues and supporters not to participate. *See, Exhibit 3 at p. 67.* Plaintiff also did not participate in the assessment himself, thereby assuring ADR would not hear his version of events. *Id. at pp. 67-68.*

7.     Once ADR completed its official Climate Assessment Report, ADR did not release it to anyone other than a handful of USDA executives. *Exhibit 3 at pp. 80.*

8.     During the course of this litigation, the USDA affirmed that "[a]t all times when conducting the Climate Assessment and creating the Climate Assessment Report, Defendant-ADR acted in a consultation relationship with USDA. There was no instance wherein Defendant-ADR had an adversarial relationship with USDA." *ECF 28-1 at ¶ 10.* In fact, USDA's own legal counsel helped guide Defendant ADR "regarding the scope and means of conducting the Climate Assessment and the creation of the Climate Assessment Report." *ECF 30-2 at ¶ 17.*

9.     In connection with separate litigation Plaintiff brought against the USDA before the United States Merit System Protection Board, Plaintiff deposed at least five (5) USDA employees: Nancy Epksy, David Kuhn, Hamed Abbas, Barbara Freeman, Ricardo Goenaga, and

Alan Meerow. *See, Plaintiff's Response to Request For Admissions Nos.* 43, 48, 53, 58, 63, and 68, attached hereto as **Exhibit 4.** In those depositions, Plaintiff purportedly asked the witnesses to identify statements they made to Defendant ADR in connection with its Climate Assessment and, at least in the Plaintiff's mind, he views their statements to ADR to be defamatory. *Id. at Response Nos.* 49, 51, 54, 56, 59, 61, 64, 66, 69 and 71.[4]

10.    Plaintiff also identified at least thirteen (13) USDA employees whom he believes conspired to have his employment with the USDA terminated. *See, Plaintiff's Answer to Interrogatory No. 15, attached hereto as* **Exhibit 5**. While this Court has ruled that the identification of USDA employees who participated in the subject climate assessment report is privileged, at least some of these thirteen individuals are known to have been interviewed by ADR. *See, ECF 46 at fn. 3.*

11.    In November 2017, Plaintiff filed a civil lawsuit against USDA employee Clifford Ramsey alleging defamation and intentional infliction of emotional distress claims, similar to the allegations in the case at bar. *Id. at Response No. 25. See, also, Gonzalez v. Ramsey, Case No. 2017-026753-CA-01, Complaint and civil docket sheet, attached hereto collectively as* **Exhibit 6**.[5] This is just one of multiple civil lawsuits, administrative proceedings, and EEOC complaints that the Plaintiff has filed against the USDA and its agents, servants and/or employees. *See, Exhibit 5 at Answer to Interrogatory No. 17.*

---

[4]    Copies of these deposition transcripts have not been produced during discovery in the instant litigation because, according to the Plaintiff, he never purchased said transcripts.

[5]    A printout of the civil docket sheet for the *Ramsey* litigation shows over 100 separate docket entries, many of which appear to be discovery disputes consistent with the pattern of discovery disputes alleged by the Plaintiff in the instant litigation.

12.     Also in November 2017, the USDA placed Plaintiff on a formal performance plan. *See, Performance Plan, attached hereto as* **Exhibit 7.** *See, also Exhibit No. 4, Response No. 28.* Rather than attempt to conform to the performance plan, Plaintiff admitted at deposition that he did not comply with all of its terms. *See, Exhibit 3 at pp. 118-128.*

13.     At the same time Plaintiff was actively embroiled in litigation with the USDA and its agents, servants and employees on multiple fronts, and was refusing to comply with all the terms of a formal performance plan, Plaintiff became a licensed attorney in the State of Florida and opened his own law practice in 2017. *Exhibit 4 at Response Nos. 24 and 42.*

14.     In February 2018, while still employed by the USDA and operating his own law practice, Plaintiff embarked on an email campaign against members of the USDA's leadership, culminating with emails to the Secretary of the USDA labeling Plaintiff as a "whistleblower" against the fraud and abuse occurring at the USDA. *See, Exhibit 4 at Response Nos. 33-37. See, also, emails attached hereto as* **Exhibit 8.** Therein, the Plaintiff wrote "I understand that for assuming my responsibility as an employee of your organization and report[sic] these issues, I will be dismissed in retaliation." *Id.*

15.     Plaintiff was terminated from the USDA in August 2018, a year and a half after ADR issued its Climate Assessment Report. *Exhibit 4 at Response No. 41. See, also, termination letter attached hereto as* **Exhibit 9.**

16.     Plaintiff has not sought any medical care, counseling, or taken any medications in connection with any alleged emotional distress at issue in this litigation. *See, Exhibit 3 at pp. 103-114.* In addition, Plaintiff had an unrelated heart attack sometime in 2017. *Id. See, also, Exhibit 5 at Answer No. 23.*

