UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
CIVIL DIVISION

|  |  |  |
|---|---|---|
| JOEY D. GONZALEZ RAMOS,<br>            Plaintiff,<br>    vs.<br><br><br>ADR VANTAGE, INC,<br>            Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.: 1:18-cv-01690-APM<br>JURY TRIAL |

**RESPONSE IN OPPOSITION TO DEFENDANT ADR VANTAGE, INC.'S RENEWED
MOTION FOR SUMMARY JUDGMENT**

Joey D. Gonzalez Ramos ("Plaintiff") responds in opposition to Defendant ADR

Vantage, Inc.'s ("ADR Vantage") Renewed Motion for Summary Judgment [ECF No. 88]

("Motion").

## I. INTRODUCTION

*"To defame someone who speaks out against the perceived flaws of their government is a type of persecution." -- Anonymous*

Since 2015, Archie Tucker, at the time the United States Department of Agriculture

Assistant Director of the Agricultural Research Service's Southeast Area, some of his direct

subordinates and Kathleen Hall, the former Labor Relations Officer, had been brewing a

retaliatory animus against Plaintiff for reporting problems at the Subtropical Horticultural

Research Station in Miami, Florida and for his efforts to better his and his co-workers' working

conditions through unfair labor practices and other protected activities such as complaints of

discrimination and disclosures to the Office of Inspector General ("OIG").  Unable to stop

Plaintiff's efforts lawfully, Tucker decided to blame Plaintiff for the problems he and his

predecessor's leadership failures created.

1

To avoid accusations of retaliation from Plaintiff, Tucker, along with a group of disgruntled employees aggrieved or connected with Plaintiff's protected activities, decided to use a third party to concoct and advance a smear campaign against Plaintiff.  That third party was Defendant ADR Vantage.

Despite its budget in the millions and being part of the Agricultural Research Service ("ARS"), the Subtropical Horticultural Research Station in Miami ("SHRS Miami") has been, for at least a decade, a monument to governmental waste. The images included in Exhibit A demonstrate a location plagued by unsanitary conditions and a lack of structural maintenance. At least until 2018, SHRS Miami's greenhouses were falling apart, mold could be found in almost every wall of its main building, safety was not a priority and at least one employee was allowed to hoard trash and toys in his desk. No serious research could be conducted under such conditions.

On November 22, 2016 Archie Tucker ("Tucker") hired ADR Vantage to conduct a so-called "Climate Assessment" at SHRS Miami with the pretext of understanding how to best address the station's work environment and take necessary "managerial action". [ECF No. 30-2 ¶ 9]. In mid-December 2016, ADR Vantage's Dianne Lipsey ("Lipsey") and Rick Buccheri ("Buccheri") travelled to SHRS Miami to interview participants of the Climate Assessment.

After ADR Vantage supposedly finished data collection, Tucker and others connected or aggrieved by Plaintiff's protected activities, with Lipsey's permission, manipulated the content of the Climate Assessment to advance a retaliatory smearing campaign against Plaintiff. After Tucker received the final copy of the Climate Assessment, he distributed it to others and used it in his defense in two *unrelated* complaints against him brought by Plaintiff. Meanwhile to cover

2

her tracks, shortly after delivering the last draft of the Climate Assessment, Lipsey *destroyed the notes* of the interviews that purportedly supported her findings.

The problems at SHRS Miami were not caused by complaints of hostile work environment. In 2018 the "2018 President's Budget Agricultural Research Service" caught up with Tucker's excuses. The report proposed to close SHRS Miami or reduce its budget. Exhibit B at 4. Front and center of the proposal was Alan Meerow ("Meerow") one of Tucker's subordinates and Plaintiff and the union's most vocals critic. Meerow's research or lack thereof was scheduled for a reduction of almost 4 million dollars, for among other things, "relatively low impact" or because the research was conducted in "substandard or inadequate infrastructure". *Id*. at 3. There was no mention of a hostile work environment as a reason for the proposed closure or budget cut.

### *The Motion*

Because Defendant is still unable to demonstrate there are no triable issues of facts, its Motion fixates over non-issues. With an empty record to support its imaginary narrative, the Motion resorts to the typical melodrama which has characterized ADR Vantage's defense throughout this litigation--by lashing at Plaintiff with outlandish and demonstrably false accusations. Meanwhile relevant issues were relegated to a secondary plane and superficial discussion.

Additionally, the Motion points to an exhibit containing dozens of pages without the specific citation to where Plaintiff or this Court can find support for the argument it makes. At least in one occasion the Motion refers to a nonexistent page in another exhibit and even contradicts the testimony of ADR Vantage's employees. In sum the Motion reflects desperation,

3

disorganization and the failure to generate a coherent argument for why this Court could grant summary judgment in favor of ADR Vantage.

## II. STANDARD OF REVIEW

Plaintiff incorporates by reference the standard of review in the Motion at 11.

## III. ARGUMENT

### A.  PLAINTIFF FILED THIS CASE WITHIN THE STATUTE OF LIMITATIONS

Plaintiff asserts that: (1) the Court's choice of law analysis would reveal that Florida's two-year statute of limitations in defamation actions applies to the instant complaint; (2) on the alternative, the instant complaint remains within the District of Columbia's one-year statute of limitation.

#### 1.  Florida Law Applies To The Statute Of Limitations

The instant complaint arises from common law principles of tort liability, and are being pursued in this Court based on diversity of citizenship and according to 28 U.S.C. § 1332, premised on the fact that ADR Vantage is incorporated and headquartered in Washington D.C. and Plaintiff is a citizen of Florida.

Employing the choice-of-law rules of the District of Columbia, "the [C]ourt must first determine if there is a conflict between the laws of the relevant jurisdictions." *Y.W.C.A. of the Nat'l Capital Area, Inc. v. Allstate Ins. Co. of Canada*, 275 F.3d 1145, 1150, 348 U.S. App. D.C. 401 (D.C. Cir. 2002). If a conflict exists, then courts in the District of Columbia must determine which jurisdiction has the most significant relationship to the claims being pursued by the plaintiff.

Florida and the District of Columbia's defamation law only conflict on the statute of limitations. While in Florida the statute of limitations is two years, in D.C. is one year.  In

defamation cases, "[t]he weight of authority considers that the law to be applied is . . . [that of] the place where the plaintiff suffered injury by reason of his loss of reputation." *Dowd v. Calabrese*, 589 F. Supp. 1206, 1210 (D.D.C. 1984). "In the case of tort actions, relevant factors include the nature of the wrong that is alleged; the place where the harm was actually suffered; the place where the extent of injury can best be appraised.   In cases of defamation, these factors normally would call for application of the law of the plaintiff's domicil." *Hanley v. Tribune Publ'g Co.*, 527 F.2d 68, 70 (9th Cir. 1975).

In a defamation action the injury occurs where the plaintiff lives and work. *See e.g., Hourani v. PsyberSolutions LLC,* 164 F. Supp. 3d 128, 138 (D.D.C. 2006). Here, the only connection between the instant complaint and the District of Columbia is that ADR Vantage is incorporated and headquartered in D.C. At all relevant times, Plaintiff has been, and remains, a resident of Florida, this is also where he works since 2001. According to ADR Vantage proper venue is in Florida, *see* [ECF No. 16 ¶ 3], therefore there is not dispute that the harm was suffered in Florida and the extent of Plaintiff's injury can be best appraised in Florida.

According to ADR Vantage the statute of limitations began to run either on April 25, 2017, the day when Plaintiff received a Report of Investigation ("ROI") containing an unredacted copy of the Climate Assessment, *Motion* at 17, or on July 14, 2017, the day Plaintiff received a heavily redacted copy of the Climate Assessment through a Freedom of Information Act ("FOIA") request. *Id*. at 16. Plaintiff filed the instant complaint in July 18, 2017, thus, indistinctively of the date this Court considers (according to ADR Vantage), the instant complaint remains within Florida's two-year statute of limitations.

2. **Under D.C. Law The Instant Complaint Remains Under The Statute Of Limitations**

Even if this Court finds that Florida law is not applicable. The instant complaint remains timely. Under the District of Columbia, the "one-year statute of limitations applicable to a defamation claim which does not involve publication though mass media and which is otherwise undiscoverable because it was published secretly, or steps were taken to prevent uncovering it, will not run until the plaintiff learns of the defamatory statements." *See McFadden v. Wash. Metro. Area Transit iAuth.*, 949 F. Supp. 2d 214, 221 (D.D.C. 2013).

ADR Vantage does not appear to dispute the application of the discovery rule; however, it claims that the statute of limitation began to run when Plaintiff received the ROI or when he received a heavy redacted copy of the Climate Assessment through a FOIA appeal.

a. **The Report of Investigation**

On April 25, 2017 Plaintiff received an ROI of discrimination complaints, numbered ARS-2016-00961 and ARS-2017-00122 ("EEO Complaints"). The entire ROI was comprised of two volumes totaling 624 pages. The first volume was 348 pages. Exhibit C at 1. Unbeknownst to Plaintiff, an unredacted copy of the Climate Assessment was included at page number 324 of the first volume. *Id*. at 2. These facts gave rise to ADR Vantage's latest theory; that the instant complaint is barred "by the applicable statute of limitations given that *any diligence* on the part of the Plaintiff would have uncovered the document that was in his own personal possession." Motion at 17 (emphasis in the original).

