UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOEY D. GONZALEZ RAMOS, ) | |
| Plaintiff, ) | |
| v. ) | Case No. 18-cv-1690 (APM) |
| ADR VANTAGE, INC., ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

**I.   INTRODUCTION**

In 2016, Plaintiff Joey Gonzalez Ramos worked for the U.S. Department of Agriculture ("USDA") in a Miami field office. He alleges that the USDA hired an external contractor—Defendant ADR Vantage, Inc. ("ADR Vantage")—to smear him in a climate-assessment report in retaliation for his protected activities at the agency. He brought this action against Defendant, asserting claims of defamation, civil conspiracy, invasion of privacy, and intentional infliction of emotional distress, and seeking damages and injunctive relief. Before the court is Defendant's renewed motion for summary judgment. For the reasons that follow, the court grants Defendant's motion in full.

**II.   BACKGROUND**

   **A.   Factual Background**

Plaintiff is an employee of the USDA. Pl.'s Resp. in Opp'n to Def.'s Renewed Mot. for Summ. J., ECF No. 90 [hereinafter Pl.'s Opp'n], Decl. of Joey D. Gonzalez Ramos in Supp. of Pl.'s Opp'n, ECF No. 90-2 [hereinafter Gonzalez Ramos Decl.], ¶ 2. At the times relevant to this

action, he worked as an information technology ("IT") specialist at the Miami field office of the USDA Agricultural Research Service. *Id.* While working at the Miami office, he was also the president of the National Federation of Federal Employees, Local 1752. *Id.* ¶ 5. Plaintiff filed numerous union grievances and administrative complaints of discrimination against USDA employees and supervisors at the Miami field office. *Id.* ¶ 6.

Plaintiff also had complaints "alleging improper conduct" filed against him by USDA employees. Def.'s Renewed Mot. for Summ. J., ECF No. 88 [hereinafter Def.'s Mot.], Def.'s Stmt. of Material Facts Not in Dispute [hereinafter Def.'s SOF], ¶ 5. For example, one employee filed a complaint "assert[ing] that Plaintiff created a racially hostile work environment by using the 'N word.'" *Id.*

In late 2016, the USDA "sought a formal climate assessment after it received complaints from employees alleging a hostile work environment" at the Miami field office. *Id.* ¶ 2; *see also id.* ¶ 19 (noting that the office had received "a disproportionate number of complaints"); Def.'s Mot., Exs., ECF No. 88-1, Ex. 11 [hereinafter Tucker Dep.], at 175.[1] USDA leadership viewed the Miami office as "dysfunctional" and hoped that "a climate assessment report," which is generally "undertaken by a third-party neutral . . . to assess and identify themes and patterns in a certain work environment with the goal of improving workplace conditions," could "help identify some of the problems." Def.'s SOF ¶¶ 2, 19 (internal quotation marks omitted); *see also* Compl., ECF No. 1 [hereinafter Compl.], ¶ 26; Tucker Dep. at 91 ("This was a dysfunctional location . . . ."); *id.* (discussing USDA management's recognition that it "need[ed] to bring an . . . independent body in to do an assessment to try to figure out and get to the bottom of what's going

---

[1] When citing Defendant's exhibits, the court uses the internal pagination for each exhibit, even though Defendant filed its exhibits as a single attachment.

on, and what [it could] do to try to resolve some of these issues and get this location back on the right track").  The USDA also viewed the climate assessment as "a way for employees to feel comfortable sharing their honest assessments with an independent third party."  Def.'s SOF ¶ 19; *see also* Pl.'s Opp'n, Pl.'s Resp. to Def.'s Stmt. of Material Facts Not in Dispute, ECF No. 90-1 [hereinafter Pl.'s Resp. to Def.'s SOF], ¶ 19(b) (admitting that Tucker so stated in his deposition); Tucker Dep. at 92–93 (expressing that USDA management viewed the climate assessment as "an opportunity [for employees] to talk to somebody who they got no allegiance to, no ties to, they can be comfortable talking with, and that's why we wanted an independent third-party who had no connection to this area office").[2]

Ultimately, the USDA contracted with Defendant, and Defendant sent some of its employees to the Miami office to conduct the assessment in mid-December 2016.  *Id.* ¶¶ 3, 6; Compl. ¶ 25.  Plaintiff "did not participate in the assessment" and, indeed, encouraged others not to do so.  Def.'s SOF ¶ 6; Pl.'s Resp. to Def.'s SOF ¶ 6.  The assessment "culminat[ed] in a formal Climate Assessment Report" ("the Report") in February 2017 that is the subject of this litigation.  Def.'s SOF ¶ 3.  Defendant "did not release [the Report] to anyone other than a handful of USDA executives."  *Id.* ¶ 7; Pl.'s Resp. to Def.'s SOF ¶ 7 (denying that he has knowledge of who qualifies