9

17.     Other than non-economic damages, the only monetary damages Plaintiff has claiming in connection with this litigation are his salary and benefits as a USDA employee prior to August 2018, although he has not calculated the amount of those damages.[6] *See, Exhibit 5 at Answer No. 21. See, also, Exhibit 3 at pp. 103-104.*

18.     On September 23, 2019, the Merit Protection Board concluded that while Plaintiff failed to prove its case of retaliation against the USDA, due to technical deficiencies in changes to its appraisal system, the Plaintiff was entitled to be reinstated and receive back pay from the date of his termination. *See, Decision, attached hereto as* **Exhibit 10.**  Plaintiff only recently conceded that he has received his back pay and been placed on paid administrative leave with full benefits from the USDA, all while he simultaneously maintains his own private law practice and pursues litigation as a *pro se* Plaintiff for monetary damages. *See, ECF 81.*

19.     On January 14, 2021, Plaintiff deposed Archie Tucker, Southeast Area Director for the USDA. *See, deposition excerpts, attached hereto as* **Exhibit 11**. At deposition, Mr. Tucker patiently explained that the USDA Miami field office was "dysfunctional" with issues that were "bigger than just [Plaintiff]" so a climate assessment report was used as a tool to "help identify" some of the problems. *Id. at p.* 91. Mr. Tucker went on to confirm that:

     a.  The USDA Miami office was receiving a disproportionate number of complaints that needed to be investigated. *Id. at pp. 175-178.*

     b.  The ADR climate assessment was a way for employees to feel comfortable sharing their honest assessments with an independent third party; it was never intended to be a formal investigation. *Id. at pp. 92-93; 172-173.*

     c.  The ADR climate assessment was one tool used by the USDA but its decisions were not based on the ADR report. *Id at pp. 187-190.*

---

[6]     During the February 8, 2021 telephone conference with this Court, Plaintiff represented that he is not claiming any past or future lost wages as damages. He has not, to date, supplemented discovery or his pleadings to withdraw that claim.

d.   ADR's climate assessment was only viewed by USDA's management and not publicly disclosed. *Id at pp. 128-129; 142-143.*

e.   At all times during the process, ADR was acting as a consultant to the USDA and complied with its contractual terms. *Id. at pp. 190-192.*

f.   After 5+ hours of questions from the Plaintiff, Mr. Tucker reaffirmed the statements in his prior declarations filed with this Court were true and accurate. *Id. at p. 201.*

20.   Following the revelation during Mr. Tucker's deposition that he provided Plaintiff with an unredacted version of ADR's Climate Assessment report much earlier than acknowledged by Plaintiff, on February 1, 2021, Plaintiff finally conceded that he received the unredacted document on April 25, 2017.  *See, February 1, 2021 email from Plaintiff and UPS tracking information, attached hereto collectively as* **Exhibit 12**.  *See, also, Exhibit 11 at pp. 132 – 134.*[7]

## LEGAL ARGUMENT

As set forth more fully *infra,* application of the relevant law to the undisputed facts warrants summary judgment in ADR's favor as a matter of law.

### 1.   Standard of Review for a Motion for Summary Judgment

"Summary judgment is appropriate when the pleadings and evidence demonstrate that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter

---

[7]   This concession is in direct contradiction to Plaintiff's prior repeated representations to this Court.  In his Complaint, Plaintiff alleges to have first received a "heavily redacted" copy of the Climate Assessment on July 14, 2017 and that he did not "discover" an unredacted copy until February 2018.  *See, ECF 1 at ¶¶ 33-34.*  In Opposition to Defendant's preliminary Motion to Dismiss, Plaintiff claimed he could not have received a copy of the unredacted Climate Assessment report before October 2017.  *See, ECF 8 at pp. 6-8.*  In Opposition to Defendant's Motion for Summary Judgment, Plaintiff asserted that he did not have an unredacted Climate Assessment report until October 2017.  *See, ECF 66 at p. 10.*

11

of law." *See, Dorn v. McTigue,* 157 F. Supp. 2d 37, 41-42 (D.D.C. 2001). *See also,* FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); Diamond v. Atwood, 310 U.S. App. D.C. 113, 43 F.3d 1538, 1540 (D.C. Cir. 1995). "In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true...However, a nonmoving party must establish more than 'the mere existence of a scintilla of evidence' in support of its position....By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment." *See, Id.* at 42, *quoting Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S. Ct. 2505 (1986).

It has long been held that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *See, Rubin v. Estate of Warner,* 881 F. Supp. 23, 25 (D.D.C. 1995), *quoting Celotex Corp., supra.* The facts in the case at bar are such that, as juxtaposed with the law as set forth *infra,* readily demonstrates why summary judgment is clearly appropriate in favor of Defendant ADR at this time.