ADR Vantage's *any diligence* standard gets it nowhere. The Motion confuses when it believes Plaintiff should have looked in the ROI with when Plaintiff had an affirmative duty to exercise due diligence in searching for the Climate Assessment. This latest argument grossly distorts the record and if anything raises another issue of fact for the jury, *i.e.*, whether Plaintiff

6

with the information he had by April 25, 2017 should have known about the existence of the

unredacted copy of the Climate Assessment in the ROI.

*Due Diligence (Not Any Diligence) Standard*

Defendant bears the burden of showing that plaintiff has not met the due diligence

standard. *Hawkins v. Greenfield*, 797 F. Supp. 30, 33 (D.D.C. 1992).  The test of due diligence

measures the plaintiff's efforts to uncover his cause of action against what a reasonable person

would have done in his situation given the same information. *Richards v. Mileski*, 213 U.S. App.

D.C. 220, 662 F.2d 65, 71 (1981). To determine whether a plaintiff exercised due diligence in

uncovering a cause of action, a court must make a fact-specific judgment in each case as to what

the court expects a reasonable plaintiff to do in uncovering the elements of his claim. *Vox Media,*

*Inc. v. Mansfield*, 322 F. Supp. 3d 19, 26 (D.D.C. 2018).

Applying this rule to the current case there is no doubt that the Motion's disingenuous

theory is devoid of merit: not only it cited the wrong standard (*any diligence*), it purposely

ignored that at the time Plaintiff received the ROI he had no reason to even suspect that there

was a conspiracy to defame him. Simply put, ADR Vantage missed the boat because it failed to

consider relevant facts discussed immediately below.

**i.    The EEO Complaints were not related to the Climate Assessment**

The basis of the EEO Complaints was race, national origin and reprisal for prior EEO

activity. Exhibit C at 3-5. These incidents occurred between July 16, 2016 and November 16,

2016. *Id*.  Since the USDA contracted ADR Vantage in November 22, 2016 and the Climate

Assessment was conducted in the middle of December 2016, clearly not a single issue in these

complaints involved the Climate Assessment. This is also confirmed by Plaintiff's questionnaire

for the EEO Complaints dated March 30, 2017 where none of the 143 questions he answered were related to the Climate Assessment. *Id.* at 6-40.

### ii.    ADR Vantage and the USDA concealed the purpose of the Climate Assessment

The announcements sent by the USDA and ADR between December 6-8, 2016, put no one on notice at the SHRS Miami about the topics contained in the Climate Assessment. According to the USDA, the "Climate Assessment [would] to help us gain perspective and consider recommendations to create positive change…." Exhibit D at 10. According to ADR Vantage, the "Climate Assessment, most of it is done one-on-one to give us a chance to know what you do and how you might like to see things change." *Id*. at 11. There is nothing in these announcements that indicated that Plaintiff or the union were a topic of the Climate Assessment.

### iii.    Plaintiff was not aware that the Climate Assessment was published

The last significant event before Plaintiff received the ROI occurred on February 2, 2017. That day Lipsey emailed the Climate Assessment to Tucker and other USDA employees. *Id*. at 23. Within hours Tucker forwarded the Climate Assessment to other USDA employees; Plaintiff was not an addressee or recipient. *Id*.

### iv.    No reasonable person would have looked for the Climate Assessment in the ROI

To support its *any diligence* standard, the Motion claims that Plaintiff "was aware that a Climate Assessment was conducted in 2016 because he affirmatively instructed others not to participate in it." Motion at 16. Then it points at "Exhibit 3", which contains 64 pages, pretending that Plaintiff or the Court could find the specific location that supposedly supports its argument. *Id.* No such effort is needed because Plaintiff does not deny the Climate Assessment was conducted. However, that does not mean that *he knew its content* or needed to learn it.

Here the issue is not whether Plaintiff was aware that the Climate Assessment was conducted; the issue is whether Plaintiff had reason to suspect that he was being falsely accused of poor performance or criminal conduct.

Less than two months before ADR Vantage appeared at SHRS Miami, Plaintiff received a rating of "superior" in his performance evaluation. This is one of the numerous ratings above-average that he received during his last 14 years with the ARS. Exhibit G. To the question if Plaintiff had any indication of the content of the Climate Assessment, he answered:

```
And I think at that time David Alexander had made a
comment about they're using this to fire me, but I –
other than that, I did not have an idea – what was –
what it was going to say.
```

Exhibit F, hereinafter [Pl.'s Dep.] at 75 (emphasis added). In sum, Plaintiff's knowledge of the Climate Assessment on November 16, 2016, the last day of the events in the EEO Complaints, was no different than his knowledge on April 25, 2017, the day he received the ROI.

Even if he knew that the Climate Assessment was *conducted in 2016*, Plaintiff was not required "to have proceeded from the outset as if he were dealing with thieves" by assuming that his superiors were engaged in a conspiracy to defame him through a third party. *Richards v. Mileski*, 662 F.2d at 71:

> Moreover, and perhaps most importantly, the defendants have not shown any circumstances that should have given [the plaintiff] special reason to make a FOIA request prior to 1977. In short, on the facts of this case, there was no affirmative duty on [the plaintiff] to have sought documents under FOIA earlier than he did [….] It cannot be said as a matter of law that [the plaintiff] failed to use due diligence in not filing his FOIA request until 1978, for he had no reason to suspect that such a request would reveal the startling possibility that the officials with whom he had worked had conspired against him.

*Id.* To accept ADR Vantage's theory, this Court would have to assume that Plaintiff: (1) had reason to suspect that there was a conspiracy to defame him; (2) suspected that the defamatory statements would appear in the Climate Assessment; (3) knew when the Climate Assessment was

published, and; (4) suspected or knew that Tucker in his defense planned to use the Climate Assessment to defend two unrelated complaints of discrimination. The Motion has failed to point to anything in the record that supports any of those assumptions.

**v.    Plaintiff had no reason to conceal the date he received the ROI**

No less bizarre and demonstrably false is the Motion's second theory; that during his deposition Plaintiff refused to disclose *how and when* he discovered an unredacted copy of the Climate Assessment. The Motion also implies that Plaintiff refused to disclose or concealed the date he had "obtained the unredacted Climate Assessment report as part of an EEO Complaint he was prosecuting." *Motion* at 17. According to the Motion, Plaintiff's *deception* was "revealed" "much to the surprise of [ADR Vantage's attorney]", during Tucker's deposition". *Id*. To support this melodramatic narrative, the Motion points to "Exhibit 11" at pages 132 -133. *See Id*.

One of the problems is that there is no page 133 in Exhibit 11 and there is nothing in page 132 that supports ADR Vantage's argument. Indeed, there is not a single piece of evidence, including ADR Vantage's boiler plate discovery requests to Plaintiff [ECF No. 88-1 at 45 – 69], that show that prior to Tucker's deposition on January 14, 2021, ADR Vantage had requested information about when Plaintiff received the ROI. *See* Exhibit H, hereinafter [A.T.'s Dep.] at 133-134. Additionally, common sense dictates that a copy confirming receipt of the ROI would not be inside the same package Plaintiff received through the mail containing the ROI. In summary, Plaintiff had nothing that showed the date he received the ROI and the Motion has failed to demonstrate the contrary.

The other problem is that the record shows that there are no reasons for surprises. Since May 21, 2019, the date of Plaintiff's deposition, ADR Vantage knew *how and when* Plaintiff discovered the unredacted copy in the ROI:

> And at the time – I think it was December or January
> – **I started looking into some reports of**
> **investigations that I have received as part of my EEO**
> **complaints, and there was a copy there unredacted.**
> **And I think that happened, I would say, between**
> **December 2017 to February 2018.** [. . . .] I mean, this
> EEO Complaint has nothing to do with this climate
> assessment, so I didn't have any idea that it was
> going to be there. . .

Pl.'s Dep. at 78-79, (emphasis added). Plaintiff looked in the ROI between December 2017 and

February 2018 because it served no purpose to look at a report of investigation until the Equal

Employment Opportunity Commission ("EEOC") schedules an initial conference, which on

average are scheduled between 6 to 12 months after a request for a hearing is filed. In this case

the initial conference was scheduled for November 15, 2017. Exhibit C at 60-62.

Another reason ADR Vantage should not be surprised is that the Complaint alleges that

Plaintiff discovered an unredacted copy of the Climate Assessment in the ROI on February 10,

2018. *See* [ECF No. 1 ¶ 34]. Indeed, after Plaintiff discovered the unredacted copy, he emailed

his former supervisor a copy on February 10, 2018, and explained:

> Not sure how this happened. I was revising the report of investigation of my
> EEO complaint and a unredacted copy of the Climate survey was buried at the
> end of the report. I must warn you that I believe that when you read what it says
> about you is going to make you angry. In the unredacted version I discovered
> that I was blamed for the waste and abuse in Miami. See page 16, section 7.
> These people are really crazy.

Exhibit D at 31. Because ADR has failed to point to any "fact-specific" details that

Plaintiff had reason to suspect that he would find in the ROI an unredacted copy of the Climate

Assessment, the Court should reject the Motion's disingenuous theory that the statute of

limitations began to run on April 25, 2017.