---

[2] Plaintiff believes that Archie Tucker, the Area Director of the Southeast Area for USDA Agricultural Research Service, "hired ADR Vantage to conduct a so-called 'Climate Assessment' . . . with the pretext of understanding how to best address the station's work environment and take necessary 'managerial action.'"  Pl.'s Opp'n at 2.  He thus disputes Defendant's characterization of USDA management's view of the role of the climate assessment, Pl.'s Resp. to Def.'s SOF ¶ 19, but he does not dispute the contents of Tucker's deposition, from which the court has quoted at length in this paragraph.  Because Plaintiff has not come forward with evidence for his "pretext" theory, *see id.*, there is no material factual dispute that USDA management sought a climate assessment with the stated purpose of identifying problems at the Miami field office, which was generating many employee complaints, and to use that information to set a course forward.  *See id.*; Def.'s SOF ¶ 19.

as a "USDA executive" but not disputing that Defendant's release was limited and within the USDA). Plaintiff was not among those who received a copy of the Report.

On April 25, 2017, Plaintiff received a large set of documents in response to a complaint he had filed against his employer regarding incidents that predated the climate assessment. *See* Pl.'s Opp'n, Ex. C, ECF No. 90-5 [hereinafter Pl.'s EEO Compls.], at 1; Def.'s SOF ¶ 20. Those documents included an unredacted copy of the Report. *See id*. at 1–2. Plaintiff maintains that he did not notice the unredacted Report at that time. Pl.'s Opp'n at 6.

Less than a month later, on May 18, 2017, a USDA executive—Dr. Deborah Brennan—visited the Miami office. Compl. ¶ 31; Def.'s Mot., Exs., ECF No. 88-1, Ex. 3 [hereinafter Gonzalez Ramos Dep.], at 84. While there, she "discussed the climate assessment" and "mentioned that the climate assessment found that the IT specialist was defective in his performance." Gonzalez Ramos Dep. at 84; *see also* Compl. ¶ 31 ("At the time, Brennan made disparaging comments about Plaintiff's job performance before the attendees. According to Brennan she based her comments in the findings of the Climate Assessment.").

"Prompted by Brennan's comments, Plaintiff requested a copy" of the Report through a Freedom of Information Act ("FOIA") request. Compl. ¶ 32; *see also* Gonzalez Ramos Dep. at 75. On July 14, 2017, Plaintiff received a "heavily redacted copy" of the Report in response to his FOIA request. Gonzalez Ramos Decl. ¶ 7. He appealed the withholdings and, on October 20, 2017, received a copy of the Report that was "less redacted." *Id*. In February 2018, Plaintiff claims, he discovered the unredacted copy of the Report he had received almost a year prior. *Id*. ¶ 8. The Report contained numerous statements reflecting what other USDA employees had said about "the IT Specialist" and made recommendations that the USDA investigate some of those statements. *See* Def.'s Mot., Exs., ECF No. 88-1, Ex. 2 [hereinafter Climate Assessment Report],

at 9–10, 13–16, 19.  The "[four] actionable statements about Plaintiff in the Climate Assessment," *id.*, that he identifies as defamatory are as follows:

- "The IT Specialist is unreceptive to any kind of suggestion and he's impolite when he's annoyed or frustrated.  In a recent incident, he took something he shouldn't have.  We talked about it and he 'flipped out,' and raised his voice. It was very uncomfortable.  I don't go to him if I don't have to."

- "No action by [the Agricultural Research Service] will be effective in improving the atmosphere at [the Miami office] without addressing the issues involving [the IT Specialist and the Administrative Officer]."

- "Questions of Waste, Fraud, and Abuse.  ADR Vantage frequently works with agencies as a confidential neutral and in that capacity, we are obligated to report to the agency what we believe to be evidence of waste, fraud or abuse.  We do not know what definition USDA would use for these concepts but the conduct we have heard about from [Miami office] employees concerning the IT specialist would raise such a question for us."

- "Govern actions of the IT Specialist.  Move the reporting line of authority for the IT Specialist to the RL to ensure his availability and improve responsiveness and to track satisfaction from Researchers and others.  Investigate allegations that he has abused his access to data, emails and telephones as well as his conduct toward other employees and consider appropriate disciplinary measures as appropriate."

Climate Assessment Report at 10, 15, 16, and 19; Pl.'s Opp'n at 24.