### 2.  Defendant ADR Is Entitled To Derivative Sovereign Immunity

Under applicable federal law, a private contractor working for the United States of America may be entitled to derivative sovereign immunity. *See, generally, Yearsley v. W.A. Ross Const. Co.* 309 U.S. 18 (1940). *See, also, McMahon v. Presidential Airways, Inc.,* 502 F.3d 1331, 1343 (11th Cir.2007) (observing Yearsley created the so-called "doctrine of derivative sovereign immunity."). To claim such immunity, a private contractor generally must show that (1) it "was working pursuant to the authorization and direction of the federal government," and (2) "the acts

12

of which the plaintiff complained fell within the scope of those government directives." *In re World Trade Center Disaster Site Litig.*, 521 F.3d 169, 196 (2d Cir.2008) (citing Yearsley, 309 U.S. at 20–21, 60 S.Ct. 413). *Accord, Myers v. United States*, 323 F.2d 580, 583 (9th Cir.1963) ("To the extent that the work performed by [the federal contractor defendant] was done under its contract with the Bureau of Public Lands, and in conformity with the terms of said contract, no liability can be imposed upon it for any damages claimed to have been suffered by the appellants.") (citing *Yearsley*, 309 U.S. at 18, 60 S.Ct. 413).

This Court has had the opportunity, on occasion, to apply the doctrine of derivative sovereign immunity. For example, in the case of *In re Fort Totten Metrorail Cases,* 895 F.Supp.2d 48 (D.D.C. 2012), this Court considered *inter alia* claims of derivative sovereign immunity raised by a private contractor against the Washington Metropolitan Area Transit Authority ("WMATA"). *Id.* Noting that it was an open question as to whether the WMATA was even a federal agency, this Court denied the contractor's claim in that case because it was the WMATA, the purported sovereign entity, that was seeking to impose liability upon its general contractor. *895 F.Supp. 2d at pp. 73-76.*

Several years later, this Court had the opportunity to again consider and apply the doctrine of derivative sovereign immunity. *See, In re U.S. Office of Personnel Management Data Security Breach Litigation,* 266 F.Supp.3d 1 (D.D.C. 2017). In that case, the derivative sovereign immunity doctrine was invoked by Key Point, a government contractor. As this Court explained:

> And importantly, the sovereign in this case, OPM, does not disavow the actions of KeyPoint. Indeed, the complaint indicates as much, alleging that "OPM did not terminate or suspend its contract with KeyPoint." CAC ¶ 5. Thus, plaintiffs fail to plead facts sufficient to allege that KeyPoint violated OPM's explicit instructions or exceeded its authority under its contract with the agency. *266 F.Supp. 3d at 49-50.*

13

On appeal, the United States Court of Appeals for the District of Columbia reversed this Court's decision but, in doing so, had the opportunity to further clarify application of the doctrine of derivative sovereign immunity. *See, In re U.S. Office of Personnel Management Data Security Breach Litigation,* 928 F.3d 42 (2019).  As that Court explained:

> Derivative sovereign immunity, though, is less "embracive" than the immunity a sovereign enjoys. *Campbell-Ewald*, 136 S. Ct. at 672. It applies only when a contractor takes actions that are "authorized and directed by the Government of the United States," and "performed pursuant to the Act of Congress" authorizing the agency's activity. *Id.* at 673. In that way, derivative sovereign immunity ensures that " 'there is no liability on the part of the contractor' who simply performed as the Government directed." *Id.* (*quoting Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 21, 60 S.Ct. 413, 84 L.Ed. 554 (1940)); *id.* at 673 n.7 ("Critical in Yearsley was not the involvement of public works, but the contractor's performance in compliance with all federal directions."). Said another way, a government contractor that "violates both federal law and the government's explicit instructions" loses the shield of derivative immunity and is subject to suit by those adversely affected by the contractor's violations. *Id.* at 672.

*928 F.3d at* 68-69.

The United States Court of Appeals went on to explain the doctrine further as follows:

> After all, the driving purpose of derivative sovereign immunity "is to prevent the contractor from being held liable when the government is actually at fault but is otherwise immune from liability." *In re World Trade Center Disaster Site Litig.*, 456 F. Supp. 2d 520, 560 (S.D.N.Y. 2006) (internal quotation marks omitted), aff'd, 521 F.3d 169 (2d Cir. 2008); cf. *Filarsky v. Delia*, 566 U.S. 377, 390–391, 132 S.Ct. 1657, 182 L.Ed.2d 662 (2012) (if qualified immunity is withheld from private individuals "acting on behalf of the government," "government employees will often be protected from suit by some form of immunity, [while] those working alongside them could be left holding the bag—facing full liability for actions taken in conjunction with government employees who enjoy immunity for the same activity").