### b.  The FOIA Responses

According to the Motion, Plaintiff's deposition testimony confirms that on April 2017, he received a "heavily redacted" copy of the Climate Assessment and that on July 14, 2017 he received a "slightly redacted" copy, both through a FOIA request. *See* Motion at 16. Based on this half-baked premise, the Motion concludes that "[b]ecause Plaintiff did not initiate the instant litigation until July 18, 2018, over a year after he received two different versions of the Climate Assessment Report", the complaint is barred by the one-year statute of limitations." *Id.*

As ADR Vantage is aware, during his deposition Plaintiff could not remember the exact dates he requested and received copies of the Climate Assessment through FOIA:

```
Q      When did you first get a copy of the climate
       assessment report?

A       I think April of 2017.
       Either then – that's when – probably that's
       when I requested it. I'm not sure. Around that
       time.
```

Pl's Dep. at 74

```
Q. How did you first get a copy of the Climate
   Assessment Report?

A. Through FOIA, Freedom of Information Act.

Q. And is that the heavily redacted copy that you
   reference in your complaint?

A. Yes
```

*Id.* at 75

```
Q. How did you then get the partially redacted
   report, which is 4B?

A. I filed an appeal with the FOIA office requesting
   that it be – it be unredacted and given to me.
```

12

*Id*. at 77. Additionally, to perpetuate this opportunistic theory ADR Vantage still refuses to acknowledge the declaration of Janice Boarman in Exhibit I, ("Boarman's Declaration") (which was also attached to Plaintiff's responses to ADR Vantage's Motion to Dismiss [ECF No. 8] and his response to the Motion for Summary Judgment [ECF No. 66-5]).

Boarman's Declaration was filed by the USDA in response to Plaintiff's lawsuit seeking to obtain an unredacted copy of the Climate Assessment (captioned *Joey D. Gonzalez v. Department of Agriculture*, Case No. 1:17-cv-24171-CMA; "FOIA Lawsuit"). The chronology of events in Boarman's Declaration should have been sufficient to dissipate ADR Vantage's *confusion*:

> 1. On or about April 15, 2017, Plaintiff submitted a FOIA request to ARS (herein the "Climate Assessment FOIA Request") … Exhibit I at 2.
>
> 2. ARS received the Climate Assessment FOIA Request on April 17, 2017, and assigned it a FOIA number - FOIA No. 2017-REE-03716-F. *Id*.
>
> 3. On July 14, 2017, ARS provided Plaintiff a response the Climate   Assessment FOIA Request. *Id*.
>
> 4. On or about September 13, 2017, Plaintiff filed an administrative appeal to ARS's response to the Climate Assessment FOIA Request. *Id*. at 3.
>
> 5. On October 20, 2017, ARS provided Plaintiff a response to his Administrative Appeal of ARS's Response to the Climate Assessment FOIA Request…. Specifically, ARS withdrew all Exemption 5 redactions to the Climate Assessment Report. Further, regarding Exemption 6, ARS withdrew certain, but not all, redactions. *Id.*

### i.   The Statute of Limitations began to run on October 20, 2017

Where the discovery rule is applicable, in order for a cause of action to accrue, "one must know (or by the exercise of reasonable diligence should know) (1) of the injury, (2) its cause in fact and (3) of some evidence of wrongdoing." *Bussineau v. President and Directors of Georgetown Coll.*, 518 A.2d 423, 425 (D.C. 1986).

13

The chronology of events in Boarman's Declaration clarifies that when Plaintiff testified in his deposition that he received a heavily redacted copy of the Climate Assessment on April 2017, he confused that date with the date he filed his FOIA request on April 15, 2017. When Plaintiff testified that he received a slightly redacted copy of the Climate Assessment on July 14, 2017, he was referring to the response he obtained on October 20, 2017. In summary, Boarman's Declaration leaves no doubt that Plaintiff received a heavy redacted copy of the Climate Assessment on July 14, 2017 and a slightly redacted copy on October 20, 2017. Even ignoring this chronology, common sense could have told ADR Vantage that a response based on a FOIA appeal is unlikely to contain more redactions than the original response.

The removal of the redactions in the October 20, 2017 response allowed Plaintiff to see that his reputation was damaged (injury) by the defamatory statements in the Climate Assessment (cause in fact) because of a conspiracy to defame him (some evidence of wrongdoing). Notably, these defamatory statements, all enumerated in the discussion of "defamation" below, only appeared in the October 20, 2017 response. ADR Vantage has offered no evidence that demonstrates that Plaintiff was aware of these statements before October 20, 2017.

Accordingly, the statute of limitations began to run on October 20, 2017. Since Plaintiff filed the instant Complaint in July 18, 2018, it is not barred by the statute of limitations.

## B.  CONSPIRACY TO DEFAME PLAINTIFF

ADR Vantage wisely refused to discuss Count II (Civil Conspiracy) of the pending Complaint, claiming that since the allegations "are baseless[,] a detail account is not necessary". *Motion* at 23. Since ADR Vantage effectively abandoned its attack on Count II, Plaintiff requests that the Court deem it conceded and summarily deny the Motion with respect to Count II. *See*

14

Fed. R. Civ. P. 56(e) (Where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the district court may "consider the fact undisputed for purposes of the motion."). In an abundance of caution, the discussion regarding Count II of the Complaint follows.

In the District of Columbia, to establish a prima facie case of civil conspiracy, a plaintiff has to prove: (1) an agreement between two or more persons; (2) to participate in an unlawful act; and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement pursuant to, and in furtherance of, the common scheme. *McMullen v. Synchrony Bank*, 164 F. Supp. 3d 77, 81 (D.D.C. 2016). [A] charge of civil conspiracy is not independently actionable, rather it is a means for establishing vicarious liability for the underlying tort. *Wiggins v. Dist. Cablevision*, 853 F. Supp. 484, 496 (D.D.C. 1994). Here the underlying tort is defamation.

According to Tucker, he hired ADR Vantage under the advice of the "Civil Rights" division of Office of General Counsel ("OGC") to assist him in identifying "factors contributing to employee complaints of harassment and a hostile work environment at SHRS." [ECF No. 30-2 at ¶ 12]. When he did so, Tucker knew that complaints of harassment and hostile work environment were individual causes of action within the jurisdiction of other USDA divisions. Exhibit E at 2-5. He also knew that OGC is responsible for litigating these complaints. A.T.'s Dep. at 189.

Because the USDA already had mechanisms to manage complaints of hostile work environment and because he has no jurisdiction over these complaints, there was no need for Tucker to reinvent the wheel. Tucker simply wanted to discredit Plaintiff for his protected

activities without exposing himself to liability. To accomplish this, he needed a third party to say what he wanted to say but could not lawfully say about Plaintiff.

### 1.   There Was An Agreement Between ADR Vantage And Tucker

"[An] agreement may be inferred from conduct. Plaintiff is not required to provide direct evidence of the agreement between the conspirators and that the unlawful agreement need not be express. Where there is no direct evidence of an agreement between the alleged co-conspirators, the factfinder may infer from the circumstances that the alleged conspirators had a meeting of the minds and thus reached an understanding to achieve the conspiracy's objectives." *Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 102-03 (D.D.C. 2006) (internal quotations and citations omitted).

Tucker found the perfect ally in Lipsey, who for $30,000 allowed him to dictate to her the defamatory statements about Plaintiff that would appear in the Climate Assessment. Lipsey may not have known initially about Tucker's plan to use a third party to parrot false and defamatory comments about Plaintiff, however by January 30, 2017 it became evident who would have the last say in the Climate Assessment—Tucker.

On that date Lipsey emailed Tucker the final version of the Climate Assessment thinking that her job was done. In response Tucker demanded that it be "pulled back" claiming that "a number of comments *we* made on the drafts is not reflected in this report" and that "[i]t's important that these changes be reflected …."  Exhibit D at 16, (emphasis added). Tucker's *we* referred to Tammi Trost ("Trost"), Stephanie Masker ("Masker") and Sheila Kopczynski ("Kopczynski"), the purported editors of the Climate Assessment that shared drafts with Lipsey. *Id*. at 16-21.

At least three of these *editors* were biased against Plaintiff; Tucker wanted the Climate Assessment to reflect positively on him and was motivated by Plaintiff's protected activities. Trost and Masker also had an interest in the outcome of the Climate Assessment because they worked for the office responsible for litigating Plaintiff's complaints of discrimination and participated as the USDA representatives in these complaints. Exhibit C at 66-69.

ADR Vantage, who according to the Motion abides by "industry standards" and professes that a "critical element of any climate assessment is the objectivity in the analysis of the collected interview data" [ECF No. 4-2 at 12], had no reason to allow others with an interest in the outcome of the Climate Assessment to edit it. Lipsey offered no explanation for allowing these individuals to do her job, claiming that she even sent drafts of the Climate Assessment to "whomever", Exhibit K [hereinafter D.L.'s Dep.] at 132-133, as she had no control of what she was doing.  On February 2, 2017 Tucker accepted the final version of the Climate Assessment. Shortly after publication, Lipsey destroyed the notes of the interviews to erase any evidence that may contradict the defamatory statements she published. *Id*. at 123-124.

Plaintiff suggests that no serious surveyor claiming to have Lipsey's expertise, and contractually obligated to provide an objective assessment, would have agreed to allow Tucker and the three other "editors", all biased against Plaintiff, to manipulate the content of the Climate Assessment. Unless, of course, she had agreed explicitly or implicitly to provide a biased report, in this case one to defame Plaintiff.

2.  **The Climate Assessment Was Created For An Unlawful Purpose**

Evidence obtained by Plaintiff in unrelated cases demonstrates that by 2015, Tucker, Hall, Meerow, and Ricardo Goenaga ("Goenaga"), all participants in the Climate Assessment

and named in Plaintiff's administrative complaints, were already looking for ways to retaliate against him.