### B.   Procedural Background

Plaintiff filed this action on July 18, 2018.  Compl.  Defendant moved to dismiss.  Def.'s Mot. to Dismiss, ECF No. 4.  This court denied that motion, *Gonzalez Ramos v. ADR Vantage, Inc.*, No. 18-cv-01690 (APM), 2018 WL 6680531 (D.D.C. Dec. 19, 2018), and the parties went on to engage in a protracted and "particularly contentious" discovery process, *Gonzalez Ramos v. ADR Vantage, Inc.*, No. 18-cv-01690 (APM), 2020 WL 7136840, at *1 (D.D.C. Dec. 7, 2020); *see also Gonzalez Ramos v. ADR Vantage, Inc.*, No. 18-cv-01690 (APM), 2020 WL 409283 (D.D.C. Jan. 26, 2020).  Defendant filed its first motion for summary judgment in March 2020.  Def.'s Mot. for Summ. J., ECF No. 55.  The court denied that motion without prejudice to permit

5

Plaintiff to take an additional deposition. *Gonzalez Ramos*, 2020 WL 7136840, at *5. Defendant filed a renewed motion on February 22, which the court now considers.[3] Def.'s Mot. at 1–2.

## III.  LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine dispute" of a "material fact" exists when the fact "is capable of affecting the substantive outcome of the litigation" and "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Elzeneiny v. District of Columbia*, 125 F. Supp. 3d 18, 28 (D.D.C. 2015).

In assessing a motion for summary judgment, the court looks at the facts in the light most favorable to the nonmoving party and draws all justifiable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). To defeat a motion for summary judgment, the nonmoving party must put forward "more than mere unsupported allegations or denials"; its opposition "must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial" and that a reasonable jury could find in its favor. *Elzeneiny*, 125 F. Supp. 3d at 28 (first citing Fed. R. Civ. P. 56(e); and then citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

---

[3] Plaintiff has filed a separate action against ADR Vantage and its counsel for defamation, invasion of privacy, and intentional infliction of emotional distress based on statements in Defendant's renewed motion for summary judgment. Am. Compl., *Gonzalez Ramos v. ADR Vantage, Inc.*, No. 21-cv-00592 (APM) (D.D.C.), ECF No. 10. A motion to dismiss in that case is ripe for consideration. Def.'s Prelim. Mot. to Dismiss Am. Compl., *Gonzalez Ramos*, No. 21-cv-00592 (APM), ECF No. 11. The court does not address that motion in this Memorandum Opinion.

## IV.   DISCUSSION

### A.   Plaintiff's Defamation Claim (Count I)

In Count I, Plaintiff asserts a claim of defamation, arguing that "[t]here are at least [four] actionable statements about Plaintiff in the Climate Assessment." Pl.'s Opp'n at 24. Defendant raises three affirmative defenses to this claim: (1) it "is entitled to derivative sovereign immunity"; (2) the claim is "barred by the statute of limitations"; and (3) the Report is "subject to" a number of qualified privileges, including, most notably, the common-interest privilege. Def.'s Mot. ¶¶ 3–5; Def.'s Mot., Mem. of P. & A. in Supp. of Def.'s Renewed Mot. for Summ. J. [hereinafter Def.'s Mem.], at 20–23. The court finds that the common-interest privilege suffices to dispose of Plaintiff's defamation claim but will also discuss Defendant's statute-of-limitations defense. The court does not reach the issue of derivative sovereign immunity.

#### 1.   The Common-Interest Privilege

Under District of Columbia law, the common-interest privilege, if applicable, is a complete defense to a claim of defamation. *Mosrie v. Trussell*, 467 A.2d 475, 477 (D.C. 1983). The defense applies to statements "(1) made in good faith, (2) on a subject in which the party communicating has an interest, or in reference to which he has or honestly believes he has a duty (3) to a person who has such a corresponding interest or duty." *Payne v. Clark*, 25 A.3d 918, 925 (D.C. 2011) (internal quotation marks omitted). If a court determines that the common-interest privilege applies, "the defendant will be presumed to have been actuated by pure motives in its publication." *Id.* (internal quotation marks omitted). But "[t]wo circumstances foreclose asserting the privilege: first, excessive publication . . . and, second, publication with malice, which, within the context of the common interest privilege, is the equivalent of bad faith." *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 858 (D.C. Cir. 2006) (internal quotation marks omitted). "[T]he burden is on

the plaintiff to prove the privilege has been abused." *Payne*, 25 A.3d at 925 (internal quotation marks omitted).