14

*Id.* at 70-71.

Turning to the facts in the case at bar, it is undisputed that at all times relevant hereto, ADR was acting pursuant to its contract with the USDA. *See, e.g., ECF 30-2* (Declaration of Archie Tucker). In fact, "[a]t all times when conducting the Climate Assessment and creating the Climate Assessment Report, Defendant-ADR acted in a consultation relationship with USDA. There was no instance wherein Defendant-ADR had an adversarial relationship with USDA." *ECF 28-1* at ¶ 10. The USDA has even confirmed that its own legal counsel helped guide Defendant ADR "regarding the scope and means of conducting the Climate Assessment and the creation of the Climate Assessment Report." *ECF 30-2* at ¶ 17. All of this was further confirmed via this Court's *in camera* review of hundreds of pages of privileged documents that included working drafts of ADR's Climate Assessment exchanged with USDA's leadership, which led in part to this Court's conclusion that at all times relevant hereto ADR was acting as the USDA agent. *ECF 46* at p. 7.

For good measure, Plaintiff confirmed with his own questioning of Archie Tucker that ADR complied with its contractual terms as a government contractor. *See, Exhibit 11.* Given these undisputed facts and the previously ruling by this Court, it is unassailable that ADR is entitled to derivative sovereign immunity. To quote the United States Court of Appeals for the District of Columbia, this "ensures that 'there is no liability on the part of the contractor' who simply performed as the Government directed" less ADR be "held liable when the government is actually at fault but is otherwise immune from liability." *928 F3d 68, 71 (internal citations omitted).* Accordingly, Defendant ADR is entitled to summary judgment as a matter of law.[8]

---

[8] Assuming arguendo this Court were to rule that derivative sovereign immunity did not apply for some reason, then as set forth *infra,* Defendant ADR would still be entitled to summary judgment on each of the Plaintiff's individual counts.

### 3.  Plaintiff's Claims Are Barred By The Statute of Limitations.

The crux of Plaintiff's Complaint – his defamation claim – is barred by the applicable one year statute of limitations.  As this Court recognized at the outset of this litigation, Plaintiff received redacted versions of ADR's Climate Assessment report more than one year before filing the instant action.  *ECF 13 at fn. 1*.  Plaintiff avoided dismissal at the preliminary stage of this litigation by representing to this Court that he was not aware of all of the defamatory statements more than a year prior to filing suit because he first obtained a "heavily redacted" version of the Climate Assessment report in July 2017.  *See, fn. 6, supra*.  That claim, however, has now proved patently false.  *See, Exhibit 12*.

The undisputed evidence is that Plaintiff was aware that a Climate Assessment was conducted in 2016 because he affirmatively instructed others not to participate in it.  *See, Exhibit 3*.  At Plaintiff's deposition, and under the penalties of perjury, Plaintiff claimed that he received a "heavily redacted" copy of the Climate Assessment Report in April 2017 (not July), but that despite such redactions the Plaintiff knew it contained negative statements about him.  *Exhibit 3 at pp. 75-77*.  Plaintiff then claimed it was not until July 14, 2017 that he received a "slightly redacted" version of the climate assessment report, which clearly showed negative comments about him.  *Id. at pp. 77 – 78*.  Because Plaintiff did not initiate the instant litigation until July 18, 2018, over a year after he received two different versions of the Climate Assessment Report which contained what he perceived to be defamatory statements against him, his defamation case is barred by the one year statute of limitations.  *See, e.g., Diamond v. Davis*, 680 A.2d 364 (D.C. 1996) (holding "[o]nce the plaintiff actually knows, or with the exercise of reasonable diligence would have known, of some injury, its cause-in-fact, and some evidence of wrongdoing, then [ ]he is bound to file [his] cause of action within the applicable limitations period, measured from the

date of [his] acquisition of the actual or imputed knowledge."). Indeed, the law is clear that all damages do not need to be known for a cause of action to accrue as "[a]ny appreciable and actual harm flowing from the [defendant's] conduct' is sufficient." *Knight v. Furlow*, 553 A.2d 1232, 1235 (D.C.1989).

Ironically, it was through Plaintiff's zealous pursuit of "discovery" that his semantical gymnastics regarding receipt of a "heavily" and "slightly" redacted versions of the climate assessment report tumbled and collapsed. In his original Complaint, and also at deposition, Plaintiff claimed he later "discovered" the unredacted Climate Assessment report without ever disclosing how or when he "discovered" it. *See, Exhibit 3. See, also, fn. 6, supra.* During Plaintiff's questioning of Mr. Tucker at deposition it was revealed, much to the surprise of undersigned counsel, that Plaintiff obtained the unredacted Climate Assessment report as part of an EEO Complaint he was prosecuting. *See, Exhibit 11 at pp. 132-133.* Counsel was then able to piece together, and get Plaintiff to finally concede, that he had within his own personal possession an unredacted copy of the climate assessment report as of April 25, 2017. *See, Exhibit 12.* Because the instant Complaint was filed more than a year later, on July 18, 2017, it is unequivocally barred by the applicable statute of limitations given that *any diligence* on the part of the Plaintiff would have uncovered the document that was in his own personal possession.