### a. Tucker, Hall and others had retaliatory animus against Plaintiff

The emails included in Exhibit D demonstrate the disdain Tucker and his subordinates had for Plaintiff since at least 2015. They alleged that Plaintiff had planted a "bot" in their computers to "remove emails complaining about [Plaintiff]." *Id*. at 1. They were concerned about running out of time to set Plaintiff up. They called for "total confidentiality" and for not raising a "red flag in Miami". *Id*. at 2. They discussed flushing Plaintiff's salary down the toilet. *Id*. at 3.

They discussed whether to use Meerow's private email account to communicate matters about Plaintiff, *id*. at 4, and how they would be "doomed" if Plaintiff started "winning grievances". *Id*. at 5. Like a covert operation, there were even "debriefings" and reports of Plaintiff's whereabouts. *Id*. at 7-8. The common denominator in the majority of these emails was Meerow, the same person that a year after publication of the Climate Assessment was proposed to have his research budget reduced and who perhaps almost caused SHRS Miami's closing.

### b. Meerow's self-preservation *complaint*

On February 12, 2016 Meerow sent a letter to Hillary Clark ("Clark") framed as a complaint of hostile work environment, Exhibit L at 1-4, naming Plaintiff and his supervisor, the administration officer or "AO" as the cause of his problems. Clark is the "branch chief" of the office of Personnel and Labor Solutions ("PALS"). She was also Hall's supervisor. A closer look at Meerow's *complaint* shows that it was triggered nonetheless by a report from the "AO" to the "Area office" that Meerow behaved unethically because he had two employees of one of his "closer collaborators" working at SHRS Miami without proper documentation. *Id*. at 2.

Thus, Meerow was not concerned about any hostile work environment, he was concerned about the ethical implications of his actions. Just like Tucker used the Climate Assessment, Meerow used his *complaint* to deflect the attention from himself and blame Plaintiff for his actions. Plaintiff was never informed about Meerow's *complaint*, it was disclosed to him almost a year after Meerow sent it to Clark and through an EEO complaint Plaintiff filed. It is worth noting that Meerow's complaint is the only evidence ADR Vantage or Tucker have presented in this case to support their claim about the "disproportionate number" of complaints of hostile work environment at SHRS Miami that justified conducting the Climate Assessment. Motion at 10.

### c.  The OIG criminal investigation involved Tucker's subordinates and Hall

Approximately on September 2016, Plaintiff and his supervisor began cooperating in an OIG criminal investigation involving some of Tucker's subordinates. *See* [ECF No. 38-5]. On December 12, 2016 Clark, apparently tipped off by Kopczynski, contacted OIG to inquire about their investigation. Exhibit D at 13.  On January 12, 2017, Clark learned from OIG that her office was in the eye of OIG for relying on a newly hired employee called Clifford Ramsey ("Ramsey") who had made accusations of discrimination against Plaintiff and his supervisor. Also, OIG informed Clark that it was aware of Hall's decision to dismiss an employee without cause. *Id.* at 14-15.

### d.  The "Independent Body" strategy

After all the planning and failed attempts against Plaintiff by Tucker and his subordinates, and fed up with all the *problems* Plaintiff was causing through his protected activities, Tucker decided that it was time to try something different: to discredit Plaintiff through an independent party that would appear more credible and unlikely susceptible to a

claim of retaliation.  Indeed, the same strategy was discussed in a memorandum by the Deputy Director of the office of "Outreach, Diversity and Equal Opportunity" ("ODEO"), Alan Robinson ("Robinson") dated August 30, 2017 recommending that Plaintiff be disciplined for Ramsey's accusations that Plaintiff called him the "N" word. Exhibit L at 6.

> Mr. Gonzalez, in the past has alleged that everyone in ARS management, as well as the ARS guidance branches and divisions (HRD/PALS and ODEO) are retaliating against him whenever disciplinary actions are recommended or pursued. In this scenario, **the finding was made by a more independent body which is very unlikely to be susceptible to a claim of retaliation (even a frivolous one).**

*Id*., (emphasis added). The memorandum was written with a "recommended consult" by Clark *Id*. at 7 and addressed to Deborah Brennan (Tucker's predecessor) and Tucker. Robinson's "Independent Body" strategy ultimately failed. Ramsey *recanted* his accusation against Plaintiff during a recent deposition.  Exhibit M, hereinafter [C.R.'s Dep.] at 3.  Indeed, Ramsey may have also pointed to Robinson when he testified that his actions were "guided" by attorneys of the USDA and that he was advised to request Plaintiff's dismissal by an attorney of the office of civil rights. *Id*. at 4-10.

Of note, Robinson may have violated EEOC policy with his memorandum since an employee in his position cannot advocate for discipline. *See* Chapter IV of the EEOC Management Directive 110 of August 15, 2015 – Avoiding Conflicts of Interest ("The same agency official(s) responsible for executing and advising on personnel actions may not also be responsible for managing, advising, or overseeing the EEO pre-complaint or complaint processes."). Exhibit E at 10-11.

### e.  Climate Assessment's unlawful purpose

Tucker never had any intention to find the cause of the alleged complaints of hostile work environment at SHRS Miami nor to follow the recommendations in the Climate Assessment.

20

Indeed, he never implemented its number one recommendation; to "hire an onboard permanent Research Leader as soon as possible". Exhibit I at 41. Up to the date of this response, SHRS Miami is still under a temporary research leader. Exhibit B at 5-6. The purpose of the Climate Assessment was to discredit Plaintiff through a third party in retaliation for: the complaints of discrimination he filed for himself or other employees; his union's activities; and his cooperation with an OIG's criminal investigation of Tucker's direct subordinates.

There is no shortage of laws and regulations that deem Tucker's actions retaliation for protected activities. For example, the EEOC considers "threaten[ing] to make, or actually make reports to authorities" or "spread false rumors" about a complainant to be retaliatory actions. Exhibit E at 7. It is an unfair labor practice to "interfere with, restrain, or coerce any employee in the exercise by the employee of any right under [5 USC § 7116]". The Whistleblower Protection Act of 1989 also prohibits among others, retaliation for reporting "violations of law, rule or regulation or gross mismanagement". 5 USC § 2302(b)(8)(9).

Tucker's retaliatory animus against Plaintiff. His manipulation of the final draft of the Climate Assessment and ADR Vantage's compliance, including the subsequent destruction of the notes of the interviews, confirm that the Climate Assessment was created for unlawful purposes.

### 3. In Furtherance Of The Conspiracy Tucker, Hall and Kopczynski Weaponized The Climate Assessment

Tucker and Hall had their own private use for the Climate Assessment. Tucker disclosed it to the investigator of the EEO Complaints ("EEO Investigator") claiming that because "several questions came up in [his] affidavit regarding the climate assessment", A.T.'s Dep. at 135, the EEO investigator "brough it up", *id*. at 138. Remarkably, there is not a single question related to

21

the Climate Assessment in Tucker's affidavit. Exhibit C at 41-59. Tucker's documented answers however demonstrates that it was he who actually "brough it up":

> Yes. I think Employee Relations conducted an investigation. There were so many issues that in December we had an independent firm go to Miami to conduct a climate assessment.

> No. Only to say Miami is an interesting place. Unfortunately we've had numerous issues there. We've had complaints about the quality of Mr. Gonzalez's work, how he does his job, and his influence over his first line supervisor. When people complain about Mr. Gonzalez he takes it personally. When the employees were interviewed a large number raised concerns about IT and the AO.

*Id*. at ¶¶ 69-70. In his last answer, Tucker in essence quoted the Climate Assessment knowing that, as one of its editors, he had fabricated this information. His self-serving answer, totally unrelated to the issues in the EEO Complaints, demonstrates that his motivation was to discredit Plaintiff using the Climate Assessment as support.

For unknown reasons Hall also had a copy of the Climate Assessment within two weeks of publication and before anyone in SHRS Miami. Exhibit D at 24. Facing an investigation by OIG and questions in the EEO Complaints, Hall also had reasons to discredit Plaintiff. To that end, on February 16, 2017 she emailed an unrequested copy of the Climate Assessment to a newly appointed union representative of the National Federation of Federal Employees ("NFFE"), Elizabeth Pittaluga ("Pittaluga"). *Id*. Hall's plan ultimately worked, after receiving the defamatory publication, Pittaluga terminated Plaintiff from the union.

Finally, there is Kopczynski, the person who apparently tipped off Clark about the OIG's investigation initiated by Plaintiff. A few months after editing the Climate Assessment, Kopczynski pretending to be an OIG investigator, communicated with Plaintiff and implied that he had obtained evidence unlawfully that Meerow and Clark were conducting official government business through Meerow's personal email account. Exhibit D at 26-27.

When Plaintiff questioned her authority and the reasons for copying Clark in her emails to Plaintiff, Kopczynski backed down claiming that she was "not the OIG". She then refused to talk with Plaintiff on the phone or provide the name of her supervisor. *Id.* at 28-30. Kopczynski ultimately disappeared and Plaintiff's disclosure was never investigated by OIG.

In sum, with the pretext of investigating allegations of hostile work environment and in exchange for $30,000, ADR Vantage, Tucker and others acted in concert to peddle, edit and publish false and defamatory statements about Plaintiff. To add credibility to their smearing campaign, they used ADR Vantage, an *independent party* that was *unlikely to be susceptible to a claim of retaliation*, just like Robinson had suggested months later. The facts and the evidence demonstrate that there was a conspiracy to discredit Plaintiff in retaliation for his protected activities.