Here, the privilege covers the four allegedly defamatory statements made about Plaintiff in the Report.  The common-interest "privilege has been applied to employers or organizations reporting information on their own employees or members," *id.* at 926–27; to statements made by third parties to employers pursuant to investigations requested by the employer, *Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873, 879 (D.C. 1998); and to other statements between stakeholders in the "proper functioning of" an organization about "anything . . . that materially affected" it, *Wood v. Am. Fed'n Gov't Emps.*, 316 F. Supp. 3d 475, 482 (D.D.C. 2018). The Report prepared by ADR fits squarely within this genre of cases.  The USDA contracted with Defendant "to conduct a Climate Assessment after several years of complaints from employees at the USDA related to its Miami field office."  Def.'s Mem. at 21.  Their agreement required Defendant to "provide a comprehensive report outlining the issues identified and categorized from the assessment interviews; recommendations for mitigation; and a proposal for an attainable way forward."  Def.'s Mot., Exs., ECF No. 88-1, Ex. 1, at 2.  The "comprehensive report" was to include, among other things, "information on Employee Relation and Labor Relation issues at the location"; "the role of the Union at the Miami location"; and "an objective analysis on the challenges at the Miami location," including "concerns of hostile work environment." *Id.* at 2; *see also* Pl.'s Opp'n, Ex. J, ECF No. 90-12.  Defendant thus was tasked with communicating to the USDA on subjects concerning the Miami field office's work environment, which would include Plaintiff's alleged disruptive behavior and misconduct, and the USDA had a legitimate interest in receiving such information.  The privilege therefore squarely applies, and the burden is on Plaintiff

to show that "the privilege has been abused." *Payne*, 25 A.3d at 925 (internal quotation marks omitted).

Plaintiff has not met this burden. First, he has offered no proof creating a material dispute of fact as to excessive publication of the Report by Defendant. Plaintiff conceded at his deposition that he was not aware of ADR giving the Report to anyone other than "upper management at the USDA." Gonzalez Ramos Dep. at 80–82. Plaintiff instead accuses USDA officials, particularly Archie Tucker, the Area Director of the Southeast Area for USDA Agricultural Research Service, of widely distributing the Report. *See, e.g.*, Pl.'s Opp'n at 35. But that is not the relevant vector of publication. Plaintiff has sued ADR Vantage in this case, not the USDA, and so USDA's excessive publication, even if established, would not strip Defendant of the common-interest protection.[4] Plaintiff also cites *Campbell v. District of Columbia*, 126 F. Supp. 3d 141 (D.D.C. 2015)—a case that dealt with employer statements *to the press* about an employee, *id.* at 146—in support of his argument that the common-interest privilege does not apply to the Report. Pl.'s Opp'n at 34. Publication by Defendant to the press is not at issue here.

Second, even construing the facts in the light most favorable to Plaintiff, he has not shown that there is a genuine dispute of material fact as to whether Defendant "lost the common interest privilege by publishing the [Report] with malice." *Mastro*, 447 F.3d at 859. "District of Columbia law sets a high standard for establishing malice sufficient to defeat the protections of the common interest privilege." *Id.* It requires showing that the publication occurred "without just cause or

---

[4] Based on a header in his opposition brief, Plaintiff might be understood to assert that Defendant, as USDA's co-conspirator, can be held vicariously liable for the agency's excessive publications of the Report. *See* Pl.'s Opp'n at 35 ("ADR And Its Co-Conspirator Published The Defamatory Statements About Plaintiff Excessively"). But Plaintiff does not develop this argument, and "this Court 'may not do the [plaintiff's] summary-judgment work for it.'" *See Campbell*, 126 F. Supp. 3d at 151 ((quoting *Coleman v. District of Columbia*, 794 F.3d 49, 61 (D.C. Cir. 2015))). In any event, the court finds, based on the evidence presented, that no reasonable jury could find that ADR Vantage conspired with USDA officials to defame Plaintiff. *See infra* at 9–12.

excuse, with such a conscious indifference or reckless disregard as to its results or effects upon the rights or feelings of others as to constitute ill will." *Id.* (internal quotation marks omitted).  At the summary judgment stage, "to discern whether the plaintiff has presented sufficient evidence to demonstrate material facts in issue with respect to the applicability of the common interest privilege," courts "look[] to the primary motive by which the defendant is apparently inspired." *Payne*, 25 A.3d at 925 (internal quotation marks omitted).  "[T]he fact that the defendant feels resentment and indignation towards the plaintiff and enjoys defaming him will not forfeit the privilege so long as the primary purpose of the statement is to further the interest which is entitled to protection." *Id.* at 925–26 (alterations omitted) (emphasis omitted) (internal quotation marks omitted).