### 4.  **Plaintiff Has Failed To Establish A Prima Facia Case Of Defamation**

Even if not barred by limitations, Plaintiff's defamation claims fail as a matter of law. In the District of Columbia, to state a claim for defamation under District of Columbia law, a plaintiff must allege "(1) that he was the subject of a false and defamatory statement; (2) that the statement was published to a third party; (3) that publishing the statement was at least negligent; and (4) that the plaintiff suffered either actual or legal harm." *Farah v. Esquire Magazine*, 736 F.3d 528, 533–

34 (D.C. Cir. 2013) (citations omitted). In the case at bar, Plaintiff cannot establish any of these elements, much less all of them.

With respect to element one, on its face the Climate Assessment Report expresses no opinions about him. As clearly stated, ADR simply "collected and are reporting experiences and points of view from employees, management, ARS Area Office officials, and others." *Exhibit 2 at p. 4 ("Report Findings")*. Any statements Plaintiff deems "defamatory" are statements made by those who interacted with the Plaintiff and reported them to ADR; ADR was not the source of the alleged statements. As but one example, looking at one of the provisions of the report that appears particularly irksome to Plaintiff is the section titled "Questions of Waste, Fraud, and Abuse." *Id. at p. 16*. In this section of Defendant's report, ADR makes clear that it was not accusing the Plaintiff of these things but, rather, stating that based on what it "heard about from SHRS employees concerning the IT Specialist [it] would raise such a question for us." *Id at p. 18*. On the next page of its report, ADR clearly recommends that the USDA "[i]nvestigate allegations that [Plaintiff] abused his access to data …" *Id. at p. 19*. Nowhere in the report does ADR state that the allegations, reports, criticisms etcetera of the Plaintiff are true but, rather, expresses its opinion that an investigation of the claims it heard from USDA employees was warranted. *See, also, Wallace v. Skadden, Arps, Slate, Meagher & Flom, 215 A.2d 873 (D.C. 1998)* (recognizing qualified privilege for the legitimate expression of an opinion).

In addition to Plaintiff failing to recognize that ADR did not reach any conclusions or make any findings against him, Plaintiff has conceded that at least five USDA employees purportedly defamed him to ADR. *See, Exhibit 4*. Further, in his mind at least thirteen (13) USDA employees were out to conspire against him. *See, Exhibit 5*. This does not take into consideration all the litigation initiated by the Plaintiff against USDA agents and employees or the detailed grievances

18

he reduced to writing in his emails to Secretary Purdue at the USDA. *See, Exhibits 3, 4, 5 and 8.* Further, for reasons which seem obvious in retrospect, Plaintiff refused to participate in ADR's Climate Assessment and instructed others who might at least be supportive of him not to participate in the assessment as well. *Exhibit 3.* Given all these admissions against interest, it is impossible for Plaintiff to establish that any statement he deems defamatory in the Climate Assessment Report was not actually made by one or more of the people he has aggrieved over his years at USDA. This is especially true when this Court has had occasion to review *in camera* the clear, consistent, and harsh criticisms voiced by USDA employees against the Plaintiff. *See ECF 46.*

Regarding the second element, Plaintiff concedes that ADR did not publish its report to anyone except the upper management at the USDA. *See, Exhibit 3 at pp. 80-81.* Because the USDA is the contractual owner of the report, Plaintiff cannot be said to have "published" the statement to anyone. *See, Exhibit 1.* Indeed, dating all the way back to the outset of this litigation, this Court acknowledged that ADR's statements to the USDA within the context of an agent / principal relationship were likely privileged. *ECF 13 at p. 3 (citing Wallace v. Skadden, Arps, Slate, Meagher & Flom,* 215 A.2d 873 (D.C. 1998).

Third, there is not one scintilla of evidence to suggest that ADR acted negligently. Plaintiff has failed to identify a single expert to opine that there was some flaw or act of negligence in the manner or method with which ADR performed its Climate Assessment. *See, e.g., Exhibit 5 at Answer to Interrogatory No. 6.* Further, as Plaintiff is well aware from this Court's *in camera* review, ADR worked with the USDA's leadership, as well as USDA's legal counsel, to assure that it was acting in conformance with the USDA's expectations. *See, Exhibit 46.* Absent an expert to explain applicable industry standards for conducting a Climate Assessment and how ADR

19

somehow negligently deviated from said standards, Plaintiff cannot meet another requisite element of his claim.