### C.  ADR VANTAGE DEFAMED PLAINTIFF

Under District of Columbia law, a plaintiff making a claim of defamation must show: "(1) that he was the subject of a false and defamatory statement; (2) that the statement was published to a third party; (3) that publishing the statement was at least negligent; and (4) that the plaintiff suffered either actual or legal harm." *Farah v. Esquire Magazine,* 736 F.3d 528, 533-34 (D.C. Cir. 2013) (citations omitted). According to ADR Vantage, "Plaintiff cannot establish any of these elements, much less all of them." *Motion* at 18.

#### 1.  Plaintiff Was the Subject False and Defamatory Statements by ADR Vantage

"A statement is considered defamatory *per se* when its defamatory character is apparent on its face, such that it imputes: (1) the commission of a criminal offense, (2) infection with a loathsome communicable disease, (3) malfeasance or misfeasance in the discharge of duties of employment or (4) unfitness for one's trade, profession or business." *Mazur v. Szporer,* No. 03-

00042 (HHK), 2004 U.S. Dist. LEXIS 13176, at *9 (D.D.C. June 1, 2004) (internal quotation and citations omitted).

There are at least 4 actionable statements about Plaintiff in the Climate Assessment:

First Actionable Statement: "The IT Specialist is unreceptive to any kind of suggestion and he's impolite when he's annoyed or frustrated. In a recent incident, he took something he shouldn't have. We talked about it and he "flipped out", and raised his voice. It was very uncomfortable I don't go to him if I don't have to." Exhibit I at 34.

Second Actionable Statement: "No action by ARS will be effective in improving the atmosphere at SHRS without addressing the issues involving these two positions [the IT Specialist and the Admin Officer]." *Id*. at 39.

Third Actionable Statement: "Questions of Waste, Fraud, and Abuse. ADR Vantage frequently works with agencies as a confidential neutral and in that capacity, we are obligated to report to the agency what we believe is evidence of waste, fraud or abuse. We do not know what definition USDA would use for these concepts, but the conduct we have heard about the SHRS employees concerning the IT specialist would raise such a question for us…" *Id*. at 40.

Fourth Actionable Statement: "Govern actions by the IT Specialist. Move the reporting line of authority for the IT Specialist to the RL to ensure his availability and improve responsiveness and to track satisfaction from Researchers and others. Investigate allegations that he has abused his access to data, email and telephones as well as his conduct toward other employees and consider disciplinary measures as appropriate." *Id*. at 43.

According to the Motion "ADR did not reach any conclusions or make any findings against him". Motion at 18.  However, the last three defamatory statements listed above were included in the "Section IV" of the Climate Assessment entitled "Summary of Findings". Exhibit I at 37. ADR Vantage's attempts to downplay its defamatory statements claiming that they were based on opinion also have no merit. "An accusation of a criminal act is not a constitutionally protected statement of opinion." *Mazur v. Szporer*, at *9. "If the opinion implied factual assertions...then it should not receive the benefit of the First Amendment protection as an opinion." *Ollman v. Evans*, 242 U.S. App. D.C. 301, 750 F.2d 970, 984 (1984).

24

All the above statements are not opinions by ADR because they "rely upon stated facts that are provably false" by the participants or *editors* of the Climate Assessment. *Moldea v. New York Times Co.*, 22 F.3d 310, 313 (D.C. Cir. 1994). On their face these statements impute to Plaintiff either the commission of a criminal offense or unfitness for his profession, and therefore are actionable as a matter of law.

### 2.  ADR Vantage Published The Defamatory Statements About Plaintiff

ADR Vantage's defense fails at the second factor where it argues that publication to "upper management at the USDA" does not amount to publication. Motion at 19.  Again, this is not the law.  "To establish a cause of action for defamation, a plaintiff must show that defamatory statements were "published," i.e., that they were communicated to some person other than the one defamed." *District of Columbia v. Thompson*, 570 A.2d 277, 291 (D.C. 1990).

### a. As a republisher ADR Vantage is the source of the defamatory statements

ADR Vantage's defense that it "was not the source of the alleged statements", Motion at 18, is similarly contrary to applicable law: "repetition of a defamatory statement is a publication in itself, regardless whether the repeater names the source . . . it is not enough for the person who repeats [the defamatory statement] to prove that the statement was made by the other person. He must prove the truth of the defamatory charges which he has thus repeated." *Olinger v. Am. Sav. & Loan Asso.*, 133 U.S. App. D.C. 107, 409 F.2d 142, 144 (1969) (emphasis added).

According to Lipsey, ADR Vantage "was not hired to establish what was truth." D.L.'s Dep. at 53. That may have been so, however it suggests that ADR Vantage was clueless about its legal responsibility: the duty to publish truth. Thus, as a republisher, ADR Vantage is liable for the false and defamatory statements it made about Plaintiff.

### 3.  ADR Vantage Was Negligent

ADR Vantage's undoing continues in the negligence factor where it claims that Plaintiff

25

needs an expert "to opine that there was some flaw or act of negligence in the manner or method with which ADR performed its Climate Assessment." Motion at 19. Nothing supports this improvised requirement.

It is well settled that ordinary negligence in the context of defamation amounts to failure by the defendant to undertake a reasonable inquiry as to the truth of the assertion prior to publication. *Moss v. Stockard*, 580 A.2d 1011, 1025 (D.C. 1990); *see also Carpenter v. King*, 792 F. Supp. 2d 29, 35 (D.D.C. 2011) ("In actions for actual damages, the District of Columbia applies a negligence standard: the plaintiff must allege a failure to observe an ordinary degree of care in ascertaining the truth of an assertion before publishing it to others, *i.e.*, a failure to make a reasonable investigation as to truth.") (internal quotations omitted); *Wood v. Am. Fed'n of Gov't Emps.*, 316 F.Supp.3d 475, 484 (D. D.C. 2018); *Kendrick v. Fox Television*, 659 A.2d 814, 822 (D.C. 1995) (same).

ADR Vantage also misunderstands that in an action for defamation "the parties moving for summary judgment, have the burden of showing a prima facie case that they were not negligent, before the burden of production shifts to the plaintiff as non-moving party". *Id*. at 823. Its contention puts the proverbial cart before the horse by attempting to shift its burden to Plaintiff.

Thus, the issue is not whether ADR Vantage followed industry practice. The issue is whether ADR Vantage can prove that it conducted a reasonable investigation as to the truth of the statements about Plaintiff before publishing the Climate Assessment to others. Because *there was no investigation*, it cannot. According to Lipsey she did not investigate or had a duty to investigate the statements ADR Vantage published in the Climate Assessment. D.L.'s Dep. at 71.

Because it did not investigate, ADR Vantage failed to meet its burden and was negligent as a matter of law. *See Kendrick* and *Moss, supra.*

Even if ADR Vantage's improvised requirement in the Motion were the law, it fails because the Climate Assessment is not based on any "industry standard", or at least a standard that Lipsey or Buccheri were aware of. According to Lipsey, the Climate Assessment is based on "practices that are standard among [ADR Vantage's] colleagues". D.L.'s Dep. at 37. Buccheri testified that "[t]here's not a standard by which [ADR Vantage was] held … for this particular project." Exhibit N [hereinafter R.B.'s Dep.] at 31. Accordingly, no expert is necessary since ADR Vantage admitted it adhered to no industry standard with respect to the report at issue. *Id.* at 32.

### 4.  Plaintiff Damages Are Presumed

Contrary to existing case law, the Motion claims that "there are no damages as a result of ADR's alleged defamatory statements" *Motion* at 20. "When a defamatory statement is *actionable per se*, compensatory damages for injury to reputation, humiliation, and embarrassment are presumed." *Kalantar v. Lufthansa German Airlines*, 402 F. Supp. 2d 130, 149 (D.D.C. 2005) (internal quotations omitted, emphasis in the original).

In sum, after failing to meet its burden to prove that there are no issues of material fact as to Count I, the Court should deny the Motion based on its claims that ADR Vantage did not defame Plaintiff.

## D.  ADR VANTAGE IS NOT ENTITLED TO DERIVATIVE SOVEREIGN IMMUNITY

"[A] government contractor that violates both federal law and the government's explicit instructions loses the shield of derivative immunity and is subject to suit by those adversely affected by the contractor's violations." *AFGE v. OPM (In re United States OPM Data Sec.*

*Breach Litig.)*, 928 F.3d 42, 69 (D.C. Cir. 2019) (internal quotations and citations omitted). Where an agent or officer of the Government purporting to act on its behalf has been held to be liable for his conduct causing injury to another, the ground of liability has been found to be either that he exceeded his authority or that it was not validly conferred. *Yearsley v. W. A. Ross Constr. Co.*, 309 U.S. 18, 21, 60 S. Ct. 413, 414 (1940).

According to the Motion, "Plaintiff confirmed with his own questioning of Archie Tucker that ADR complied with its contractual terms as a government contractor". Motion at 15. It then points to "Exhibit 11" perhaps hoping that the Court could decipher the relevant testimony in the almost 48 pages of transcript text. However, there is nothing in those 48 pages that could support ADR Vantage's argument and again, there is no need for such effort.