Plaintiff argues that Defendant acted with malice because "[t]he primary motive in creating the Climate Assessment was to discredit Plaintiff in retaliation for his protected activities." Pl.'s Opp'n at 37.  On this point, *Mastro v. PEPCO* is instructive.  In that case, the D.C. Circuit affirmed a grant of summary judgment in favor of an employer on the grounds that the plaintiff had "raised no triable issues of fact as to [the defendant's] loss of the common interest privilege[,] [b]ecause neither excessive publication nor publication with malice exist[ed]." *Mastro*, 447 F.3d at 859. The allegedly defamatory statements at issue were contained in termination memoranda circulated to the employer's upper management and to the D.C. Department of Employment Services.  *Id.* at 849.  The court concluded that "[t]he primary purpose behind management's publication of the memoranda" was documenting the events giving rise to the plaintiff's termination, not "sully[ing] Mastro's reputation." *Id.* at 859.  "Whatever impermissible motives may have prompted [the defendant] to terminate Mastro, Mastro has presented no evidence suggesting that the communication of that decision to a small group of appropriate individuals was driven by anything

more than the mundane need for businesses and governments to keep track of personnel actions." *Id.* The same is true here. Plaintiff has offered much speculation but no evidence that retaliation drove the Report. Instead, the facts plainly show a "mundane . . . business[] and government[]" purpose, *id.*: the USDA, driven by employee complaints, charged Defendant with assessing the working environment at its Miami field office, and in order to complete that task, Defendant had to report to the USDA on factors affecting the Miami working environment—including certain elements of Plaintiff's performance in his role that affected the office climate as perceived by other employees. *See* Def.'s Mem. at 21; Def.'s SOF ¶¶ 1–5, 19. Plaintiff has come forward with no evidence that retaliating against him was ADR Vantage's primary purpose in drafting the Report.

Plaintiff also alleges that the president of ADR Vantage was aware of "some connection between retaliation and statements made about Plaintiff," and so "when ADR Vantage admits that it was aware that the defamatory statements were payback for Plaintiff's protected activities, it is in fact admitting to having acted with malice." Pl.'s Opp'n at 38 (internal quotation marks omitted). Defendant has made no such admission. Rather, it stated that "many of the complaints/ criticisms expressed by [Plaintiff's] fellow employees" that contributed to the USDA hiring Defendant to conduct a Climate Assessment "stemmed from the unrelenting grievances he filed in his role as a union officer." Def.'s Mem. at 22. Defendant made this statement to explain why statements in the Report about Plaintiff were relevant to Defendant and the USDA's common interest: "Because the entire purpose of the Climate Assessment was to help the USDA gauge ways to improve the working environment at its Miami office, and the report was given to only the USDA's leadership," statements reflecting complaints by Plaintiff's coworkers were "precisely the type of situation where a qualified privilege should exist and be applied." *Id.* Moreover, even taking Plaintiff's mischaracterization of Defendant's words at face value, mere awareness of

11

"some connection between retaliation and statements made about the Plaintiff," Pl.'s Opp'n at 38 (internal quotation marks omitted), would not rise to the level of "conscious indifference or reckless disregard as to its results or effects upon the rights or feelings of others as to constitute ill will." *Mastro*, 447 F.3d at 859; *see also Moss v. Stockard*, 580 A.2d 1011, 1025 (D.C. 1990).

Plaintiff makes much of the Report's suggestion that he may have abused his position by improperly accessing stored materials, even though a USDA official, Tucker, was aware that the allegation had already been investigated and no wrongdoing had been found. Plaintiff argues that Tucker's awareness "that the accusations about Plaintiff abusing his access to computer and phone" that were included in the Report "were false" establishes malice. Pl.'s Opp'n at 37. Not so. Tucker is not the defendant in this case; ADR Vantage is. Plaintiff has supplied no evidence that ADR Vantage knew that Plaintiff had been cleared of wrongdoing by the time of the Report's publication. Given the purpose of the Climate Assessment and the associated Report—to "help identify" some of the "themes and patterns" in the "hostile work environment" at the Miami field office as a "tool" to be used in "improving workplace conditions," Def.'s SOF ¶¶ 2, 19; Def.'s Mem. at 21—Plaintiff simply has not established that Defendant's inclusion of statements that reflected other USDA employees' perceptions of Plaintiff's effect on the working environment was driven by a "primary motive" of "ill will or enmity." *Payne*, 25 A.3d at 925.

Finally, Plaintiff attempts to establish malice by transforming an out-of-circuit district court case into a dispositive, four-factor test, which he alleges he has "irrefutabl[y]" met. Pl.'s Opp'n at 38–39. This attempt is unavailing. First, the case Plaintiff cites, *Echtenkamp v. Loudon County Public Schools*, 263 F. Supp. 2d 1043 (E.D. Va. 2003), involves an application of Virginia law, not District of Columbia law. It also does not purport to set forth a four-factor test for malice; rather, it offers an example of an evidentiary showing that survived a motion to dismiss. *Id.*

at 1063. Moreover, both *Echtenkamp* and the Virginia Supreme Court case it cited in the portion of the opinion Plaintiff points to involved factual scenarios where the allegedly defamatory statements were made in bad faith by the defendant-employer in the events surrounding each plaintiff's termination. *Echtenkamp*, 263 F. Supp. 2d at 1052–53; *Oberbroeckling v. Lyle*, 362 S.E.2d 682, 685 (Va. 1987). Here, Defendant was not Plaintiff's employer, and the allegedly defamatory statements were made for a purpose independent of evaluating or influencing Plaintiff's employment: Defendant included the allegedly defamatory statements about Plaintiff in its report to reflect the views of Miami USDA employees, Pl.'s Opp'n at 37, and to deliver to the USDA a complete report of "themes and patterns in [the] work environment with the goal of improving workplace conditions." Def.'s SOF ¶ 2.