Finally, there are no damages as a result of ADR's alleged defamatory statements. To the extent Plaintiff has averred his good reputation was damaged, there is not one scintilla of evidence to suggest that anyone provided a copy of the Climate Assessment by ADR changed their opinion of the Plaintiff in any way. To the extent Plaintiff alleges some nebulous emotional distress, he has failed to identify a single expert, or produce a single medical record, to document any of his assertions. *See, Exhibit 5.* To the extent Plaintiff has alleged he lost his job as a result of the Climate Assessment Report – as opposed to his refusal to comply with a performance improvement plan, refrain from filing grievances and lawsuits against the USDA, or sending incendiary emails to the USDA's leadership – the Merit Protection Board has ordered his job be reinstated with back wages paid. *See, Exhibit 10. See, also, ECF 81.* There are, therefore, no compensable damages.

Next, assuming arguendo Plaintiff could meet each of the elements for a defamation claim, any such claim is not actionable against ADR based on the common interest privilege. A qualified common interest privilege applies to statement(s) "(1) made in good faith, (2) on a subject in which the party communicating has an interest, or in reference to which he has or honestly believes he has a duty (3) to a person who has such a corresponding interest or duty." *Payne v. Clark*, 25 A.3d 918, 925 (D.C. 2011) (*quoting Moss v. Stockard*, 580 A.2d 1011, 1024 (D.C. 1990)). "Whether a statement is privileged is a question of law." *Id.* "Where the court determines that the common interest privilege is applicable, 'the defendant will be presumed to have been actuated by pure motives in its publication [, and] [i]n order to rebut this presumption, express malice or malice in fact must be shown [by the plaintiff].' " *Id.* (*quoting Moss*, 580 A.2d at 1024 (internal citation omitted)).

20

In *Wood v. American Federation of Government Employees*, 316 F.Supp.3d 475 (D.D.C. 2018), this Court ruled in an analogous case:

> Applying the common interest privilege, the D.C. Circuit has held that "there is no doubt that an officer of a union has a qualified privilege when he makes a statement informing the union of any supposed dereliction of duty of its officers." *Blake v. Trainer*, 148 F.2d 10, 12 (D.C. Cir. 1945). This principle applies here. Mr. Nelson is a National Representative of AFGE. His e-mail was sent to a small group of AFGE officers, members and staff, who all had a common interest in the proper functioning of AFGE Local 2798, violations of union rules, any supposed dereliction of duty by union officers, and anything else that materially affected their union. The statements in Mr. Nelson's e-mail informed these officers, members and staff of the supposed union-related wrongdoing of Plaintiff, a former AFGE officer, and two other AFGE officers. The e-mail therefore concerned matters of legitimate interest to officers, members and staff of AFGE and was entitled to qualified privilege.  *316 F.Supp.3d 482-483.*

The undisputed facts in the case at bar are that the USDA employed ADR to conduct a Climate Assessment after several years of complaints from employees at the USDA related to its Miami field office.  *Declaration of Archie Tucker, ECF 30-2 at ¶¶7-19.*  ADR's Climate Assessment report was then used to improve the working environment for USDA employees. *Id.* Just as in the union situation in *Wood, supra*, ADR's actions in the case at bar clearly enjoy a qualified privilege.  Moreover, there is not one scintilla of evidence to suspect that ADR, a small, reputable, woman owned business in the District of Columbia which did not know the Plaintiff, had any reason whatsoever to intentionally harm him or act with actual malice.  *See, http://adrvantage.com/.*

In addition to the common interest privilege, another qualified privilege applicable to Plaintiff's claim is that of consent.  "Publication of a defamatory statement is privileged if: (1) there was either express or implied consent to the publication; (2) the statements were relevant to

the purpose for which consent was given; and, (3) the publication of those statements was limited to those with a legitimate interest in their content." *Farrington v. Bureau of Nat. Affairs, Inc.*, 596 A.2d 58, 59 (D.C. 1991). Like the common interest privilege, the D.C. Circuit has applied the consent privilege to statements about conduct affecting the business of unions. *See Manbeck*, 384 F.2d at 973 ("plaintiff ... 'by virtue of his membership in the union, and assuming to serve it, was subject to reasonable criticism in respect of the work performed for the union.' ") (quoting *Caldwell v. Hayden*, 42 App. D.C. 166, 170 (D.C. Cir. 1914) ). Turning again to *Wood, supra,* this Court explained:

> Plaintiff voluntarily joined AFGE Local 2798 and then successfully ran for union office. *See* Wood Depo. at 12, 15–16, 19–20. By doing so, Plaintiff consented to the requirements that he uphold the union's constitution, and abide by its rules and disciplinary procedures. *Id.* This impliedly includes a consent to being the subject of internal union discussions criticizing his union-related activities. Mr. Nelson's e-mail falls within that category. The purpose of Mr. Nelson's e-mail, based on the content of the e-mail itself and Mr. Nelson's deposition testimony, was to protect the union by drawing attention to supposed violations of the union's constitution and rules. The e-mail was sent only to union officers, members and staff with a legitimate interest in such information. Plaintiff consented to being the subject of statements like these when he joined and then ran for elected office within AFGE. *316 F.Supp.3d at 483.*

The undisputed facts in the case at bar are nearly identical to *Wood* in that, here, Plaintiff was his local union president and many of the complaints / criticisms expressed by his fellow employees stemmed from the unrelenting grievances he filed in his role as a union officer. Because the entire purpose of the Climate Assessment was to help the USDA gauge ways to improve the working environment at its Miami office, and the report was given to only the USDA's leadership, this is precisely the type of situation where a qualified privilege should exist and be applied.

The sworn deposition testimony of Archie Tucker which Plaintiff, himself secured for the defense, confirms all of the above. Notably, ADR's climate assessment was a way for employees to feel comfortable sharing their honest assessments with an independent third party and was never intended to be a formal investigation. *See, Exhibit 12 at pp. 92-93; 172-173.* It was just one tool used by the USDA but its decisions were not based on the ADR report. *Id at pp. 187-190.* Moreover, ADR's climate assessment was only viewed by USDA's management and not publicly disclosed. *Id at pp. 128-129; 142-143.* Further, at all times throughout the process, ADR was acting as a consultant to the USDA and complied with its contractual terms. *Id. at pp. 190-192.* For any or all of the aforementioned reasons, Defendant ADR is entitled to summary judgment on Count I of the Plaintiff's Complaint.

### 5.  The District Does Not Recognize "Civil Conspiracy" As A Separate Tort

Count II of Plaintiff's Complaint asserts "civil conspiracy" as a separate cause of action against Defendant ADR. While Plaintiff's assertions in Count II are baseless, a detailed analysis is not necessary since under the law of the District of Columbia, an alleged civil conspiracy does not give rise to a separate cause of action. *See, Jackson v. Donovan,* 856 F.Supp.2d 147 (D.D.C. 2012). Accordingly, Defendant is entitled to summary judgment on Count II of the Plaintiff's Complaint.

### 6.  Plaintiff Has Failed To State A Prima Facia Case For Intentional Infliction Of Emotional Distress.

To establish a claim for the intentional infliction of emotional distress, a plaintiff must show:

23

(1) "extreme or outrageous conduct" which (2) "intentionally or recklessly" causes (3) "severe emotional distress to another." To establish the required degree of "outrageousness," the plaintiff must allege conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Kerrigan v. Britches of Georgetown,* 705 A.2d 624, 628 (D.C.1997) (internal citations omitted).

The legal standard for a Plaintiff asserting such a claim is an exacting one. As the District of Columbia Court of Appeals has explained:

> "For a defendant to be liable for intentional infliction of emotional distress ... '[i]t has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that ... his conduct has been characterized by "malice" ...' " *Weaver v. Grafio,* 595 A.2d 983, 991 (D.C.1991) (quoting RESTATEMENT § 46 cmt. d (1965)) (alteration in Weaver ). The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Drejza v. Vaccaro,* 650 A.2d 1308, 1312 n. 10 (D.C.1994) (quoting RESTATEMENT § 46, cmt. d (1965)).

*Armstrong v. Thompson,* 80 A.3d 177, 189 (D.C. 2013).

In the case at bar, the undisputed evidence is such that ADR's actions with respect to the Climate Assessment Report were more than justified. Plaintiff has conceded that fellow employees who spoke with ADR purportedly "defamed" him, giving ample justification for the statements set forth in ADR's report. *See, e.g., Exhibits 3 - 5.* Further, Plaintiff instructed his friends not to cooperate with ADR, nor did the Plaintiff personally meet with ADR, such that ADR never heard a conflicting version of events with which it could have tempered its report. *See, Exhibit 3.* Further still, as the record demonstrates, ADR conferred with USDA's legal counsel for guidance. *See ECF 46; See also, ECF 30-2.* Under this undisputed set of facts, there is nothing "outrageous" nor "intentionally reckless" about ADR's conduct. Certainly, contracting with the

24

United States of American to assess ways to improve employee morale at a satellite office in Miami is not something which should be "utterly intolerable in a civilized community."