Stripped of irrelevancies, the crux of ADR Vantage's immunity defense is that Tucker's declaration [ECF No. 30-2] confirms that it is entitled to derivative sovereign immunity. In ADR Vantage's code, Tucker's "no adversarial relationship" statement, Motion at 15, translates to something like *ADR Vantage's actions were authorized and directed by the USDA*. Tucker's own testimony undermines this defense:

```
Q. According to you, ADR did not have an adversarial
   relationship with the USDA, correct?

A. No, they did not.

Q. They did not. Okay. So does that mean that they
   complied with the contract?

A. I would refer you to the contracting officer for
   that.
```

A.T.'s Dep. at 194-195. Tucker also testified that in his 45 years with the ARS he has never worked in the "field of contracting" and has "limited knowledge of contracting" *Id*. at 97. Therefore, Tucker could not determine compliance with governmental contracts.

If ADR Vantage wanted this Court to decide whether it is entitled to derivative sovereign immunity, the starting point was the scope of its contractual obligation with the USDA, followed by a showing that it complied with the contract as directed, not the tortuous semantics of Tucker's declaration. *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 673 n.7 (9th Cir. 2014) ("Critical in *Yearsley* was not the involvement of public works, but the contractor's performance in compliance with all federal directions.").

The record demonstrates that derivative sovereign immunity does not apply here because ADR Vantage: (1) failed to protect personally identifiable identification ("PII"); (2) failed to preserve the notes of the interviews it conducted, and; (3) failed to deliver an objective assessment.

### 1. ADR Failed to Protect Personally Identifiable Information

According to its contract with the USDA, ADR Vantage was:

> [R]esponsible for **protecting Personally Identifiable Information (PII) in accordance with the all applicable Federal, Departmental and Agency statuses, regulations, and policies**. PII is - any information about an individual maintained by an agency, including (1) any information that can be used to distinguish or trace an individual's identity …. and (2) any other information that is linked or linkable to an individual, such as medical, educational, financial, and employment information.

Exhibit J at 5, (emphasis added). Although ADR Vantage was aware that it was not authorized to publish PII, it did not follow the USDA's directives.  Although in the Climate Assessment the majority of participants were identified in groups such as "Researchers", "Scientist" or "Technicians", Plaintiff was singled out as the "*IT Specialist*" or the "*union president*" and his supervisor as the "*Administrative Officer*" or "*AO*". Compare the following two paragraphs:

> Most of the Scientists indicated a degree of in-fighting and competition among their colleagues. Technicians seemed less affected, but aware of tensions…

> The IT Specialist was identified by most employees interviewed as being involved in, if not the source of, harassment and hostility. He serves USDA as the IT Specialist for SHRS as a direct report to the AO. He is also president of the National Federation of Federal Employee's (NFFE) local.

Exhibit I at 31, 35. At the SHRS Miami, there was only one IT Specialist and one union president, who happened to be the same person: Plaintiff! Without exception, every time Plaintiff is mentioned, a negative or false and defamatory statement followed. *See i.e.*, *Id*. at 31, 33-35, 39-40 and 43.

### a. ADR Vantage, not the USDA, published Plaintiff's PII.

According to the Motion, the "USDA has even confirmed that its own legal counsel helped guide Defendant ADR [regarding the scope and creation of the Climate Assessment]" Motion at 15. Not so. The USDA argued in the FOIA Lawsuit that the redactions in its responses were made because the Climate Assessment contained PII:

> First, USDA's Vaughn index explains that the Exemption 6 redactions were made to identities of individuals in the Climate Assessment Report who were the subject of personal opinions and comments about their job performance collected during the Climate Assessment…
>
> ARS redacted specific alleged workplace deficiencies set forth in the Climate Assessment Report, and collected during Climate Assessment interviews, when disclosure of the specific deficiencies would enable the identity of the individual linked to the alleged deficiency. *Id.* This was done because the information is "personal and unique", and deletion of personal identifying information alone, without deletion of the specific alleged deficiency, was not adequate to provide the necessary privacy protection.
>
> ARS also redacted the specific alleged incidents as they are so unique that revealing them would also reveal details allowing the deduction of the identity of the individuals who witnessed the alleged behavior. *Id.* Disclosing such information threatens to identify these individuals as potential witnesses to, or potential victims of, alleged workplace transgressions.

Exhibit I at 6-7; *see also Id*. at 8-23. To the question whether he directed ADR Vantage to publish Plaintiff's PII, Tucker answered, "absolutely not." A.T.'s Dep. at 67.  To the question whether ADR Vantage was allowed not to comply with protecting PII, Tucker answered:

```
And Mr. Gonzalez, I would have to yield to the person
who helmed the contract. I did not helm the contract
and the requirements of the contract, and ensuring
that all of the – that the requirement was met.
```

*Id*. at 145. Finally, during her deposition Lipsey admitted that most people in the USDA that read Plaintiff's titles ("IT Specialist" or "Union President") would recognize that the Climate Assessment referred to him. *See* D.L.'s Dep. at 32. Obviously, it was ADR Vantage, not the USDA who divulged Plaintiff's PII.

## 2. **ADR Vantage Failed To Preserve USDA's Property**

According to ADR Vantage's contract with the USDA:

> All records, files, documents, and work papers associated with this work shall be the property of the Federal government…. At the time of record disposition or contract transition, the vendor shall box, label and deliver all records, flies, documents, materials and work papers to the COR or a location identified by the COR.

Exhibit J at 4. Lipsey took contemporary notes of the interviews she conducted with participants in the Climate Assessment in a notebook and in her computer. D.L.'s Dep. at 112. Buccheri took notes only in his laptop. R.B.'s Dep. at 17. They both admitted to *destroying* these notes. Lipsey testified that the notes were destroyed "pretty close to immediately after [she] finished the case." D.L.'s at 123-124. Buccheri testified that he believes that Lipsey destroyed his notes. R.B.'s Dep. at 19.

To the question if he had amended ADR Vantage's contract to permit destruction of the notes, Tucker answered:

```
A. No, but if I wanted to do that and had done it,
   then we would have talked -- I would have talked
```

```
            to the COR [Contract Officer Representative] and
            we could have amended the contract to reflect
            that.

Q. Okay. But you did not amend the contract, correct?

A. Not that I'm aware of.
```

*Id*. at 108-109. To the question whether he would have directed ADR Vantage to destroy the

notes of the interviews, Tucker answered that he did not remember but if he did it would have

been "inappropriate". *Id.* at 66.  By destroying the USDA's property, ADR Vantage breached its

contract. Thus, negating its defense of deliberative sovereign immunity.

### 3.  <u>ADR Failed To Deliver An Objective Assessment</u>

According to its contract with the USDA, ADR Vantage was to:

> Provide an objective analysis on the challenges at the Miami location,
> specifically address concerns of hostile work environment.

Exhibit J at 4.  As previously discussed, Lipsey allowed Tucker and others with ulterior motives

against Plaintiff to edit the Climate Assessment. At least two of the editors, Trost and Masker,

were attorneys from OGC, the same office litigating Plaintiff's complaints of discrimination.

Both Trost and Masker had actively participated in Plaintiff's complaints. Exhibit C at 66-69. No

objectivity could come from their input. *Pittsburgh Press Club v. United States*, 579 F.2d 751,

758 (3d Cir. 1978) (holding that an objective survey must be conducted independently of the

attorneys involved in the litigation). Finally, ADR Vantage cannot prove the Climate Assessment

is objective because it destroyed the notes of the interviews which contained the data it relied on

to support its conclusions about Plaintiff.

In sum, Tucker's testimony confirms that he is not the person who can testify as to

whether ADR Vantage followed the directives of the USDA. The facts and the evidence, not the

semantics of Tucker's declaration, confirmed that ADR Vantage was operating on its own and

contrary to the directives of the USDA when it published Plaintiff's PII, failed to preserve government property and provided a biased report. Accordingly, this Court should deny the Motion based on the derivative sovereign immunity defense.

### E.  ADR VANTAGE IS NOT ENTITLED TO THE COMMON INTEREST PRIVILEGE

"The common interest privilege protects otherwise defamatory statements made (1) in good faith, (2) on a subject in which the party communicating has an interest, or in reference to which he has, or honestly believes he has, a duty to a person having a corresponding interest or duty, (3) to a person who has such a corresponding interest." *Mastro v. Potomac Elec. Power Co.*, 371 U.S. App. D.C. 68, 83, 447 F.3d 843, 858 (2006) (internal quotations and citations omitted).

> Two circumstances fore-close asserting the privilege: first, excessive publication, defined as publication to those with no common interest in the information communicated, or publication not reasonably calculated to protect or further the interest, and, second, publication with malice, which, within the context of the common interest privilege, is the equivalent of bad faith. While the defendant bears the burden of proving the elements of the common interest privilege, the burden of defeating the privilege by showing excessive publication or publication with malice lies with the plaintiff.

*Id.* ADR Vantage failed to meet its burden of showing that the common interest privilege applies because the Motion fails to explain: (1) why it acted in good faith; (2) why it believed that it had a duty to report defamatory statements about Plaintiff; and (3) who had a corresponding interest in receiving the statements. Even if there were such explanation, ADR Vantage would have failed all the *Mastro* factors.

First factor. In the Motion's less-than-half-page *analysis* of why it is entitled to the qualified privilege, ADR Vantage failed to explain what statements it made about Plaintiff in good faith. Motion at 21. For this reason alone, it cannot meet its burden in a motion for summary judgment.