In sum, the common-interest privilege applies to the Report, and Plaintiff has not met his burden in rebutting its application. As a result, judgment as a matter of law is warranted in favor of Defendant on Plaintiff's defamation claim.

        2.     *The Statute of Limitations*

Even if the common-interest privilege does not apply, Plaintiff's defamation claim is time-barred, compelling summary judgment in favor of Defendant on that alternative ground. In his opposition to Defendant's motion for summary judgment, Plaintiff argues for the first time that his defamation claim is subject to Florida's two-year statute of limitations rather than the District of Columbia's one-year period. Pl.'s Opp'n at 4. That argument is a nonstarter. Federal courts sitting in diversity "apply the choice-of-law rules of the forum state." *Seed Co. Ltd. v. Westerman*, 832 F.3d 325, 331 (D.C. Cir. 2016). Here, of course, that means the court applies District of Columbia law. "D.C. choice-of-law rules . . . treat statutes of limitations as procedural, and therefore ordinarily mandate application of the District's own statute of limitations." *Jones v.*

*Kirchner*, 835 F.3d 74, 81 (D.C. Cir. 2016) (alteration omitted) (internal quotation marks omitted); *see also Seed Co.*, 832 F.3d at 331 ("The District of Columbia in turn requires us to apply its rules concerning the statute of limitations."). Thus, the District of Columbia's statute of limitations, not Florida's, governs this case.

Under District of Columbia law, "[a] claim for defamation must be filed within one year of accrual of the cause of action." *Maupin v. Haylock*, 931 A.2d 1039, 1041–42 (D.C. 2007). Generally, "the cause of action accrue[s], and the one-year limitations period beg[ins] to run, at the time the allegedly defamatory statement was published." *Id.* at 1042. However, in some defamation cases "where the defamatory statement is inherently undiscoverable," *McFadden v. Wash. Metro. Area Transit Auth.*, 949 F. Supp. 2d 214, 221 (D.D.C. 2013) (alteration omitted) (internal quotation marks omitted), courts have instead "applied the so-called 'discovery rule.'" *Id.* That rule provides that "the statute of limitations will not run until plaintiffs know or reasonably should have known that they suffered injury due to the defendants' wrongdoing." *Id.* (internal quotation marks omitted).

But it is not settled law that the discovery rule applies in every defamation case. The rule does not apply to defamation claims in the "mass media" context, where "the fact of injury . . . can be readily determined." *Chandler v. Berlin*, 998 F.3d 965, 971 (D.C. Cir. 2021) (alteration omitted) (internal quotation marks omitted). And "[t]he D.C. Court of Appeals has . . . expressly left open the question of whether the discovery rule should be applied where the statement was undiscoverable because a defendant concealed the material, or because it was not otherwise discoverable." *Id.* (internal quotation marks omitted). Here, the court is skeptical that the discovery rule applies because the statements at issue were not, at least as of April 20, 2017, "inherently undiscoverable." *McFadden*, 949 F. Supp. 2d at 221. Recall that Plaintiff admits to

receiving an unredacted version of the Report on or about that date. *See* Pl.'s EEO Compls.; Def.'s SOF ¶ 20. But both parties here assume that the discovery rule applies. *See* Def.'s Mem. at 16 (citing *Diamond v. Davis*, 680 A.2d 364 (D.C. 1996), and stating the discovery rule); Pl.'s Opp'n at 6 (asserting that "ADR Vantage does not appear to dispute the application of the discovery rule"); Def.'s Reply to Pl.'s Opp'n to Def.'s Renewed Mot. for Summ. J., ECF No. 93 [hereinafter Def.'s Reply], at 4 (again citing *Diamond* and discussing inquiry notice). So, the court will do the same.