Next, Plaintiff has not alleged any facts which would rise to the level of "severe emotional distress." The undisputed facts are that he did not see a single doctor, nor take a single medication, to deal with his alleged emotional distress. *See, Exhibit 3.* Further, Plaintiff has alleged other individuals have allegedly caused him severe emotional distress during this same time period, such as it would be incumbent upon Plaintiff to set forth expert medical evidence delineating any purported trauma between the different events causing him distress. *See, Exhibit 6.* For good measure, ADR's Climate Assessment Report is mild and pales in comparison to the written diatribes Plaintiff sent to USDA officials in the months leading up to his termination in August 2018. *See, Exhibit 8.* Given Plaintiff's prolific litigation history and claimed conspiracies by USDA officials against him, nothing ADR did or failed to do caused him any "severe emotional distress" as would be required to be actionable in this case. Accordingly, summary judgment is warranted as to Count III of the Plaintiff's Complaint.

### 7. Plaintiff Has Failed To State A Prima Facia Case For Invasion Of Privacy

In *Kitt v. Capital Concerts, Inc.*, 742 A.2d 856, 859 (D.C. 1999), the D.C. Court of Appeals defined the tort of invasion of privacy – false light as requiring "a showing of: 1) publicity 2) about a false statement, representation or imputation 3) understood to be of and concerning the plaintiff, and 4) which places the plaintiff in a false light that would be offensive to a reasonable person." RESTATEMENT (SECOND) OF TORTS § 652E (1977). "Failure to establish any one of these elements will defeat a plaintiff's cause of action." *Id.* Also of note, this tort has frequently been analyzed in the same manner as a defamation claim. *Zimmerman v. Al Jazeera Am., LLC*, 246

25

F.Supp. 3d 257, 273 (D.D.C. 2017).    For the same reasons set forth *supra* with regard to defamation, Count IV of the Plaintiff's Complaint must also fail.    Indeed, it is worth noting that the only offensive conduct in this case was that of the Plaintiff and the things he wrote to the USDA's leadership. *See, Exhibit 8.*  Accordingly, without further belaboring the point, Defendant is entitled to summary judgment as to Count IV of Plaintiff's Complaint, as well.[9]

## **CONCLUSION**

Plaintiff's complete and utter failure to generate any dispute which could survive summary judgement is not surprising when this case is viewed in context.    Plaintiff fails to see any self-accountability for his actions and believes everyone is "conspiring" against him.    The instant litigation against ADR is just part of a long series of EEOC complaints, civil lawsuits, and administrative actions initiated by the Plaintiff.    To make matters worse, unless and until his litigation against the USDA and its agents comes to an end, Plaintiff continues to waste valuable resources within our judicial system and the Department of Justice.    Equally disturbing, Plaintiff's actions are being funded by the United States through his paid administrative leave, all while he continues with the separate operation of his own law practice.    To any objective observer, this is the epitome of waste, fraud and abuse.    Add to that the fact that the Plaintiff has materially misrepresented to this Court – both through affirmative statements and material omissions – that he was in possession of an unredacted version of ADR's climate assessment report since April 2017 and not only is summary judgment required, but sanctions as well.

---

[9]    Plaintiff also includes a separate count V for injunctive relief.    It is unclear what exact 'injunctive relief' plaintiff seeks but for all the reasons set forth *supra,* Defendant ADR is entitled to summary judgment on all counts.

26

For all of the reasons set forth above, the instant case should finally come to an end before further judicial resources and taxpayer money is wasted on this ill-conceived litigation.

Respectfully submitted,

WALKER, MURPHY & NELSON, LLP

/S/ John J. Murphy

John Murphy, Esq. (Bar #14407)
9210 Corporate Boulevard, Suite 320
Rockville, Maryland 20850
(301)-519-9150 (Office)
(301) 519-9152 (Fax)
jmurphy@walkermurphy.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Motion For Summary Judgment was electronically mailed and/or mailed on the _22nd_ day of February 2021 to:

Joey D. Gonzalez Ramos, Esq.
P.O. Box 145073
Coral Gables, FL 33114-5073
E-service: joey.gonzalez@jdg-lawoffice.com
**Pro Se Plaintiff**

/S/ John J. Murphy

John J. Murphy, Esq.

27

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JOEY D. GONZALEZ RAMOS,                    :
                                           :
    Plaintiff                              :
                                           :
v.                                         :        Case No.: 18-cv-01690 (APM)
                                           :
ADR VANTAGE, INC.,                         :        Assigned To: Amit P. Mehta
                                           :
    Defendant.                             :

### ORDER

UPON CONSIDERATION of Defendant, ADR VANTAGE, INC.'s Motion for Summary Judgment, and any Opposition thereto, it is hereby this _____ day of _____, 2021, ORDERED:

1. That Defendant ADR's Motion for Summary Judgment be and hereby is GRANTED.


_____

JUDGE Amit P. Mehta

28