33

Second factor. ADR Vantage's contract with the USDA and Lipsey's testimony confirm that it was not hired to conduct an evaluation of Plaintiff's performance nor to investigate or report his alleged criminal behavior. Exhibit J at 2-5, D.L.'s Dep. at 71. Therefore, ADR Vantage could not have an honest belief that it had a duty to report these matters. *Bayatfshar v. ARINC, Inc.*, 961 F. Supp. 2d 206, 217 (D.D.C. 2013) (holding that a qualified privilege is not available to a non-employer of the plaintiff).

Even if it believed it had, the defamatory statements about Plaintiff are not protected by a qualified privilege. In *Campbell v. District of Columbia*, 126 F. Supp. 3d 141 (D.D.C. 2015), an analogous case to this one, the defendant sent emails to the press alleging that the plaintiff, a finance director of the D.C. Department of Health Care, was terminated for "contract-steering". *Id*. at 146. The plaintiff sued alleging among others that she was defamed and retaliated against for her protected disclosures. *Id*. at 147.

The defendant raised the defense of the common interest privilege claiming that it was protected because the alleged defamatory statements were published for the "District's and public's shared genuine interest in making known how seriously the District took allegations of impropriety regarding its employees." *Id*. at 151, (internal quotations omitted). Finding that the offending emails were not protected by privilege, the *Campbell* court went on to say:

> [T]he employment-based common interest privilege recognized by the D.C. Court of Appeals, the common interest at stake when an employer gives the character or describes the conduct of an employee is conceptually distinct from the District's asserted interest in showing the public how seriously it took allegations of impropriety regarding its employees.
>
> In contrast to an employer's interest in opining on an employee's character, the District's asserted interest here is one of managing public perceptions of the employer's own character. Moreover, the D.C. Circuit, in a decision cited approvingly by the D.C. Court of Appeals, has recognized the employment-based common interest privilege when the statement is made in good faith in

34

answer to an inquiry by one contemplating employment of the servant—a condition clearly not evinced by the record in this case.

*Id*. at 152 (cleaned). Here too ADR Vantage has failed to present any evidence that the USDA asked that Plaintiff be identified by his titles and for a report of his alleged performance deficiencies or criminal conduct. Indeed, none of the defamatory statements published by ADR Vantage about Plaintiff have any relation to the USDA's requirements for a "Organizational Climate Assessment" in its contract. Exhibit J at 4. Much less with the USDA's definition of hostile work environment. Exhibit E at 3-4.

Third factor. ADR Vantage has failed to explain what corresponding interest in Plaintiff's performance or alleged criminal activities did Masker, Trost, Kopczynski, Hall, the EEO Investigator, Pittaluga or the persons included in Tucker's email dated February 2, 2017 have.

## 1. ADR And Its Co-Conspirator Published The Defamatory Statements About Plaintiff Excessively

"The grounds for the privilege, of course, do not exist where the employer publishes the notice … to persons without a legitimate job-related interest in receiving it". *Tacka v. Georgetown Univ.*, 193 F. Supp. 2d 43, 52 (D.D.C. 2001).

In this case Lipsey shared drafts of the Climate Assessment with Masker, Trost, Tucker and Kopczynski. Exhibit D at 16-21. After receiving the final copy, Tucker, who testified that the Climate Assessment "was not for public distribution", A.T.'s Dep. at 129, republished it to the EEO Investigator and among others to Simon Liu ("Liu") and Joon Park ("Park"). Exhibit D at 22.  Hall, who somehow obtained a copy, republished to NFFE. *Id*. at 24.

In his email to Liu and Park, Tucker claimed that he will work with "OGC and PALS in developing a strategy to address and implement the recommendations in the report". *Id*. at 22. Yet it is not clear what connection Liu or Park had with OGC or PALS and more importantly,

what connection any of these individuals had with Plaintiff. Liu is the Associate Director of the ARS. Exhibit E at 8. Like the others, Liu was not in Plaintiff's line of supervision and in the previous 18 years has never set foot at SHRS Miami.

Park is the Deputy Administrator and Business Center Chief Operating Officer of Research, Education, and Economics. *Id*. at 9. Park had never been part of Plaintiff's line of supervision and has not visited SHRS Miami in almost a decade. With the exception of Tucker, none had a legitimate interest in Plaintiff's performance.

Hall is in no better position than Tucker. Republishing the false and defamatory statements about Plaintiff to Pittaluga, an employee of NFFE, served no purpose other than defaming him. Just like Hall, Pittaluga had no connection to Plaintiff's employment with the ARS and had no legitimate interest in receiving reports about Plaintiff's job performance or whether he is abusing his access to computers or committing waste, fraud and abuse.

### 2.  ADR And Its Co-Conspirators Published The Defamatory Statements About Plaintiff With Malice

"Malice [in the context of defamation] is the doing of an act without just cause or excuse, with such a conscious indifference or reckless disregard as to its results or effects upon the rights or feelings of others as to constitute ill will." *Marshall v. Allison*, 908 F. Supp. 2d 186, 200-01 (D.D.C. 2012) (internal quotations and citations omitted).

The presence of malice is therefore measured by the primary motive by which the defendant is apparently inspired in disseminating a statement, not the truth of the assertions. *Mattiaccio v. Dha Grp*., Inc., 989 F.Supp.2d 104, 108 (D.D.C. 2013). For example, courts have recognized as indicators of malice evidence that an employer acted out of ill will towards an employee or was retaliating against an employee. *Tacka v. Georgetown University,* 193 F.Supp.2d at 54 (finding the plaintiff had proffered indicators of malice with evidence that the

employer was trying to "deliberately derail" the employee's tenure application instead of facilitate its review); *Echtenkamp v. Loudon County Pub. Schools,* 263 F.Supp.2d 1043, 1062 (E.D.Va.2003) (holding that the plaintiff properly pleaded malice when his complaint alleged facts indicating a larger pattern of retaliation against the plaintiff). This is precisely what ADR Advantage and its co-conspirators did against Plaintiff.

The primary motive in creating the Climate Assessment was to discredit Plaintiff in retaliation for his protected activities. To that end ADR Vantage published the false and defamatory statements about Plaintiff irresponsibly and lacking "the careful, systematic assessment of credibility one would expect before making accusations of which an employee reputation and livelihood depended." *Mastro v. Potomac Elec. Power Co.*, 447 F.3d at 855.

Before ADR Vantage published the defamatory statements, Tucker knew that the accusations about Plaintiff abusing his access to computer and phone were false. When asked if these allegations were investigated before they were published Tucker answered:

> Yeah, the same -- you know, the same concerns was expressed as a part of that IT assessment that was done back around 2015, 2016, so, you know, we asked Tom Houston and the OCIO's office at headquarters to take a look and monitor our system and see if they could find any evidence of anything that might show that that was the case, and they did not find anything.

A.T.'s Dep. at 157- 159. When asked why he allowed this accusation to be published in the Climate Assessment knowing that nothing was found about the allegations, he answered that "the report reflect[ed] the views of the employees". *Id*. at 160-161.

In other words, for Tucker it was more important that the Climate Assessment reflected the "views" of the participants than contradicting his knowledge that these "views" were already

37

found baseless. The same accusation was then used by ADR Vantage to claim that it was "evidence" that Plaintiff was committing waste, fraud or abuse. Exhibit I at 40. Tucker and ADR Vantage's willful ignorance of what was published about Plaintiff confirm that both, as co-conspirators, acted with reckless disregard for the effects these defamatory statements had on Plaintiff and his job.

Another indication that ADR Vantage acted in bad faith is Lipsey's knowledge of "some connection" between retaliation and the statements made about Plaintiff. D.L.'s Dep. at 93-94. Her testimony is summarized in the Motion which recognizes that the statements were made in retaliation for Plaintiff's protected activities. *See i.e.,* "[i]t is impossible for Plaintiff to establish that any statement he deems defamatory in the Climate Assessment Report was not actually made by one or more of the people he has aggrieved over his years at USDA…. Many of the complaints/criticism expressed by his fellow employees stemmed from the unrelenting grievances he filed in his role as a union officer." Motion at 19. Thus, when ADR Vantage admits that it was aware that the defamatory statements were payback for Plaintiff's protected activities, it is in fact admitting to have acted with malice.

The *Echtenkamp* court, *supra*, provided an example of the evidentiary detail necessary to support a finding of malice by clear and convincing evidence: "(i) the record showed that plaintiff's prior record was exemplary, (ii) the defaming defendant took over plaintiff's job, (iii) the defamatory charges against plaintiff were discredited and plaintiff was offered his job back, and (iv) that the defaming defendant was overheard saying that plaintiff "was a lying, cheating, SOB; that he … got; that he crucified him; and he tackled him to the wall." 263 F.Supp.2d at 1063 *citing Oberbroeckling v. Lyle*, 234 Va. 373, 362 S.E.2d 682 (1987).

In this response Plaintiff has offered irrefutable evidence of at least three of these four factors (the second factor does not apply), *i.e.*, first factor – Plaintiff's work record in the ARS is exemplary. Exhibit G. Third factor – some of the defaming statements about Plaintiff are false or have been discredited. C.R.'s Dep. at 3; *see also* A.T.'s Dep. at 159. Fourth factor – the emails attached to this response show plans to retaliate against Plaintiff from Tucker and some participants of the Climate Assessment for Plaintiff's protected activities. Exhibit D at 1-8.

The Motion argues that ADR Vantage "which did not know the Plaintiff, had any reason whatsoever to intentionally harm him or act with actual malice." Motion at 21. Lipsey did not need to know Plaintiff to know of the seriousness and the consequences of her accusations, much less given the expertise that she and ADR Vantage claim to have. *See* [ECF No. 4-2 at 12–13, 20–21, 26–27].