Even under the discovery rule's more generous definition of the accrual date, Plaintiff's defamation claim is untimely. Under the discovery rule, "a cause of action accrues when a plaintiff knew or should have known through the exercise of reasonable diligence of: (1) the existence of the injury, (2) its cause in fact, and (3) some evidence of wrongdoing." *Momenian v. Davidson*, 878 F.3d 381, 388 (D.C. Cir. 2017) (internal quotation marks omitted). Here, Plaintiff had actual knowledge of those three elements at least by May 18, 2017, entirely apart from the copy of the unredacted Report he received the month prior.[5] He concedes that "[o]n May 18, 2017," Dr. Deborah Brennan, a USDA official, "made disparaging comments about Plaintiff's job performance" in front of him and his coworkers at the Miami office. Compl. ¶ 31; Gonzalez Ramos Dep. at 84 ("[S]he mentioned that the climate assessment found that the IT specialist was

---

[5] Both parties devote much time to discussing whether Plaintiff's receipt of the unredacted Report as part of the April 2017 Report of Investigation ("ROI") put Plaintiff on inquiry notice, thus starting the limitations period. *See* Def.'s Reply at 4–5; Pl.'s Opp'n at 11–14. The April 2017 ROI was prepared in response to "EEO Complaints [about] race, national origin[,] and reprisal for prior EEO activity" that Plaintiff had submitted. Pl.'s Opp'n at 7; *see* Pl.'s EEO Compls. at 4. It is certainly possible that Plaintiff's receipt of the Report in April 2017 is enough to have placed Plaintiff on inquiry notice, particularly given that, according to him, both the April 2017 ROI and the Report contain proof of reprisals and retaliation against him. *See Diamond*, 680 A.2d at 372 (explaining that "a cause of action accrues for purposes of the statute of limitations when the plaintiff has either actual notice of her cause of action or is deemed to be on inquiry notice" and that "inquiry notice is that notice which a plaintiff would have possessed after due investigation" (internal quotation marks omitted)). The court need not decide that issue, however, because Plaintiff's defamation claim is time-barred even based on a later accrual date.

defective in his performance."). He further admits that, "[a]ccording to Brennan[,] she based her comments in the findings of the Climate Assessment." Compl. ¶ 31; Gonzalez Ramos Dep. at 84.

Based on his own account, then, Plaintiff was aware by May 2017 that the Report contained unflattering statements about his job performance, and that it had been published to, at least, Brennan. He knew that Defendant was the source of the Report. Pl.'s Opp'n at 8–9; *see* Pl.'s Resp. to Def.'s SOF ¶ 6 (discussing Plaintiff's awareness of, response to, and decision not to participate in Defendant's climate assessment). And as Defendant notes in its reply brief in support of its motion for summary judgment, "Plaintiff alleges he was aware of a 'conspiracy' against him dating back to at least 2015." Def.'s Reply at 4. He thus knew of the existence of an injury, its cause in fact, and some evidence of alleged wrongdoing as of May 2017. *See Momenian*, 878 F.3d at 388. That is enough under the discovery rule to trigger the accrual of the limitations period. *Id.*; *see also Stith v. Chadbourne & Parke, LLP*, 160 F. Supp. 2d 1, 7 (D.D.C. 2001); *McFadden*, 204 F. Supp. 3d 134, 153 (D.D.C. 2016). Because Plaintiff did not file this action until July 18, 2018— more than a year after May 18, 2017, and so outside the one-year statute of limitations—his defamation claim is time-barred.

Plaintiff responds that "the statute of limitations began to run on October 20, 2017," when he received a "slightly redacted copy" of the Report in response to his FOIA request, less than a year before he filed his action. Pl.'s Opp'n at 13–14. The court disagrees. As discussed, Plaintiff learned facts relating to the existence of his injury, its cause in fact, and some evidence of alleged wrongdoing by Defendant when Brennan publicly criticized his work performance based on the Report's findings in May 2017. That Plaintiff learned *more* information in October 2017, when he received a less-redacted version of the Report (even though he already possessed an unredacted copy, as well as a "heavily redacted" copy from which he admits he could glean "negative

16

comments" about him, Gonzalez Ramos Dep. at 77), does not restart the limitations period. His filing of the Complaint in July 2017 therefore was untimely.

### B. Remaining Claims

In addition to his defamation claim, Plaintiff asserts claims for civil conspiracy, false light invasion of privacy, intentional infliction of emotional distress, and permanent injunctive relief. The relationship between these claims and the defamation claim compels summary judgment in favor of Defendant in full. The court briefly explains why this is so for each claim.

#### 1. *Invasion of Privacy (Count IV)*

The court begins with Plaintiff's claim for false light invasion of privacy. *See* Compl. ¶¶ 66–75. "[U]nder District of Columbia law, a false light claim requires a showing of: (1) publicity; (2) about a false statement, representation or imputation; (3) understood to be of and concerning the plaintiff; and (4) which places the plaintiff in a false light that would be offensive to a reasonable person." *Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 272 (D.D.C. 2017) (cleaned up) (internal quotation marks omitted). "[B]ecause the elements of a false light claim are similar to those of a defamation claim, courts often analyze the two claims in the same manner, particularly where a plaintiff rests both claims on the same underlying allegations." *Zimmerman*, 246 F. Supp. 3d at 274. Additionally, a one-year limitations period governs false light claims under District of Columbia law. *See Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1086 (D.C. Cir. 2007).