An IT professional charged with abuses to his access to computers or phones is not only subject to legal prosecution, but to the end of his employment and career in the field. Similarly accusing any federal employee of committing waste, fraud and abuse which in the context of public service imply factual allegations of official malfeasance, is grounds for legal prosecution and/or dismissal. Both charges carry a stigma of dishonesty.

Based on this record, reasonable jurors could find that ADR Vantage published the defamatory statements excessively and acted with the requisite malice for the sole purpose of retaliating against Plaintiff for his protected activities. Accordingly, ADR Vantage is not entitled to the protection of the common interest privilege.

39

**F.  PLAINTIFF DID NOT CONSENT TO ADR'S DEFAMATORY STATEMENTS**

Citing *Farrington v. Bureau of Nat. Affairs*, 596 A.2d 58 (D.C. 1991) and reaching for its last defense, ADR Advantage claims that Plaintiff consented to the false and defamatory statements in the Climate Assessment. Motion at 22.

The defendant has "the burden to show that there was no dispute that [plaintiff] consented to the publication of the evaluation, that the statements contained within the evaluation were pertinent to his work performance, and that the distribution was limited to those with a legitimate interest in the evaluation." *Id.* at 59. "Consent is a qualified privilege that exist only due to the absence of contract or of some affirmative act of consent." *Tacka*, 193 F. Supp. 2d at 51.

Other than reiterating that ADR Vantage was somehow entitled to defame Plaintiff as payback for his protected activities and claiming that the Climate Assessment was distributed to "only the USDA's leadership" the Motion does not provide much analysis of this defense. Motion at 22.  There is no evidence that demonstrates how Plaintiff consented to the defamatory statements, how these statements pertained solely to his performance, or that the defamatory comments about Plaintiff were distributed to the those with a legitimate interest.

### 1.  Plaintiff Did Not Consent To The Defamatory Statements By ADR Vantage

In *Farrington* the court held that the requirement of the plaintiff's work evaluation was prescribed by the "collective bargaining agreement" and that when the plaintiff agreed to a written evaluation, he consented to the publication of statements relevant to his quality of work. 596 A.2d. at 59-60. Here, ADR Vantage failed to consider that participation in the Climate Assessment was voluntary, Exhibit D at 10, and that Plaintiff was not on notice of the purpose of the Climate Assessment, therefore he could not have consented to something he did not know.

There is also nothing in the record that demonstrates that Plaintiff affirmatively consented to ADR Vantage's *assessment* of his performance. To the contrary, after learning of the Climate Assessment: (1) on December 11, 2016, Plaintiff alerted employees that the union did not approve the Climate Assessment, Exhibit D at 12; (2) Plaintiff also suggested to two union officers not to participate, Pl.'s Dep at 67-68; (3) Plaintiff did not participate in the Climate Assessment, *id.*; and, (4) Plaintiff filed an unfair labor practice on December 13, 2016 against the ARS for bypassing the union in conducting the Climate Assessment, Exhibit E at 1. These are not the actions of someone who had consented to be defamed in the Climate Assessment.

## 2.  The Defamatory Statements Did Not Pertain to Plaintiff's Performance

As to whether the defamatory statements in the Climate Assessment pertained solely to Plaintiff's quality of work, they did not. Throughout the Climate Assessment, Plaintiff is referred as "IT Specialist" and "Union President" interchangeably as if these two positions were one and the same.

As ADR Vantage knows because of the expertise in labor relations it represented to the USDA to have, Exhibit J at 4, Plaintiff's protected activities are not the subject of a performance evaluation. *Government DOI, Office of the Sec'y, Government Gov't Comptroller*, 11 F.L.R.A. 521, 1983 FLRA LEXIS 364 (F.L.R.A. Mar. 9, 1983) (holding that the Agency infringed in the union's rights under 5 USCS § 7102, when it included negative comments in the union president's performance appraisal for filing a grievance on behalf of some employees.).

## 3.  The Defamatory Statements About Plaintiff Were Distributed To Persons Without A Legitimate Interest In Them

The *Farrington* court also found that the plaintiff's evaluation was published "only to supervisory personnel and labor-relations personnel, who were pursuing a related grievance for [plaintiff]." 596 A.2d. at 60. Here, even assuming that ADR Vantage, Tucker and Hall had

distributed Plaintiff's job evaluation and not a false and defamatory *assessment* of his

performance, none of the persons that received it could have acted on it because none were part

of Plaintiff's supervision or were appointed by the USDA to investigate Plaintiff's supposed

criminal conduct. To the contrary, some of the persons that did receive or edited the defamatory

comments about Plaintiff did so because they were biased against him for his protected activities,

not because they had a legitimate concern for his performance as an IT Specialist.

ADR Vantage failed to demonstrate that there are no issues of material fact for its

defense of consent. Since a reasonable juror could find that Plaintiff did not consent to the

Climate Assessment and that it was distributed excessively, this Court should deny the Motion.

### G.  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ("IIED")

ADR Vantage throws against the wall at least seven defenses against Count III of IIED.

Only one merits discussion; that Plaintiff has not alleged "any facts which would rise to the level

of "severe emotional distress." Motion at 25. "To establish a claim for intentional infliction of

emotional distress a plaintiff must allege: (1) extreme and outrageous conduct on the part of the

defendant which (2) intentionally or recklessly (3) causes the plaintiff [to suffer] severe

emotional distress." *Ortberg v. Goldman Sachs Grp.*, 64 A.3d 158, 163 (D.C. 2013).

#### 1.  **ADR's conduct was extreme and outrageous**

"[C]ourts in other jurisdictions, have found that causing the innocent plaintiff to be

subject to [] an accusation of crime and putting her in fear that charges will be brought passes the

bounds of conduct that will be tolerated by a civilized society and is, therefore, outrageous

conduct." *Kalantar v. Lufthansa German Airlines*, 402 F. Supp. 2d at 145 *quoting Dean v. Ford

Motor Credit Co.*, 885 F.2d 300, 307 (5th Cir. 1989), (internal quotations omitted); *see also

Carey v. Piphus*, 435 U.S. 247, 262, 98 S. Ct. 1042, 1052 (1978) ("[S]tatements that are

defamatory *per se* by their very nature are likely to cause mental and emotional distress, as well as injury to reputation…").

The accusations in the Climate Assessment that Plaintiff was abusing his access to the data, email and telephones of his co-workers and committing fraud, waste and abuse caused Plaintiff a reasonable fear of losing his job or being charged criminally. Under these circumstances, ADR has failed to carry its burden of proving that there are no issues of material fact as to the count of IIED.

### H.  INVASION OF PRIVACY – FALSE LIGHT

Other than justifying the retaliatory actions against Plaintiff for his protected activities, there isn't much discussion in the Motion about Count IV of the Complaint. Motion at 26.

An invasion of privacy- false light claim requires a showing of: (1) publicity (2) about a false statement, representation or imputation (3) understood to be of and concerning the plaintiff, and (4) which places the plaintiff in a false light that would be offensive to a reasonable person. *Kitt v. Capital Concerts, Inc*., 742 A.2d 856, 859 (D.C. 1999). "Since the District of Columbia applies a negligence standard to defamation actions involving private individuals, that standard should also be applied to a false light action." *Dresbach v. Doubleday & Co.*, 518 F. Supp. 1285, 1288 (D.D.C. 1981) (internal citation omitted).

### 1.  ADR Vantage's Publication Placed Plaintiff In A False Light

The previous discussions in the defamation section of this response should be sufficient to demonstrate that Plaintiff meets factors one through three and that ADR Vantage acted negligently. As to factor four, the Supreme Court has distinguished the claim of false light invasion of privacy from defamation noting that a false light claim concerns the mental distress

of being exposed to the public view, and not necessarily from harm to one's reputation. *See Time, Inc. v. Hill*, 385 U.S. 374, 384 n.9, 87 S. Ct. 534, 540 (1967).

The information published by ADR Vantage about Plaintiff falls squarely into the type of personal information that is not publicly available and that if published, by its nature, may cause embarrassment and mental distress. *Smith v. Dept. of Labor*, 798 F.Supp.2d 274, 284 (D.D.C. 2011) (an employee has at least a minimal privacy interest in his or her employment history and job performance evaluations and "[t]hat privacy interest arises in part from the presumed embarrassment or stigma wrought by negative disclosures.").

ADR Vantage placed Plaintiff in false light when it publicly and negligently discussed his complaints of discrimination and implied that they were frivolous. Exhibit I at 39. ADR Vantage also published false statements that Plaintiff is a fraudster and that he cannot perform in his profession as an IT Specialist. *Id*. at 34-43.

## IV. CONCLUSION

Plaintiff asks the Court to deny the Motion.

Submitted on March 23, 2021

/s/ Joey D. Gonzalez
Joey D. Gonzalez Ramos
Florida Bar No. 127554
E-service: joey@joeygonzalezlaw.com
***Pro Se Plaintiff***

44

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
CIVIL DIVISION

| | | |
|---|---|---|
| JOEY D. GONZALEZ RAMOS,<br>Plaintiff,<br>vs.<br><br>ADR VANTAGE, INC,<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.: 1:18-cv-01690-APM<br>JURY TRIAL |

## **ORDER**

Upon consideration of the Defendant's renewed motion for summary judgment [ECF No. 88] ("Motion"), it is ORDERED that the Motion is hereby DENIED.

Dated: _____          _____

Amit P. Mehta
United States District Judge