Here, Defendant's defamation and false-light claims are based on the same allegations: the allegedly false or otherwise damaging statements concerning Plaintiff that Defendant published in the Report. *See* Pl.'s Opp'n at 43 ("The previous discussions in the defamation section of this response should be sufficient to demonstrate that Plaintiff meets [elements] one through three [of

17

a false-light claim] . . . ."); *id.* at 23–25, 43–44; *see also Gonzalez Ramos*, 2018 WL 6680531, at *2 (noting that "Defendant's arguments as to defamation and false light invasion of privacy are one and the same"). As a result, Plaintiff's false-light claim suffers the same fate as his defamation claim, and Defendant's motion is granted as to the false-light claim.

2.   *Intentional Infliction of Emotional Distress (Count III)*

A similar analysis applies to Plaintiff's claim of intentional infliction of emotional distress ("IIED"). *See* Compl. ¶¶ 62–65. "In a claim for intentional infliction of emotional distress, a defendant will be liable only if he or she engages in (1) extreme or outrageous conduct[,] which (2) intentionally or recklessly causes (3) severe emotional distress to another." *Kerrigan v. Britches of Georgetowne, Inc.*, 705 A.2d 624, 628 (D.C. 1997) (internal quotation marks omitted). The "extreme and outrageous" conduct Plaintiff points to on the part of Defendant is its "publishing defamatory and false information about Plaintiff" in the Report. Compl. ¶¶ 64–65; *see also* Pl.'s Opp'n at 43 ("The accusations in the Climate Assessment that Plaintiff was abusing his access to the data, email and telephones of his co-workers and committing fraud, waste and abuse caused Plaintiff a reasonable fear of losing his job or being charged criminally."). Plaintiff correctly notes that "statements that are defamatory per se by their very nature are likely to cause mental and emotional distress," *Carey v. Piphus*, 435 U.S. 247, 262 (1978), and that some defamatory statements may therefore form the basis of an IIED claim, so long as each of the elements of the tort can be shown. Pl.'s Opp'n at 42–43. But because the statements at issue are subject to the common-interest privilege, Defendant cannot be held liable for them under what is effectively a defamation claim by a different name.

Moreover, because Plaintiff's IIED claim is "intertwined" with, and indeed "completely dependent on," his defamation claim, it "falls subject to" the one-year statute of limitations and is,

18

like the defamation claim, untimely. *Thomas v. News World Commc'ns*, 681 F. Supp. 55, 73 (D.D.C. 1988) (internal quotation marks omitted); *see also Burda v. Nat'l Ass'n of Postal Sup'rs*, 592 F. Supp. 273, 281 (D.D.C. 1984), *aff'd*, 771 F.2d 1555 (D.C. Cir. 1985); *Mittleman v. United States*, 104 F.3d 410, 416 (D.C. Cir. 1997) (observing that, under District of Columbia law, "emotional injury arising out of the publication of false statements, as from false light invasion of privacy, would be governed by the one-year statute of limitations").

The court grants Defendant's motion as to Plaintiff's IIED claim.

### 3. *Civil Conspiracy (Count II)*

Plaintiff's Complaint includes a freestanding "civil conspiracy" count. Compl. ¶¶ 54–61. "Under District of Columbia law, a civil conspiracy is not an independent tort but only a means for establishing vicarious liability for an underlying tort." *Nader v. Democratic Nat'l Comm.*, 567 F.3d 692, 697 (D.C. Cir. 2009) (cleaned up). It is "a theory of liability, not a separate cause of action that demands its own count." *Baird v. Holway*, 539 F. Supp. 2d 79, 91 (D.D.C. 2008). Because "a civil conspiracy claim incorporates . . . every substantive element of the underlying tort," *Nader*, 567 F.3d at 697, and because judgment will be entered against Plaintiff on his underlying tort claims, the same holds true for his civil-conspiracy claim. In addition, for good measure, civil conspiracy claims incorporate the statute of limitations of the underlying tort and thus Plaintiff's civil conspiracy claim is time-barred. *Nader*, 567 F.3d at 697 ("[A] civil conspiracy claim incorporates not only every substantive element of the underlying tort, but also its statute of limitations . . . .").

The court therefore grants Defendant's motion with respect to Plaintiff's civil conspiracy count.

        4. *Permanent Injunctive Relief (Count V)*

Finally, Plaintiff asserts a freestanding count for "permanent injunctive relief." Compl. ¶¶ 76–81. Because none of Plaintiff's theories of liability are viable, he is entitled to no relief. The court grants summary judgment on this "claim."

## V.     CONCLUSION

For the foregoing reasons, the court grants Defendant's motion for summary judgment as to all claims. A final, appealable Order accompanies this Memorandum Opinion.

Dated: September 29, 2021

Amit P. Mehta
United States District Court Judge